1   Anne Hadreas, SBN 253377
    DISABILITY RIGHTS CALIFORNIA
2   1330 Broadway, Suite 500
    Oakland, CA  94612
3   Telephone : (510) 267-1200
    Facsimile :  (510) 267-1201
4
    Melinda Bird, SBN 102236
5   DISABILITY RIGHTS CALIFORNIA
    350 S. Bixel Street, Suite 290
6   Los Angeles, CA  90017
    Telephone : (213) 213-8000
7   Facsimile :  (213) 213-8001

8   Attorneys for Plaintiff

9

10              **UNITED STATES DISTRICT COURT**

11            **NORTHERN DISTRICT OF CALIFORNIA**

12                   **SAN JOSE DIVISION**

13  | Disability Rights California, the California Protection and Advocacy Agency for Persons with Disabilities, | CASE NO.: |

14  **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

15                   Plaintiff,

16          vs.

17  County of San Benito; San Benito County Behavioral Health; and Alan Yamamoto, Director of San Benito County Behavioral
18  Health, in his official capacity,

19                   Defendants.          Action Filed:  April 4, 2019

20

21

22

23

24

25

26

27

28

**JURISDICTION**

1.     This Court has jurisdiction over the claims brought herein pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 2201.

2.     This action seeks to enjoin Defendant County of San Benito and its County mental health agency from continuing to deny Plaintiff Disability Rights California (hereinafter "DRC") access to witnesses and records needed to carry out an investigation into abuse and neglect of patients with mental illness.  Plaintiff DRC is the designated Protection and Advocacy System for people with disabilities in California and brings claims on its own behalf under the Protection and Advocacy for Individuals with Mental Illness Act (hereinafter "PAIMI"), 42 U.S.C. § 10801, *et seq.*

3.     Plaintiff DRC has a duty under the PAIMI Act and corresponding state law to investigate incidents of abuse and neglect against individuals with mental illness.  42 U.S.C. § 10805(a)(1)(A); California Welfare and Institutions Code (hereinafter "Cal. Welf. & Inst. Code") § 4902(a)(1).  This includes the authority to interview victims and witnesses and access confidential records. 42 U.S.C. § 10805(a)(4); Cal. Welf. & Inst. Code §4903.  Here, Plaintiff DRC is investigating serious and credible reports of abuse and neglect of psychiatric patients by Defendant County.  Defendant County has denied access to witnesses and records, violating Plaintiff DRC's rights under the law and frustrating its mission as a Protection and Advocacy system.  Plaintiff DRC also raises claims under 42 U. S.C. § 1983 for violation of its rights under color of state law.

**PRELIMINARY STATEMENT**

4.     Plaintiff DRC brings this action against the Defendants County of San Benito, San Benito County Behavioral Health (hereinafter "SBCBH") and SBCBH Director Alan Yamamoto. DRC has received multiple, credible reports that Defendants routinely detain County residents who are in psychiatric crisis in the emergency room of a local medical facility, Hazel Hawkins Hospital, for excessive periods of time without providing them with access to appropriate mental health treatment and potentially in violation of due process requirements.  The reports also indicate that Defendants held these patients involuntarily in conditions akin to solitary

confinement while they waited for appropriate placement and improperly curtailed their rights to challenge their detention.

5. Plaintiff DRC has made a finding that there is probable cause to believe that the abuse and neglect of County patients has occurred. It has begun an investigation into Defendants' practices, as is consistent with its role as the Protection and Advocacy system for the State of California. Plaintiff DRC has repeatedly requested access to witnesses and records to carry out this investigation, and has attempted to work with Defendants to ensure maximum efficiency and to minimize administrative burdens to the extent possible.

6. Defendants refuse to provide DRC with full access to witnesses and records, including the names and contact information of affected individuals, in violation of the PAIMI Act and implementing regulations and state law. DRC requires full access to this information in order to carry out its investigation and fulfill its statutory mandates under federal law. In particular, Plaintiff DRC seeks to compel Defendants to provide the names and contact information of psychiatric patients held involuntarily at Hazel Hawkins Hospital for more than twenty-four hours.

7. Plaintiff DRC has suffered and will continue to suffer irreparable injury as a result of Defendants' illegal denial of access to both information and witnesses of the alleged abuse and neglect. DRC's ability to conduct a full investigation, consistent with its role as California's Protection and Advocacy system, has been impeded and delayed. Without the evidence needed to complete DRC's investigation, the patients whom DRC is charged with protecting will also suffer irreparable injury since they will continue to be subjected to Defendants' practices that appear to result in abuse and neglect of people with psychiatric disabilities.

8. Plaintiff DRC hereby seeks the following relief: 1) a declaratory judgment that Defendants, by refusing to provide DRC the requested information, have violated federal law; 2) a temporary restraining order and preliminary and permanent injunctions requiring Defendants to provide access to all records and witnesses required for a full investigation, including names and contact information of individuals harmed by Defendants' policies; and 3) a preliminary and

permanent injunction forbidding Defendants from interfering, in any way, with DRC's statutorily authorized access to information, records and witnesses consistent with federal and state law.

## VENUE

9.     Venue is appropriate in this district pursuant to 28 U.S.C. § 1391(b) as a substantial portion of the events or omissions giving rise to Plaintiff DRC's claims occurred within this judicial district.  Defendants all reside in this judicial district.

## PARTIES

10.     Plaintiff DRC is a non-profit agency designated by the Governor of California as California's Protection and Advocacy System for persons with disabilities pursuant to California Cal. Welf. & Inst. Code Sections 4900(i) and 4901.  DRC's mission is to advocate, educate, investigate, and litigate "to advance the rights, dignity, equal opportunities, and choices for all people with disabilities."  DRC's work is guided by its Board of Directors, the majority of whom have disabilities, and by members of the PAIMI Advisory Council, who review DRC's work regarding people with mental illness.  DRC has standing pursuant to an express private right of action to enforce its authorizing statutes and to bring suit on behalf of its constituents. 42 U.S.C. § 10805(a)(1)(B); Cal. Welf. & Inst. Code § 4902(a)(2).  Plaintiff DRC files this Complaint in its own name to redress injuries to itself in fulfilling its mandate to protect and advocate for the rights of people with disabilities in California.

11.     Defendant County of San Benito is a public entity, duly organized and existing under the laws of the State of California. The County is located in the Central Coast region of California. The County has at all relevant times been responsible for the actions and/or inactions and the policies, procedures, practices, and customs of the San Benito County Behavioral Health agency.

12.     Defendant San Benito County Behavioral Health (SBCBH) is a division of the County of San Benito charged with ensuring access to mental health services to eligible residents, pursuant to Title 9, California Code of Regulations, § 1810.345.

13.     Defendant Alan Yamamoto is the Director of SBCBH and is sued in his official capacity only.

14.     Defendant SBCBH is the agency charged by state law with designating and training eligible individuals to write applications for emergency detention of individuals who are determined to be a danger to themselves, a danger to others, or gravely disabled pursuant to Welfare & Institutions Code § 5150, *et seq.*  *See* Cal. Welf. & Inst. Code § 5121.  Defendants' employees regularly write and sign these applications for detention and determine where these patients will be detained.

15.     SBCBH is the agency in San Benito County authorized to designate facilities for the evaluation and treatment of individuals detained pursuant to the Lanterman-Petris-Short Act. *See* Cal. Welf. & Inst. Code §5150. SBCBH has failed to designate any facilities under this authority, delaying access to evaluation and treatment for individuals with mental illness in San Benito County.

## PAIMI STATUTORY FRAMEWORK AND DRC'S AUTHORITY

16.     Congress enacted the PAIMI Act in the mid-1980s in response to the abuse and neglect of individuals with mental illness.  *See* S. Rep. No. 109, 99th Cong., 1st Sess. 2-3. Recognizing that individuals with mental illness are vulnerable and were subject to legal deprivations, Congress expanded the mission of the Protection & Advocacy (P&A) system to encompass the protection of individuals with mental illness and authorized additional funds to the P&A systems for this purpose.  42 U.S.C. §§ 10802(2), 10803, 10827.

17.     On May 9, 1978, the Governor of California designated Protection and Advocacy Inc. as the P&A system for the State of California.  Protection and Advocacy Inc. was subsequently renamed Disability Rights California and is the Plaintiff in this action.

18.     State and federal law require the P&A system to maintain the confidentiality of all and any of the records that it obtains during an abuse or neglect investigation to the same extent as is required by the service provider.  42 U.S.C. § 10806; *see also* Cal. Welf. & Inst. Code § 4903(f) (same).

19.     P&A systems such as DRC have the authority to monitor facilities and locations where services are provided to individuals with mental illness, which includes the right to reasonable unaccompanied access to such individuals.  42 U.S.C. § 10806(a); 42 C.F.R.

§ 51.42(b) - (d).  Under the PAIMI Act, P&A systems also "have the authority to investigate incidents of abuse and neglect[.]".  42 U.S.C. § 10805(a)(1)(A); *see also* Cal. Welf. & Inst. Code § 4902(a)(1) (same).

20.    A P&A system such as DRC has the authority to access individuals, including service recipients and others who may have knowledge of the abuse and/or neglect, confidential information, and records when abuse or neglect is reported to the agency or when the P&A finds that there is "probable cause" to believe that the incidents occurred.  42 C.F. R. § 51.42(b); 42 U.S.C. § 10805(a)(4)(B)(iii); Cal. Welf. & Inst. Code § 4902(b)(1).

21.    The regulations implementing the PAIMI Act include a definition of probable cause, which "means reasonable grounds for belief that an individual with mental illness has been, or may be at significant risk of being subject to abuse or neglect.  The individual making such determination may base the decision on reasonable inferences drawn from his or her experience or training regarding similar incidents, conditions or problems that are usually associated with abuse or neglect."  42 C.F.R. § 51.2.

22.    In the regulations implementing the PAIMI Act, "abuse" is defined broadly as "any act or failure to act by an employee of a facility rendering care or treatment which was performed, or which was failed to be performed, knowingly, recklessly, or intentionally, and which caused, or may have caused, injury or death to an individual with mental illness."  *Id.*  It also includes "any other practice which is likely to cause immediate physical or psychological harm or result in long term harm if such practices continue."  *Id.*

23.    In the regulations implementing the PAIMI Act, "neglect" is defined broadly as a "negligent act or omission by an individual responsible for providing services in a facility rendering care or treatment which caused or may have caused injury or death to an individual with mental illness or which placed an individual with mental illness at risk of injury or death."  42 C.F.R. § 51.2.  Neglect may include a failure to "establish or carry out an appropriate individual program or treatment plan"; "provide adequate nutrition, clothing, or health care"; or "provide a safe environment" with adequate numbers of appropriately trained staff.  *Id.*

24.     Protection and Advocacy Systems around the nation conduct investigations of abuse and neglect using their access authority under the P&A Acts, just as Plaintiff DRC has in this matter.  At times, other defendants have challenged the authority of P&A systems to obtain confidential information and access witnesses.  Over the last twenty years, scores of courts have upheld the right of P&A systems to pursue abuse and neglect investigations.  These court opinions in favor of P&A systems include two new decisions issued in the month of March 2019 alone.  *See, e.g.,* Disability Rights Pennsylvania v. School District of Philadelphia, Civ. No. 17-4858, U.S.D.C., E.D. Pa., 2019 WL 1405844 (Order filed 03/28/2019) and *Disability Rights Ohio v. Buckeye Ranch, Inc.,* Civ. Nos. 2:18-CV-894, 2:18-CV-906, U.S.D.C., S.D. Ohio, 2019 WL 1369400 (Order signed 03/26/2019).

25.     Congress intended P&A agencies such as DRC to be "effective" in protecting and advocating on behalf of people with disabilities.  *Mississippi Protection & Advocacy System, Inc. v. Cotten,* 929 F.2d 1054, 1058 (5th Cir. 1991).  Courts have found that, to be effective, P&A systems must have the discretion to make their own determination of probable cause regarding abuse or neglect, without prior judicial review.  *See, e.g., Protection & Advocacy for Persons with Disabilities v. Armstrong,* 266 F.Supp.2d, 303, 321 (D. Conn. 2003) ("it is by now a settled principle that the P&A is the 'final arbiter of probable cause for triggering its authority to access all records for an individual that may have been subject to abuse or neglect.'").

26.     California has a corresponding statute regarding the authority of the state protection and advocacy agency.  Cal. Welf. & Inst. Code § 4900 *et seq*.  The state statute is derived from the federal law and provides similar requirements for P&A access to individuals, reports, and records.

27.     In this case, Plaintiff DRC received multiple credible reports of abuse and neglect and has made a finding that there is probable cause to believe that incidents of abuse and neglect have occurred and may occur in the future when individuals are involuntarily detained at Hazel Hawkins Hospital for more than 24 hours.  DRC's finding that abuse and neglect have probably occurred and may occur in the future is based on the complaints it received, a review of San Benito County data and policies, and from an on-site inspection of Hazel Hawkins Hospital.

28.    Based on DRC's finding of probable cause, Defendants have an obligation to provide Plaintiff DRC with access to affected service beneficiaries or other persons, including those thought to be the victims of abuse and those "who might be reasonably believed by the system to have knowledge of the incident under investigation."  42 C.F.R. § 51.42(b); *see also* Cal. Welf. & Inst. Code § 4902(a)(1) (requiring the P&A to have access to individuals who are victims of the abuse or neglect as well as who "might have knowledge of the alleged abuse or neglect" if such incidents are reported to the P&A or when the P&A has probable cause to believe that incidents of abuse or neglect have occurred).

29.    Defendants also have an obligation to provide all records concerning the alleged abuse under 42 C.F.R. § 51.41(b) and Cal. Welf. & Inst. Code § 4903(a)(2)(C).  This obligation necessarily involves the requirement of producing names of the individuals involved.

30.    DRC has requested records and the names and contact information of those subjected to the alleged abuse and neglect and others who may have knowledge of the circumstances.  DRC has also requested copies of records for certain of these patients and may require additional records in the future as its investigation proceeds.  Defendants have provided limited information, but they have refused to provide essential and substantive information that DRC has requested pursuant to its access authority.  Defendants have refused to provide access to records, witnesses and patients, and will continue to refuse in the future.  In so doing, Defendants have violated 42 C.F.R. § 51.42(b) by refusing to provide DRC with the names and contact information of those affected, despite repeated requests.

### LEGAL RIGHTS UNDER THE LPS ACT

31.    The Lanterman-Petris-Short (hereinafter "LPS") Act was enacted to, *inter alia,* "end the inappropriate, indefinite, and involuntary commitment of persons with mental health disorders," "provide prompt evaluation and treatment of persons with mental health disorders," and "safeguard individual rights through judicial review."  Cal. Welf & Inst. Code § 5001.

32.    Under the LPS Act, when people are in a mental health crisis and are unwilling to accept treatment voluntarily, they can be held involuntarily, if they are thought to be a danger to

themselves, a danger to others, or "gravely disabled," meaning that they cannot provide their own food, clothing, or shelter.  Cal. Welf & Inst. Code §5008.

33.     The LPS Act established a statutory framework for a series of incremental involuntary holds for evaluation and treatment, starting with a 72-hour hold under Welf & Inst. Code §5150.  The initial process is commonly known as a "5150 hold."  Counties are authorized to "designate" inpatient psychiatric facilities to accept and treat patients on a 5150 hold.  Cal. Welf & Inst. Code §5150.  Practically speaking, patients are frequently taken to local emergency rooms initially to be "cleared" for physical health problems before transfer to a county-designated inpatient psychiatric facility for evaluation and treatment pursuant to the 5150 hold.  Non-designated facilities have immunity from liability for holding detained individuals only for the first 24 hours of a 5150 hold.  Cal. Health & Safety Code § 1799.11.

34.     Defendant San Benito County and SBCBH have not designated any facilities to hold psychiatric patients under Welf. & Inst. Code § 5150.  Instead, Defendant SBCBH holds patients in the emergency room of Hazel Hawkins Hospital – a general medical facility that offers no mental health treatment – until the patient can be transferred outside the county to a mental health facility designated by the other county, a process that sometimes takes several days.

35.     Because of the fundamental liberties infringed by involuntary treatment, patients treated under the LPS Act have specific delineated rights.  During the 72-hour period, the detained person has a right to assessment and evaluation on an "ongoing basis." Cal. Welf. & Inst. Code §5150(a).  Additionally, once a person detained under § 5150 is admitted to a facility designated by the county for 72-hour treatment and evaluation, they have a right to a prompt evaluation and "whatever treatment and care his or her condition requires for the full period that he or she is held."  Cal. Welf. & Inst. Code § 5152.

36.     For individuals held beyond 72 hours under the LPS Act, additional rights attach, including the right to a judicial determination of whether the person may be held for intensive treatment or must be released.  Cal. Welf. & Inst. Code § 5254.  The person being held also has

the right to counsel and the right to bring a writ of habeas corpus.  Cal. Welf. & Inst. Code §§ 5254, 5254.1.

37.     Mental health patients also have certain affirmative rights under the LPS Act, including the right to "treatment services which promote the potential of the person to function independently," the right to "prompt medical care and treatment," and the right to be "free from harm, including unnecessary or excessive physical restraint, isolation, medication, abuse, or neglect."  Cal. Welf. & Inst. Code § 5325.1.  Patients may only be placed in seclusion or restraint based on an individualized assessment that the restriction is necessary to protect the patient or others from injury.  Cal Code Regs., tit. 9, § 865.2.  Seclusion and/or restraints may never be used as a substitute for a less restrictive form of treatment.  Cal. Code of Regs., tit. 9, § 865.4.

**FACTS**

38.     After learning that all individuals detained under Cal. Welf. & Inst. Code § 5150 in San Benito County are taken to Hazel Hawkins Hospital, DRC conducted a monitoring visit of the facility in August 2018.  DRC staff toured the emergency department and met with Hazel Hawkins staff.  Hazel Hawkins Hospital is a non-designated general acute hospital in Hollister, CA, which has no mental health services of its own.  DRC learned that Defendants placed individuals in crisis on 5150 holds and then ordered them to be held in the Emergency Room at Hazel Hawkins.  Defendants provided them with no treatment, no individual or group therapy, no crisis intervention, and no opportunity to see a psychiatrist.  Patients were given little or no information about what to expect and how long they would be held.  DRC learned that individuals on 5150 holds were frequently left in the emergency room for more than 24 hours and in some cases for several days.  Clinical staff at Hazel Hawkins Hospital reported to DRC that they had to watch individuals "suffer" while detained in the emergency room because of the inappropriately long detentions, lack of treatment and lack of information regarding their holds.

39.     DRC also observed the conditions in which individuals on 5150s were held. Hospital staff noted that some patients were subjected to seclusion and restraint.  DRC found that Hazel Hawkins holds individuals on 5150s in a bare, windowless room, under seclusion, isolated from all others, for the entirety of their detention at the hospital. These conditions appear to

constitute unlawful seclusion in violation of Cal. Welf. & Inst. Code § 5325.1 and Cal Code of Regs, Title 9, § 865.2 and § 865.4.



[Photo description: Hospital bed in empty room at Hazel Hawkins, used for holding individuals on 5150s]

40.     The conditions DRC observed and the reports received supported a finding of probable cause of abuse and/or neglect of patients, including a violation of their right to be free from unnecessary seclusion and restraint, and their right to prompt and appropriate assessment and treatment under Cal Welf. & Inst. Code § 5150(a), § 5152 and § 5325.1.

41.     DRC reviewed 2018 data on 5150 holds at Hazel Hawkins Hospital and confirmed that Defendant held at least 32 patients in the emergency room for 24 hours or more.  At least 5 people were detained at the emergency room for more than 72 hours without treatment.  These patients were also denied the due process protections under the LPS act to which they were entitled after 72 hours had passed.

42.     Defendants' practice of holding psychiatric patients in the Hazel Hawkins Emergency Room without treatment is not new.  In 2016, the San Benito County Grand Jury released a scathing report of the Defendants' mental health system, finding Defendants lacking a

"clearly defined program to care for persons that need to be held involuntarily for mental care assessment (5150), through to evaluation and treatment" and "out of compliance" with the California Welfare & Institutions Code.  San Benito County Grand Jury Report, 2015-2016, (hereinafter "Grand Jury Report") p. 109, Exhibit A.  The report highlighted complaints about "[l]ong delays," including "very long" delays for individuals needs needing hospitalization – those most in need of services.  *Id.* at 95.  The Report found that during these extended detentions sometimes "many 5150s are written, called 'stacking.'"  *Id.*  In its conclusion, the Grand Jury found:

> The time between initial custodial hold and admission as an inpatient for a person in an involuntary hold under [the Welfare & Institutions Code] often exceeds 72 hours in [San Benito County], and not infrequently goes beyond a week. Reports indicate that patients are being held waiting in the [Hazel Hawkins Hospital Emergency Department] for as long as 14 days for further mental health evaluation and treatment.

*Id.* at 109.

43.     The Grand Jury Report also cited complaints that individuals held in Hazel Hawkins received no psychiatric treatment while detained in the emergency room.  *Id.* at 95. The Report noted that the County refused to provide recommendations to start treatment while they detained the person and had limited availability to consult on the care of individuals in psychiatric crisis.  *Id.*  The Report cited complaints that individuals were "languishing" in the emergency room without treatment.  *Id.* at 97.

44.     DRC has received additional complaints, as recently as this year, that Defendants routinely detained individuals with mental illness in the emergency room at Hazel Hawkins Hospital for extended periods.  At least one of the incidents resulted in a complaint to the California Department of Health Care Services.

45.     Defendants have not disputed DRC's findings that Hazel Hawkins Hospital has no mental health staff, offers no mental health treatment, leaves psychiatric patients alone in a bare room, and is unable even to continue a patient's medications.  Additionally, in the San Benito County Board of Supervisors' a response to the Grand Jury Report in 2017, they admitted that multiple people had been held more than 72 hours, one for a full 14 days.

1

**INFORMATION REQUESTS & ON-GOING INVESTIGATION**

2     46.     In a letter dated December 3, 2018 to Defendants, DRC informed Defendants of its

3 findings of probable cause regarding abuse and neglect of psychiatric patients held on 5150s in

4 Hazel Hawkins Hospital.  DRC informed Defendants of the basis for this finding, referencing the

5 multiple complaints of inappropriately long detentions in the emergency room, the reports of

6 inadequate care and treatment, the County's history of these practices and lack of appropriate

7 facilities or protections for individuals on 5150 holds.  DRC explained its statutory authority to

8 pursue further investigation and requested policies and patient information, including the names

9 and contact information of those held in the Hazel Hawkins Emergency Room for more than 24

10 hours.  DRC requested that Defendants produce this information no later than December 10,

11 2018.

12     47.     Between December 10, 2018 and February 27, 2019, Defendants requested

13 repeated extensions of time in which to respond.  DRC agreed to these requested extensions.

14     48.     Defendants objected to producing certain information, such as names and contact

15 information.  DRC provided extensive information in writing for its statutory authority to obtain

16 confidential information and reiterated its duty to keep all responsive information as confidential

17 as was required of Defendants.  DRC also provided examples and settled case law, evidencing

18 the frequency with which DRC and other P&A agencies conduct similar investigations and

19 prevail in court when their access authority is challenged.

20     49.     On February 27, 2019, Defendants produced the names and contact information for

21 six patients who had been held on "stacked" 5150s in 2018, effectively abandoning its objections

22 based on confidentiality.  At the same time, Defendants refused to provide a "[l]ist of all

23 individuals, including contact information if known by SBCBH, held at Hazel Hawkins Hospital

24 for more than 24 hours since January 1, 2018, including documentation of how long they

25 remained at Hazel Hawkins," as DRC had requested.  On information and belief, this list consists

26 of approximately 30 people, meaning that Defendants have provided a small fraction of the

27 information DRC has requested pursuant to its access authority. Defendants stated that the basis

28

of their refusal related to questions regarding the scope and propriety of DRC's probable cause determination.

50.     On March 4, 2019, DRC again outlined the basis for its probable cause determination.  Defendants requested another extension of time to consult further with the County Board of Supervisors.  In an effort to avoid costly litigation, DRC agreed.

51.     On March 20, 2019, Defendants' counsel, after acknowledging "the patience that DRC has already exhibited in this matter," requested another extension until April 2, 2019 to bring the matter back to the San Benito County Board of Supervisors. DRC agreed to a new deadline of April 2, 2019.  However, DRC stated that, given the importance of the investigation and the numerous extension it had already given, if Defendants did not provide the requested information by that date, DRC would seek declaratory and injunctive relief in federal court.

52.     On April 2, Defendants' counsel did not respond to DRC's requests.  On April 3, Defendants' counsel informed DRC that Defendants would not provide responsive information to DRC's request absent a court order.  To date, DRC has not received the names and contact information of individuals held at Hazel Hawkins for more than 24 hours on 5150 holds.

53.     On April 3, 2019, Defendant County filed an action for declaratory relief in the superior court of San Benito County.  *County of San Benito v. Disability Rights California,* Case No. CU-19-0060.  The County's state court complaint seeks "judicial determination of Plaintiff's duty to disclose confidential patient information."  The County filed this action immediately after counsel for Plaintiff informed the County that, after protracted attempts to resolve this matter without litigation, DRC intended to file this action in federal court to vindicate its access authority under federal law.  The County's state court action appears to be an attempt to avoid a federal forum for the resolution of this issue of federal law.  The County's state court complaint acknowledges, as it must, that DRC has requested information "pursuant to federal law as the protection and advocacy agency for the State of California," and that "under federal law, the protection and advocacy agencies must have authority to investigate incidents of abuse and neglect." Plaintiff intends to file a notice of removal of the state court action  to this Court as a question arising under federal law under 28 U.S.C. § 1446.

54.     As a result of Defendants' refusal to provide the requested information, access to potential victims of and witnesses to abuse and/or neglect, DRC is unable to complete its statutorily mandated investigation into the detention and treatment of individuals involuntarily detained for psychiatric treatment in San Benito County.  Individuals held beyond 24 hours in the Hazel Hawkins emergency room are either themselves the victims of abuse or neglect or may "be reasonably believed by [DRC] to have knowledge of the incident under investigation."  42 C.F.R. § 51.42(b).

## CLAIMS FOR RELIEF

**First Claim for Relief—Violation of the Protection and Advocacy for Individuals with Mental Illness Act (PAIMI)**

**(Access to Individuals, General Information, and Records)**

55.     Plaintiff DRC incorporates and re-alleges the foregoing paragraphs as if fully set forth herein.

56.     The PAIMI Act (42 U.S.C. § 10805(a)(1)(A)) authorizes DRC as the protection and advocacy system for California to investigate incidents of abuse and neglect of individuals with mental illness.

57.     The PAIMI implementing regulations require that Defendants provide DRC the "the opportunity to interview any facility service recipient, employee, or other persons, including the person thought to be the victim of such abuse, who might be reasonably believed by the system to have knowledge of the incident under investigation."  42 C.F. R. § 51.42(b).

58.     Under 42 C.F. R. § 51.42(b), DRC has the authority to access service recipients and witnesses, when one or more of the following is true:

1.     An incident of abuse or neglect is reported or a complaint is made to the P&A system;

2.     The P&A system determines there is probable cause to believe that an incident has or may have occurred; or

3.     The P&A system determines that there is or may be imminent danger of serious abuse or neglect of an individual with mental illness.

59. Here, although only one criterion must be present, DRC has satisfied both (1) and (2). DRC received multiple, credible reports and complaints that individuals with mental illness have been subjected to abuse and/or neglect while they are detained by Defendants for more than 24 hours under Cal. Welf & Inst. Code §5150 in the Hazel Hawkins Emergency Room. Additionally, DRC has made a finding that it is probable that incidents of abuse and neglect have occurred. DRC's determination regarding abuse and neglect is based on multiple reports, a review of county data and policies and from an onsite inspection of the conditions in which Defendants detain patients.

60. Based on this finding and complaints, DRC requested the names and contact information of those subjected to abuse and neglect or who may have knowledge of incidents of abuse and/or neglect. Defendants have violated 42 C.F.R. § 51.42(b) by refusing to provide DRC with the names and contact information of all those affected, despite repeated requests.

61. Defendants have an obligation under 42 U.S. C. § 10805(a)(4) and 42 C.F.R. § 51.41(b) to provide all records of any individual, including those whose whereabouts are unknown, when the following conditions are met:

    (i) The individual, due to his or her mental or physical condition, is unable to authorize the P&A system to have access.

    (ii) The individual does not have a legal guardian, conservator or other legal representative, or the individual's guardian is the State or one of its political subdivisions; and

    (iii) A complaint or report has been received and the P&A system has determined that there is probable cause to believe that the individual has been or may be subject to abuse or neglect.

62. DRC has received complaints that Defendants detain individuals in the Hazel Hawkins Emergency Room for more than 24 hours without treatment and in illegal seclusion. Based on those reports, a review of available data, and a monitoring inspection of Hazel Hawkins Hospital, DRC has found probable cause to believe that these patients have been subjected to abuse and/or neglect.

63.    Defendants have not provided information that any of these individuals have legal guardians or conservators who are not a government agency.  Without access to these individuals, DRC does not have knowledge of whether they are unable to authorize DRC access to records.

64.    DRC has requested records from Defendants that will indicate their names and contact information.

65.    Defendants have violated 42 U.S.C. § 10805(a)(4)(B)(iii) and 42 C.F.R. § 51.41(b)(2) because they have refused to produce these records without justification and despite repeated requests.  By refusing to provide DRC access to requested information and records, Defendants has violated the PAIMI Act and the regulations promulgated pursuant to the statute.  Additionally, by refusing to provide DRC access to individuals and records, Defendants have frustrated DRC's purpose as an "effective" Protection and Advocacy agency.  DRC has been unable to fully investigate the alleged incidents of abuse and/or neglect in a timely manner as mandated under federal law.

66.    DRC has no adequate remedy at law.  There is no administrative remedy to exhaust.

### Second Claim for Relief

### Violation of Rights under Color of State Law – 42 U.S.C. § 1983

67.    Plaintiff DRC realleges the matters set forth above in the paragraphs above as if fully set forth herein.

68.    The PAIMI Act provides Plaintiff DRC with the right, duty and authority to investigate incidents of abuse and neglect of individuals with disabilities, including those with mental illness. 42 U.S.C. § 10805(a)(3) and 42 C.F.R. Part 51. Plaintiff DRC is authorized to interview witnesses and access records related to allegations of abuse and neglect.

69.    Defendants' acts and omissions as set forth above were carried out under color of state law and violate 42 U.S.C. § 1983 by depriving Plaintiff DRC of rights under the PAIMI Act, 42 U.S.C. §§ 10801 *et seq.*

70.     Plaintiff is entitled to recover its attorneys' fees, costs, and expenses in this action pursuant to 42 U.S.C. §1988.

### DECLARATORY AND INJUNCTIVE RELIEF IS WARRANTED

71.     Plaintiff DRC repeats, reiterates, and realleges all of the foregoing, as if fully set forth herein.

72.     Plaintiff DRC has standing to bring this action on its own behalf, because the refusal of access by Defendants constitutes an injury in fact to DRC's legally-protected interests and the interests of its constituents.  This injury is concrete, particularized, actual, and imminent. There is a causal relationship between the injury and Defendants' challenged conduct, and a favorable decision by this Court will address the injury.

73.     Due to Defendants' violations of the PAIMI Act, DRC is irreparably harmed as it is prevented from carrying out its responsibilities under those Acts.

74.     Further, due to Defendants' denial of Plaintiff DRC's rights under the PAIMI Act, patients with mental illness in San Benito County are irreparably harmed.  These patients are injured because they are deprived of the benefit of a full investigation into the existence and extent of abuse and neglect while they were detained or if they are detained in the future by Defendants in Hazel Hawkins Hospital.

75.     Unless Defendants are enjoined to provide to DRC the access required by federal and state law, DRC and its constituents will continue to be irreparably harmed as DRC will be unable to protect and advocate for persons with disabilities consistent with federal and state law.

### PRAYER FOR RELIEF

76.     Wherefore, Plaintiff DRC respectfully prays that this Court grant it the following relief:

a.     Enter a declaratory judgment that Defendants' refusal to provide the information, records and access to witnesses requested by DRC, including but not limited to names and contact information of individuals held for more than 24 hours on detentions under Cal. Welf. & Inst. Code § 5150, is in violation PAIMI Act, and further declare that Defendants' failure to grant Plaintiff DRC access to witnesses

18

1   and records required to investigate the abuse and neglect of psychiatric patients

2   held at Hazel Hawkins Hospital violates Plaintiff's rights under 42 U.S.C. §10805

3   (a) (4) (A) and 42 U.S.C. §1983;

4   b.   Preliminarily and permanently enjoin Defendants to provide to DRC the access to

5   information, records, and witnesses it requires to investigate abuse and neglect of

6   psychiatric patients held at Hazel Hawkins Hospital, including but not limited to

7   the names and contact information of individuals held for more than 24 hours on

8   detentions under Cal. Welf. & Inst. Code § 5150;

9   c.   Preliminarily and permanently enjoin Defendants from interfering, in any way,

10   with DRC's access to individual program recipients, witnesses, records, and related

11   information;

12   d.   Waive the security requirement of Rule 65(c);

13   e.   Order Defendants to pay Plaintiff DRC's reasonable attorneys' fees and costs

14   under 42 U.S.C. § 1988; and

15   f.   Grant DRC such other and further relief which to this Court seems just and proper.

Respectfully Submitted

Dated:  April 4, 2019                    DISABILITY RIGHTS CALIFORNIA


_____/s/  Anne Hadreas_____
Anne Hadreas

## EXHIBIT A

*Disability Rights California v. County of San Benito, et al.*

### San Benito County Grand Jury
### Final Report
### 2015-2016

# EXHIBIT A



# SAN BENITO COUNTY
# GRAND JURY

## FINAL REPORT
# 2015 - 2016

Date _____

**Ann C. Ross, Foreperson**
**2015-2016 San Benito County Civil Grand Jury**

# Table of Contents

Abstract……………….…………………………………………………… 3

List of Jurors ………………………………………………………… 5

Foreperson Letter…………………………………………………… 9

A Summary of California Guiding Legislation:
Civil Grand Juries;
San Benito County Interpretation and Ordinance…...........................13

Final Reports:
County Parks Pedestrian Safety…………………………………..25

The San Benito County Special Education Local Plan Area
Individualized Education Program (IEP)…………………………35

Gophers at School in Hollister School District………………...41

"The Jewel on the Hill" Hazel Hawkins Memorial Hospital
Emergency Department……………………………………………51

A California Payment Method for Procurement
 "CAL-Card" in Hollister Government………………………….. 63

San Benito County Jail……………………………………...69

San Benito County Juvenile Hall……………………………..79

Psychiatric Hold and Treatment
SBC issues in Public Healthcare Management………….…….83

Officials and Management Distribution Reports Summary………….121

# San Benito County Consolidated Grand Jury Report
## 2015 - 2016

ABSTRACT

BY, ANN C. ROSS

*This consolidated San Benito County Civil Grand Jury Report summarizes successes found and some areas where additional efforts are needed in local leadership. Excellence in educational services for special needs children and in managing our community hospital's emergency department contract service is indicated. Sizeable efficiency in the City of Hollister's CAL-Card program is another success. While the County Jail and Juvenile Hall benefit from an outstanding and dedicated staff, it is understood that both detention centers are experiencing new challenges. This report highlights the civil distress determined where more collaboration is necessary among agencies to deliver the necessary health management for those in need of emergent psychiatric care. Finally, this report provides some recommendations on which county leaders may consider where needed.*

*San Benito County Civil Grand Jury*

*P.O. Box 1624*

*Hollister, CA 95024*



*List of Jurors*

*San Benito County Civil Grand Jury 2015-2016*

*Alphabetized:*
*Velma Bittelcomb*
*Carroll Buck*
*Fannie Curro*
*James Egan*
*Orlando Farias*
*Gene Hopp / Pro Tem*
*Linda Hopp*
*Paula Mercier*
*Grace Navarro*
*Elizabeth Painter*
*Kimberly Parsons*
*Linda Regan*
*Ann C. Ross / Foreperson*
*Jose Silva*
*Manuel Solis*
*Juan Solono*
*Michael Wedekind*



*Foreperson Letter-*

*A term on the grand jury can be a little bit Colombo and a little bit Crossfire; engaging panelist, investigator, fact-finder, essayist, provoker. This form of civic duty is unique. Picture a room filled with the busy activity of lively roundtable discussion amongst the most interesting people, a plethora of outlooks and array of experiences. There is no hierarchy or set decision maker - all members are equal. Through trial and experience the team ultimately becomes adept at reasoning together through animated but confidential dialogue and amid eclectic backgrounds, knowledge, and skill sets – and of course, differing opinions. It is something one doesn't ordinarily experience. Meetings of this jury, at their best, elicited remarkable sessions that explored each other's ideas to determine pathways and define options even amid a limited backdrop provided to do their job.*

*The task seems straightforward; to look into depth about topics believed to be of interest or concern to county residents and to politely ask the questions and gather data to get to the bottom of an issue. Matters can arise because journalists piqued community interest but could only provide a summary, which subsequently raised more questions. That's what happened in evaluation of the CAL-Card program used by the City of Hollister.*

*Annual inspections were conducted. Through doing so, a theme surfaced about how the most vulnerable in our community may be experiencing our county services. This initially occurred in a review of the County Jail and Juvenile Hall. Our county's special needs students fare well in SBC with IEPs, yet our community still needs to find its way towards improved mental health care for family or friends placed in civil commitment.*

*Several aspects of our county are running smoothly and some less so. Hazel Hawkins Hospital, County Parks, and Gopher population reviews brought forth a few areas needing just a bit of enhanced coordination between local agencies, while others areas indicated a greater amount of collaboration and leadership efforts are needed to streamline and optimize operations.*

*Working as a jury to report, though extremely interesting, wasn't as simple or straightforward as it could or should have been. Instead of an annual "begin again"; in SBC the grand jury is more of an annual "starting over". And, due to a newly implemented County Ordinance, this Jury worked under an unprecedented working environment among the other 57 counties in the State of California as well as in the recent history of San Benito County. The jury setting in SBC was already in the position to have to "start over" annually as a result of the lack of carry over physical support, dedicated assistance with administration and structure to maintain necessary continuity for local procedures. What is missing to effect continuity is an unshared, committed area for confidential meetings; standard ability to ensure confidential digital correspondence and the ability to centrally*

*maintain secure data; ability to draft and complete formal, confidential report writing; and ensured annual funding for training, supplies, and materials.*

*But then, just prior to this Jury's term, the Board of Supervisors' passed the new Ordinance (adopted "new" based on interpretation from 1993) that not only took action that disregarded bringing the jury up to date in needed support or stipends but interfered with statewide generally practiced research and reporting procedures. This manipulation resulted in further limits and increased control of jury operational structure and output by challenging the legality of financing Civil Grand Jury research and operations. This was even added to a long-standing previously approved annual capital expense rollover.  What was taken away and kept from this Jury's access by the Board of Supervisors are that which ALL other CA counties have (even the poorest), some of what SBC juries already had, and that which has long been recognized as standard practice in the State of CA by the California Jurors Association (whom oversees and conducts all training). This Jury was without rollover of dedicated space to seat the county's annually anticipated 19 jurors whom are to meet and work and to store current and previous instructional files; without rollover of standardized computer software planned for secure report writing or basic dedicated computer hardware and established IT support; or even an inventory of basic standard office basic office supplies as folders, staplers, hole punch, binders, paper, ink, etc., Nor, was the jury able to be seated with a timely team of willing trained volunteer jurors that happened to have the access to personal digital equipment, smartphones, or supplies that the Supervisors hoped for so this support doesn't have to be provided.  After attempting to follow the new antiquated local legal restriction in concert with the lacking resources, the jurors (many of whom hadn't been formally trained) reluctantly resigned to conduct "unofficially BOS endorsed" work in committees at various "pick-up" locations, on various non-secure computers, while for another year carrying around confidential materials and working and storing files out of the back of their cars and in their garages. The combined effect was to render all steps: exploring ideas, investigation, drafting, writing, meeting, and finally printing to either be at best more lengthy and problematic than any year preceding this jury (where at a minimum regular committee work was at least recognized to be a critical aspect of jury operations), or truncated entirely.  CA Civil Grand Jury operations and CA State Civil Juror's Association recommendations simply do not have the acknowledgement and support in San Benito County even though it is CA State and Superior Court sanctioned.  Perhaps some other SBC grand juries can or will adapt to the archaic and haphazard format to which it is subject, but not without cost.  In my opinion, to provide our county residents with consistent quality work output when jury reporting is already subject to inherent procedural restraints cannot also be subject to a long list of other bureaucratic barriers and limitations placed upon them by the BOS.  If so, the spirit intended by the truly unique State of CA counties' mandate to conduct civil investigations upon elected officials cannot be dependably, effectively, achieved in San Benito County.*

*In the meantime, I hope an eye will be kept out for what happens next as a result of some of the attention the jury could bring to the topics of interest presented.  The findings that*

*encompass the recommendations are made in the best interest of all – even for those whose agencies were evaluated. After you set the reporting aside please attend to watch and see if the impact of the work completed in our county under less than equal working conditions and resources and see if the results bring some of the effect you want.  Is the follow-up what you expect from our leadership? If you're unhappy that some elected officials provide perfunctory answers and then set reporting aside as they seem to do to the jury, then speak up.  Or, join the SBC Civil Grand Jury and continue to ask for ensured improvement in jury resources and quality and establish continuity toward excellence.  I believe the jurors all had an interesting experience. They also crafted work for the furtherance of betterment - against far too many barriers.*

*Ann C. Ross*

**A Summary of California Guiding Legislation:**
**Civil Grand Juries;**
**San Benito County interpretation and Ordinance**
*Prepared by, Ann Ross*

*GOVERNMENT CODE –*
*TITLE 8. THE ORGANIZATION AND GOVERNMENT OF COURTS [68070 - 77655] (Title 8 added by Stats. 1953, Ch. 206. )*
*GOV SECTION 68070-68114.10*
*CHAPTER 1. General Provisions [68070 - 68114.10]*
 *(Chapter 1 added by Stats. 1953, Ch. 206. )*

*TITLE 4. GRAND JURY PROCEEDINGS*
*CHAPTER 1. General Provisions 890*
*The current operations of the Civil and Criminal Grand Jury are governed by the Penal Code beginning at 888 through 939.91.*
*2013 California Code Penal Code - PEN*
*PART 2. OF CRIMINAL PROCEDURE*

**The Foundation of the CA Grand Jury**.
Grand Juries have existed in CA since the state's original constitution of 1849-50, and 1879. (Article I. Sec 23, 24)

Though a civil grand jury has the backing of the CA Constitution, its resource law is derived from both rules and interpretations.  Grand juries fall under the scope of Rules of Court (Standard 10.50), CA Government Code and the CA Penal Code. When CA adopted its Penal Code, the grand jury was directed to and *"authorized to investigate county government and function specifically as watchdogs over county governments."* The Penal Code was the first to officially incorporate the term "Watchdog" to refer to the purpose of the Civil Grand Jury.

This guiding law, in the CA Penal Code, section 888; explains, …"*The grand jury in each county shall be charged and sworn to investigate matters of civil concern*."

The court decision *[Monroe v Garrett (1971), 17 Cal App 3d 280]* further supported the civil grand jury's authority stating "*…a grand jury is **the only** agency...that has the opportunity to see the operation of the local government on any broad basis… presenting conclusions from that overview…they should be **encouraged** and not prohibited"*.

To seat civil jurors, the CA Superior Court in each county typically select and appoints jurors from a pool of qualified *volunteers*. Courts may typically select 6 jurors from each supervisorial district for the initial pool of 30 and then conduct extensive interviews and outreach for other qualified citizens.

CA Penal Code 916 provides the law that each unique grand jury has the authority to decide for itself what, of the things it is empowered to do, it wants to do.

Combined CA legislation provides mandates about why, what, and who, for the civil grand jury, but not the **how**. The how was left subject to further interpretation than the constitutionally law mandated.  County governments and grand juries found they needed guidance about how to get the job done to meet this unfunded state mandate.

The recommended **how** instruction grand juries and local governments in CA receive now is from the California Grand Jurors Association (CGJA, 1997- present).  This organization is sanctioned by the Courts of California.  With the training the CGJA provides each new jury does not have to completely "reinvent the wheel". The Association proliferates a set of best general practices based on its years of collective information, institutional knowledge, and experience.

One of CGJA's "best practices" is to form various committees to study citizen complaints and areas of interest. The jurors are instructed that it is optimal to establish several committees in various areas of interest such as Research, Report Writing, Detention Centers, County, City, Special Districts, etc., at the beginning of the term, assign jurors to those committees, and then jurors within committee collectively select areas they believe need some study, investigating, or on which to work. Once an area of interest or path is chosen by a committee and approved by the jury plenary, the committee will evaluate agencies' or districts' procedures and systems to determine successes or those problematic, conduct in-depth research, and prepare reports. The committee members bring updates to the full jury at the less frequent plenary meetings for discussion and decision making, as needed.

The CGJA's mission is also to centralize information to proliferate any legal updates, and changes in law, rules, and interpretations.  The Association publishes a _Compendium of California Grand Jury Law_ (www.cgja.org) for reference. Much of the information discussed in this section is found in this Compendium. The CGJA can help assess procedures and data about juries' relationships with local elected officials and is the resource for determining the counties with the most proficient jury structures. CGJA is the institutional knowledge from the combined history of all 58 CA county civil grand juries about how to get their important job done. CGJA conducts this annual fee-based training to update related resource law and best practices. San Benito County does not budget or pay for this crucial annual training, or copies of the annual printed compendium and updates for the jury or the county counsel, courses and travel for Foreperson/Pro-Tem training, or other courses for Report Writing that the CGJA offers annually and that the other 57 counties regularly attend.


**The Purpose.**
The grand jury's official purpose is to investigate local governments as an independent body; operationally separate from the entities and officials it investigates. Their work will look inside agencies' processes similar in such a way as a consulting organization might

- to find if procedures work as intended. A jury must conduct its investigations with a broad access to public officials, employees, records, and information (and can ensure cooperation by utilizing the CA Public Records Act 10-day window of compliance, as needed).

The grand jury's will implement fact-finding efforts to look at areas of interest in the county that surface, then provide their Findings of support or concern, and provide Recommendations for improving government operations and enhancing responsiveness. In this way, the grand jury acts as a *representative of county residents in promoting government accountability.*

**Jury Research**

*The grand jury is a judicial tribunal from whose decision there is no appeal. (In re Kennedy, supra) Greenburg v. Superior Court for the City and County of San Francisco (1942).* Grand jury reference law in this case speaks to both criminal and civil findings; but in the case of a *civil grand jury* it establishes that their Findings with respect to local government and leadership cannot be appealed. Agencies, according to law, cannot request that investigative decisions by a civil grand jury be set aside instead of addressing them directly. Since the CA civil grand jury is expected to do research, *originating from the people of the county*, the same people to whom the leaders are held accountable, this is an important note. Along similar line, the agencies should conduct careful research to ensure their responses to the people about their concerns, which prompted the jury to investigate, are comprehensive and acceptable to the people.

In other policy, CA addresses the issue that a government that is not transparent is more prone to corruption and undue influence because there is no public oversight of decision-making. Laws that address this concept are sometimes referred to as "sunshine laws," or open government laws. In California, the **Brown Act**, located at California Government Code 54950 et sec., is our sunshine law; a legislative act passed in 1953 to specifically address the need for transparency in CA government.

Law guiding Officials' Responses to Grand Jury Findings and Recommendations is found in CA Penal Code 925-933.6**.** This law explains what the head of agencies and government officials must do in response to a grand jury investigation.

Grand jury Findings are presumed factual because false declarations before a grand jury are a crime (Penal Code 888) AND because juries **must** triangulate each Finding (i.e. confirm what is indicated using at least *three different types* of sources). Juries and constituents should expect to see officials reply to Findings with diligent research. Juries and the people of the county are to expect that Findings not be set aside by elected officials as "simply incorrect" without further information or  perhaps other data provided as proof.

The Finding and Recommendation must each be addressed as a matter of public record by the agency.  If the Board or agency head disagrees with any Finding or a

Recommendation, the official must explain why to the public, but may not have any Finding be rescinded.

So, the civil grand jury is then not just simply state and county *sanctioned* for the people, it is state *mandated* for the people - for a reason. The jury functions to assist elected officials manage its resources by receiving unbiased reviews of their management effectiveness and oversight.  By nature of the Board's structure and sunshine law, these officials may not be able to uncover systemic inefficiencies among themselves about themselves and require this varied angle of perspective.

Jury research is confidential. Reporting by a grand jury does not identify those interviewed. Penal Code section 929 requires "*that reports of the Grand Jury not contain the name of any person who provides information*".  Further, jurors may not make any reference that may identify a person.  All indications are to be stricken from formal reporting.  Even though the final report is public record, all jurors' notes, files, records, including emails and computer files must be kept confidential, binding for **life**, and may **not** be subpoenaed by any court. It is a crime for a civil grand juror to speak about his or her interviews, data collection, or discussions in committee or plenary.

To facilitate necessary confidentiality, a year-to-year established ability to be able to meet securely, and keep files, data collection, interview notes, photographs, correspondence between jurors, correspondence from county citizens, and have technology and support for report writing, and storage **is a baseline** of the jury processes. Without this, 1) Security/interviewing/discussions can be compromised, 2) Continuity of local operational points of contact and procedural logistics is lost, 3) The time used by a new jury to establish and rework to achieve the baseline can use a large part of their term - that is, before they can even begin to research the jury must work to get these criteria in place.  There are many juries that do not have any prior year carry over personnel.  Even if there are some jurors that either move on to the following year's jury or are accessible for reference, conversations, meetings and discussions between prior and current jurors is minimal *by design due to confidentiality*.

Without established baseline support, such basics as keys, binders of agencies' point of contacts, local codes and procedure manuals, IT information and any other carry over materials can be lost - in some cases significantly aggravating time constraints and the confidence of the process. With dedicated local physical support, computer processes and IT support, methods for secure correspondence report writing, information flow, and consolidated printing logistics information can be maintained from year to year. Even with dedicated support, it can happen that confidentiality is suspected to be breached during the term, say from a juror resignation, causing a rework of the systems in place that can also be time-consuming.  It makes sense then that each new jury not be asked to completely establish their own local baseline logistics of what equipment, where to meet, what chairs, and which software system to use etc., at the start of each jury term.

**What happened to the San Benito County Civil Grand Jury for this report?**
The 2015-2016 Grand Jury did not re-address the inherent conflict of interest of watchdog role to the BOS or reduced compensations in its consolidated report as a plenary. What is reported here instead is a debrief summary of the operational and observational experience of the first year of impact of the BOS's decision to officially not recognize jury work via stipend and that impact added to the missing baseline support that is provided in all other CA counties. Additional context of the impact of the working conditions of the jury was also provided in the Foreperson Letter.

Along with the ease of observation of a continuing need for local workspace and critical digital secure operational logistics, is the need for jury media continuity (web page, twitter account), and a seat at the table for budget negotiating.  Despite requests to assist with all constraints mentioned here and in the Foreperson Letter, the only recent actions taken by the SBC BOS applicable to the jury was to continue to question publically up to the present why the jury does what it does, needs what it needs, and take action to move the jury into *further incongruence* with CGJA best practices. Simply, since the Foreperson and jurors change annually/regularly, the BOS can every so often respond with "civic responsible sounding resource" questions about what?, why?, and who? is watching the jury for extravagances, waste, and misuse of resources. This forces the seated jurors to "make it through the term" only to have the routine the following year with the same supervisors but new jurors kicking off the the cycle by looking for office space. At this point, it may be time the question is posed, WHO IS watching out for the jury since the BOS is not and by extension not watching out for its constituents.  When made clear through traditional channels provided to the jurors, the BOS doesn't respond with the best interest of its jury and therefore not the best interest of its constituents. That is: to support the San Benito County's Civil Grand Jury in its mission to provide unbiased review of county, city, and special district officials and management.


**San Benito County Civil Grand Jury – The New/Old Ordinance.**
The SBC Ordinance placed on the SBC civil jury in 2015 follows the below reference points:

- CA law says the BOS is required to provide the funding to support its annual grand jury. The prior year's jury came into conflict with the SBC BOS about standards for budgeting and compensation for duties. The SBC is expected seat and pay 19 annual jurors, with 12 being required to be present as quorum for decision-making. Crucial committee work is not expected either traditionally, or by the CGJA, to be done concurrent with plenary work, or as a plenary.

- In 2014, (SBC Jury 2014-15) the jury knew at the start of its term and reported to the BOS early in their term that the jury was short of funding to complete projects approved by jury supermajority and deemed essential for completion. These were projects in full progress and under investigation. The structure of the 2014-15 Grand Jury was of exceptional standard and in personnel; in fact ideal, based on the learned

recommendations of the CGJA, the CA courts and counties' recognized authority. Jury structure that year, protocol of the *daily* committee work, and weekly plenary meetings were outstanding as was the Foreperson leadership. It was also serendipitous that specialists on the panel of jurors overcame many (but not all) of the critical missing resources required from the county. Most prominently, IT expertise happened to be available and therefore confidentiality was secure. I was proud to serve my community on that panel.

- The San Benito County Supervisors responded to the foresighted request by the jury for assistance with its *own* question about the financing of the grand jury. Typically, any **new** development of rules and interpretations can and do happen most often when a CA county official is unclear as to jury operations or if there is conflict between the BOS and the jury, the officials issue a request for a "Ruling." For example, PC section 919(b) was added at one point to expand the mandate that: *The grand jury shall inquire into the condition and management of the public prisons with the county,* when officials queried for clarity in the jury performing detention reviews. In the case of the new San Benito County rules, the Board of Supervisors made no such request for a ruling before implementing an Ordinance that further restricted the work of the local civil grand jury

- The BOS response was to refute the need and refuse the jury's request to budget for its county's mandated 19 jurors. Funding fell short to meet to complete the year of projects with weekly plenary meetings, with each juror working on at least two committees as recommended by the CGJA, and with at least one committee meeting most days.  Instead of requesting advice from CGJA to clarify why this might be typical jury activity, get advice and support from the Superior Court, or a ruling by the Attorney General to resolve the dispute, in 2015 the SBC Supervisors reached to apply their own legal interpretation of the below law based on an old interpretation pre-dating the CGJA. The desired outcome of the BOS was to further reduce associated jury cost and did so using the below:

*CA Government Code 68091:*
*"Except as otherwise provided by law, the board of supervisors in each county may specify by ordinance the compensation and mileage for members of the grand jury in that county." (Added by Stats. 1980, Ch. 1361.)*

*CA Penal Code section 890 (2013).  Unless a higher fee or rate of mileage is otherwise provided by statute or county or city and county ordinance, the fees for grand jurors are fifteen dollars ($15) a day for each day's attendance as a grand juror, and the mileage reimbursement applicable to county employees for each mile actually traveled in attending court as a grand juror.*
*(Amended by Stats. 2001, Ch. 218, Sec. 1. Effective January 1, 2002. Operative July 1, 2002, by Sec. 2 of Ch. 218.)*

*890.1.  The per diem and mileage of grand jurors where allowed by law shall be paid by the treasurer of the county out of the general fund of the county upon warrants drawn by the county auditor upon the written order of the judge of the superior court of the county.*

**- The San Benito County government then unfortunately interpreted this section to mean that per diem and mileage reimbursement could be further restricted to meetings of the entire grand jury** and that $15 a day as the listed minimum for jury work was still sufficient from 1980 for jurors in SBC.

- The holder of funds, the SBC Board of Supervisors (BOS), rejected the jury's request for funds to complete their investigations (the request was not to increase per diem). The jurors were willing to work the extra days in committee to complete research, but were denied the opportunity.

- The Superior Court did not issue an order to increase funds.

- The BOS found a way to *decrease* future payments to grand jurors.  Along with reducing juror stipends, the BOS also continued to dismiss requests to implement use of previously approved funds for capital equipment (office, desks, chairs, technology), or to obtain additional funds for consumables (paper, pens..).  The BOS stated concern was simply that if they "approved the grand jury's request, then every department might ask for money beyond their budget, causing chaos" and several times, "*Who? is watching the jury?, they asked.*  At least one major difference between the grand jury budget and other departments is the grand jury is selected *after* the annual budget is set and has therefore no prior input to the budgeted funds directed for use. Therefore the request for appropriate funds when the jury term is in session is uniquely productivity based and should be recognized. The 2014 jury took issue at the beginning of their term that their budget was initially insufficient. Repeated and timely requests were made for reallocation from the General Fund, but the final budget was ultimately directed to them without using the baseline to support 19 jurors and the various committee meetings needed to compose a timely consolidated report.  The debate took open forum during BOS meetings in 2015 and created frustration for the BOS and both the outgoing and incoming jurors.  Local SBC newspapers reported the issue and one of the final grand jury report findings indicated the BOS knowingly attempted to limit the reach and success of the county civil grand jury; implying little respect for the process of the CA mandate. (CA Grand Jurors Report, 2014-2015) (BenitoLink)

As basis for the reasoning of this new restriction, the SBC BOS chose to dust off a disparate Attorney General interpretation (ruling) to set the local Ordinance effectively limiting grand jury policy and procedures.  The ruling was one handed down and formed in *1993* as a result of a request from the County of San Mateo at that time when San Mateo officials requested clarification. This AG ruling was prior to the CGJA formation (1997), prior to Unfunded Mandate Reform Act (UMRA), The Trial Court Funding Act of 1997, and the Trial Court Facilities Act of 2002. [Which relieved some financial burden to counties by transferring county courthouses to the state government. Note the effect of the latter was to relieve CA counties' burden to maintain the Trial Court Funding Act of 1997 by offsetting compensation for the mandated criminal grand juries, but not the civil grand juries]

19

So, the more valid question is:  Who IS watching (out for) the grand jury?

**What do the new (2015) Ordinance rules, in practice, really mean for later juries?**
Committees using traditional CGJA guidelines are out.  San Benito County's new rule to restrict juror stipends came in the form of Ordinance: § 3.01.012,  FEES FOR GRAND JURORS; MILEAGE.  (Ord. 889, § 1; Ord. 934, § 1, 2015)  The digital link is:

http://library.amlegal.com/nxt/gateway.dll/California/sanbenitocounty_ca/title3administra tionandpersonnel/chapter301administrationgenerally/articleiiingeneral?f=templates$fn=a ltmain-nf.htm$q=[field%20folio-destination-name:'3.01.012']$x=Advanced#JD_3.01.012

In October 2015 the initially empaneled jury of 2015-16 established to prepare this consolidated report faced widespread negativity from within and out. The media reported negatively about the status of the grand jury. Then there were the new rules; these were added to "office space" defined as the default - an intermittently available and semi-confidential conference room, one desk located outside the room in a lobby, no dedicated computers, no IT support to count on, a lock-broken cabinet to store some non-confidential files and another cabinet for which the key was long gone. There was though an agreement to be reimbursed if out-of-pocket ink, paper, and even a filing cabinet were purchased. The jury found the *CAO's and his office, The Chief Probation Officer, and SBC Administrative staff in general, along with County Counsel to be extremely helpful and accommodating with what they could do to help with lacking administration and logistics and some of the previous frustration calmed.*  But, in the wake of conflict between the BOS and the grand jury, public perception, the frustrating provisions of the new rule, and the negative media reporting (though valid), a working jury was not achieved until February 2016. Following that, continued IT security issues led to administrative setbacks resulting in reworks to ensure operational confidentiality before report approvals and later to repair corrupted files and an array of other non-streamlined administrative challenges until consolidated report release.

***SBC BOS's did not take the opportunity*** *to pioneer*, *take the lead*, or display recognition of the value of the grand jury to its constituents and work toward solutions; perhaps with admin/capital/funding support, or even suggesting state legislation, requesting state guidance, or pioneering assistance with compensation of civil jurors working under the unfunded state mandate to relieve financial strain on the county as had been accomplished when the CA Trial Court Funding Act was implemented. Instead SB County ***gained state recognition*** for its backlash to its jury and bizarre imaginative use of applying 1993's, San Mateo County local government feedback from then Attorney General Lundgren and his opinion on matters as it stood at that time in CA - two and a half decades earlier. The incongruent AG procedural opinion was adopted in SBC as local law. The Attorney General Opinion and the part the SBC BOS's liked for the 2015 Ordinance is the 1993 wording used which said:  *"In our view, Section 890 is sufficiently similar to the grand juror compensation statutes construed in our prior opinions as to require the same restrictive construction. The terms*

20

*"attendance" and "attending court" refer to grand jury sessions called for the performance of official duties by the entire membership."*

*Of course **trial juries** all meet together and attend court together.* **A civil grand jury meeting in plenary for all work was proved in the case of preparing this consolidated report to be inefficient, ineffective, and unnecessarily restrictive.**

As the outlier, the 2015-16 SBC grand jury needed to reconstruct several times and were unable to follow CGJA best practices. The BOS, whether it meant to or not, **did indeed influence grand jury operations** by compelling the jury to withdraw and restart several times. Retracting committee work as fundamentally unsanctioned work, or secondary as to not be compensated for, significantly undermined the grand jury's evaluations, investigations, interviews, research, writing, etc., especially in light of other critical resources lacking. Plenary interviews are cumbersome and often inappropriate; with 12-19 present together in a room requesting data to review or interviewing a witness and not enough chairs, triangulating findings by interviews as one 3 source methods was very difficult and in some cases not possible.

The SBC BOS effectively set in motion a reversal of best practice procedure in our county based on its decision to use this 1993 decision to base its Ordinance and rolled back the net gain of information to support its citizens from establishing and compensating a grand jury in the first place.

Yes, the BOS follows Government Code 60891.  But yet, instead of looking for current legislative guidance to be drafted from the court or the state government, the BOS took the path to meet policy with negative connotations.  Use of CGJA *best practices* are of course comprised when based on pre-dated laws. Not being able to comply, SBC lost its place in CA. SBC became the "poor example". The "new-old" Ordinance meant that the BOS asked the SBC grand jury to ignore the value of CGJA's evolution and institutional knowledge and to essentially work in setback mode – when, ironically, the BOS had not yet sanctioned its county's juries to catch up in the first place structurally or operationally to align with similar CA counties by providing capital equipment or dedicated work space as needed and one time promised.

To be clear, necessary grand jury committee work ***may** be* authorized for compensation by a county board of supervisors pursuant to section 68091 of the Government Code. The 1993 interpretation said: Section 890 mandates compensation only for grand jury sessions of the entire membership, including *indictment* proceedings. It does not mandate compensation for committee meetings, but - the interpretation was clearly referring to criminal grand juries' committees AND the interpretation reads on ***…but does not exclude it…*** when referring to committee work. Accordingly, Government Code section 68091 does in fact authorize a county board of supervisors to prescribe grand juror compensation for committee meetings and investigative sessions. It is just that SBC will not. The code also establishes only the baseline for the stipend.  Many counties have brought their stipends up to date.  Not SBC.  SBC falls below the average

grand jury budgets based on estimated population and per capita costs; $.83 statewide versus $.35 in San Benito County.

The CGJA trains jurors they are supposed (based on best practices) to be on at least 2 committees as an expected official duty.  To be effective, investigative work, it is offered, *should not be* done in plenary. Since investigative work is an official duty of the grand jury that the entire membership must conduct via committee; then *committees have become "attending court" in a grand jury proper.*  Therefore, committee work is a *necessary implication* of the civil grand jury statute and committee work should be compensated per juror at the same rate as a plenary meeting.

**What now?** And, **Who IS watching (out for) the grand jury?**
Though each former foreperson may have been outstanding, as was my predecessor, continuity is suffering with no "home for the grand jury". Though each foreperson may care, he/she has no directive or authority to obtain workspace, chairs, tables, etc., and by design he/she cannot redirect or direct the procedural issues of anything local or otherwise.  So, local baseline infrastructure, and IT security administration and assistance to the grand jury proper are needed to obtain the outcome expected by the state of CA.  Not having what is needed at the beginning of a term to hit the ground running is not only discouraging to the jury, but puts the jury is setback mode the whole term compared to other counties such that either the security, quantity, quality, or timeliness of reports will be compromised.

With the **how** of a grand jury not interpreted by any law to be formally or informally influenced by the BOS, the resource(s) structure is their basic responsibility (or control). Since 1997, the best practices were developed and are available to help our BOS understand how our county now differs radically from all other counties in meeting the mandates. Legislation has even been since adopted since 1993 that the BOS can use to address handling an unfunded mandate if the General Fund cannot or is chosen not to provide the grand jury with the resources, assistance, and tools needed.

**Unfunded mandates** are statutes or regulations that require a state or local government to perform certain actions with no money provided for fulfilling the requirements.  In the case of civil grand juries, CA counties are tasked with meeting the grand jury state mandate, are to establish juries independent of the BOS, and then pay the jurors from the local General Fund.  This inherent conflict should not need elaboration.  Criminal grand juries and the courts no longer have this issue.

Further, if a local mandate is funded by the state, the state can suspend the requirement if they do not have funding that year.  Because the local government funds the grand jury, this mandate is not suspended by the state even if it may suspend other unfunded mandates in a fiscal year. Local government has no authority to suspend the state mandate for civil grand juries nor stop it from being funded through the General Fund.  The local government can though work to constrain grand jury work to shield themselves from thorough investigations. Is that how it should be in SBC?

Even with the best of legal advice of county counsel and juror effort, the grand juror may find that for reasons of efficiency and expedition it is easier to use the immediate resources available and move on rather than to encounter delays.  Is that what the BOS is counting on?

Under Dillon's Rule, California legislature has stipulated local governments are administrative arms of the states and can be ordered to carry out state programs or policy mandates. When state budget shortages became common after 1990, the number of mandates continued to increase.  Applications were subsequently submitted to the state mandate commission to relieve the burden on the county. Today, this is why the state and not the General Fund pay for trial jurors stipends and maintenance of the CA Superior Courts. Yet, if the BOS continues to fall short with respect to providing for its civil grand juries, the Superior Court can order the BOS to provide needed resources and support to be taken from the General Fund.  Is that what the BOS is counting on?

The **Unfunded Mandates Reform Act** (UMRA) became effective October 5, 1995.  It is public law 104-4 and updates were made in 2015.  The Unfunded Mandates Reform Act provides that each bill must be analyzed for its impact on local government before it can be voted on. In this way, the legislators know impact before it is imposed.  This Act of course had not happened yet before the last time the Attorney General was queried for opinion – and so 1993 remains the most recent official answer regarding paying grand juries.  San Mateo asking for the AG ruling to determine their local government acted wisely under the law at that time. Now many counties simply reach out to the CGJA to ask for clarification. The CGJA does not though have standing to request AG rulings.

Since SBC BOS has outlier status from following GC 60891, but not following best practices to manage or pay their jury, and waiting for an order from the local Superior Court is also an outlier status that's the poor example, maybe the BOS would consider gaining positive outlier status by considering one of two other options: Take the step to request an updated formal opinion from the AG and put San Benito County on the legal books as precedent, or pioneer to try and have all CA counties receive state help to subsidize the mandate through the CA State Mandate Commission.

Under Government Code section 12519, the Attorney General has statutory authority to give his/her opinion in writing to the following authorized requestors: constitutional officers, state legislators, state agencies, judges, district attorneys, county counsels, city prosecutors and sheriffs.

**Here is the contact information:**  Office of the Attorney General Opinion Unit, Dept. of Justice 455 Golden Gate Ave., Suite 11000 San Francisco, CA 9410. https://oag.ca.gov/opinions

**COUNTY PARK PEDESTRIAN SAFETY**
**San Benito County Grand Jury**
**2015-2016**

## SUMMARY

The San Benito County Board of Supervisors (BOS) manages Veterans Memorial Park in Hollister, CA using a recognized Veterans Park Commission. Children frequent the park area, including those attending a proximate elementary school; a large playing field; general public picnic area; toddler lot; and skate and bike park. With the element of child play, Veterans Park has a higher than expected speed limit along the access road, Memorial Drive. A jury investigation was undertaken of this aspect of local government park management; specifically, the San Benito County Grand Jury (SBCGJ) was concerned that the risk of pedestrian injury along Memorial Drive, adjacent to the park, is too high.

## BACKGROUND

One of the 3 operative mandates from the State of California to county civil grand juries is to evaluate at least one area of their county's management. The other two mandates are to inspect the jail(s)/prisons and juvenile halls in their county.  To meet the first mandate, this San Benito County (SBC) Grand Jury initiated a general review of county park management.  Several parks located within SBC were considered. The jury determined that the State of California oversees Bolado Park while San Justo Reservoir & Park has federal government oversight.  The City of Hollister (COH), is responsible for the rest of the parks, with the exception of The Historical Park and Veterans Memorial Park.

The jury did a general review the local government management of Veterans Park then moved to address several citizen concerns and complaints about the safety of Veterans Memorial Park visitors with respect to the access road, Memorial Drive.

### Veterans' Memorial Park Commission
The BOS uses a Park Commission to uphold responsible oversight of Vets Park. The Veterans Memorial Park Commission organizes general supervision and control of the development, maintenance, and management of the park. Established in November 1950, the Commission has 5 members (called commissioners): (2) members of the Board of Supervisors, appointed by the Chairperson of the Board; and one representative from each of the three veterans organizations of the county; American Legion, Hollister VFW, and San Juan Bautista VFW. The Commission meets quarterly, January, April, July, and September, on the first Monday of the month, at 7:00 p.m., in the Board of Supervisor chambers.

25

The BOS and Veterans Commission, over the extent of several past decades, establish annual user agreements with groups using the park frequently. Individual agreements are with Hollister Babe Ruth, Hollister Little League, Hollister Heat, Hollister Tremors, and Pop Warner football.  Each of the five current groups receives priority over other community groups and individuals with respect to use and of scheduling the fields for organized youth sports.  In exchange for their first right of usage, each of the user groups agrees to maintain the field, pay for utilities, secure insurance, dumpsters, lawn maintenance, vandalism, manage the field schedule for their organization, and be responsible for all costs incurred to operate the field.  The county receives no rent for the field; and the county incurs no expense for the field clean up. The groups finance and enhance the park with some cosmetic work (ex., adding batting cages) but SBC Public Works operates planning, budgetary management, and repairs/replaces base elements of equipment (BBQs) and structures (restroom).

The Veterans Park Commission updates the 5 annual agreements to ensure contact information and insurance is current. The agreements are not meant for exclusivity of the fields. Fields are sub-leased to hold special community events and personal parties. If other persons or organizations wish to use the fields, requests are made to Public Works to approve a time of use and sub-lease. If there is a dispute between organizations or conflict about scheduling or type and kind of usage, county government is the decision maker.

A facet of the user agreements is the incumbency upon all organizations routinely using the fields to *work in partnership with the Veterans Park Commission, and therefore San Benito County residents to ensure proper oversight of safety* and access to the fields.

Representing all county citizens, the BOS holds the critical level of responsibility with safety oversight in Veteran's Park; and management of the perception of safety. The jury focused researched to help ascertain how unsafe a 40 mph speed limit is along the residential access road Memorial Drive; and to determine the potential risk of injury and inherent danger with the plethora of children and parents using the fields year round.

## METHODOLOGY

Information and data were gathered from the County and City of Hollister (COH) about vehicular accidents with pedestrians.  Insight from parents of children who frequent the park fields was relayed in concern for pedestrians and others that have observed unreported "close calls" and near accidents. Professional drivers and engineers were interviewed to advise typically encountered calming techniques to manage speed.

The Grand Jury received input and documents from:
Incident data relative to Memorial Drive by Veterans Memorial Park
Hollister Police Department data
Citizens concerned
Staff
Veterans' Memorial Park Commission meeting minutes

Data show that reported pedestrian injuries over the last 5 years in the Veterans Park vicinity are:

- Child victim of hit and run, vehicle turning into the intersection of Hillcrest Road and Memorial Drive.
- Pedestrian struck by a vehicle backing out onto Memorial Drive from a private drive;
- Child injured by vehicle at the intersection of Sunnyslope and Memorial;
- Child gravely injured/death near the intersection of Sunnyslope and Memorial.

Public agencies set speed limits that are not determined by statute or legislation. The process to set or change the speed limit on city roads not part of the state of California Transportation Department (CALTRANS) is conducted by city engineers and public works personnel conducting a survey. Testing results are evaluated and a recommendation submitted to the approving authority.  The COH, City Council is that approving authority. To evaluate a current speed limit or obtain new recommended speed, engineers conduct this speed survey using the speed zone Engineering and Traffic Surveys (E&TS).

A survey on existing speed limits are done every 5 years in Hollister, or initiated if conditions on a road change. Vehicles' speeds on a road segment as Memorial Drive are documented when drivers do not know they are being recorded. Prevailing speeds collected during a spot speed survey are used to determine the 85th Percentile Speed. The 85th Percentile speed is that speed at or below which 85 percent of the observed vehicles are traveling. The 85th Percentile Speed (also called the "critical vehicle speed") of a spot speed survey is the primary indicator of a speed limit that might be imposed. The "85th Percentile Speed" is what is typically recommended to the approving authority. The most recent speed survey summary of Memorial Drive was July 2, 2012 and resulted in the decision to raise the speed limit to 40 mph, from 35 mph between the segment where Sunnyslope Road and Hillcrest Road intersect with Memorial Drive; the segment adjacent to Veterans Park.

E&TS summary speed testing, by design, doesn't take into consideration what is alongside the road. The test factors in travel speeds that may be just over, or far over, the existing limit.  The summary is a formula to compute an "optimal" speed from data reflecting what is already being travelled.  The consideration of who, where, and what is on the road is through government policy.  These factors of roadway characteristics such as adjacent land uses, side street traffic, on-street parking and sight distances should be considered by local government into setting the speed limit; and the speed limit re-considered when the factors change. Limits might best be established based upon a combination of these factors along with the measured "critical vehicle speed."

Though SBC, Veterans Park Commission, and individual user groups are inherently responsible for the number of people near and around the park and the safety of people using the park, local City government sets the speed limit of the road to access the park, perhaps using factors unrelated to accident risk or number of children present.

The rate and speed of traffic to injury has not resulted in a statistically significant number of injuries by Vet Park within the last 5 years. County and City government may be content with the speed limit and the level of pedestrian safety on Memorial Drive based on the few injuries. However, citizens have tangible **perception** of danger and are concerned about risk in this area for their children. The grand jury analyzed the relationship between speed and risk to see if perception had merit or basis.

## DISCUSSION

It is acknowledged that reported injury to pedestrians in Veterans Park access road is low; and it is also reasonable to accept that the risk that a pedestrian struck by a vehicle will be seriously injured or killed will increase as impact speed increases.  If both the perception of danger is high and the risk of danger is higher with a 40mph speed limit than a 25mph speed limit should the limit be reduced? Is the summary test misleading? What is the risk the pedestrians confront, and the risk level the city accepts, on Memorial Drive?

To simplify analysis, research was conducted to compare the risk of *severe* injury and the absolute, *death,* at various speed limits, in areas where vehicles and pedestrians are present, and by using collected data on a national scale by AARP. Sensitivity analysis shows that in the relationship between speed and risk, with other factors constant, the risks to pedestrians from vehicles travelling at lower speeds increase slowly and risks increase more rapidly at higher speeds. For example, results for severe injury due to speed indicate that average risk of severe injury for a pedestrian struck by a vehicle is 10% at an impact speed of 16 mph, 25% at 23 mph, 50% at 31 mph, 75% at 39 mph, and 90% at 46 mph. The average risk of death for a pedestrian reaches 10% at an impact speed of 23 mph, 25% at 32 mph, 50% at 42 mph, 75% at 50 mph, and 90% at 58 mph.

Risk can vary by age and is considered for the jury's research purposes. For example, the same risk of a 70 year old pedestrian struck by a car travelling at 25 mph is not the equivalent to the risk of a 30 year-old, or teen, or child. Evaluating further, to find the *average,* adjusted standardized risk on a street like Memorial Drive; risk of death is determined to be 10% at an impact speed of 23 mph, 25% at 32 mph, 50% at 42 mph, 75% at 50 mph, and 90% at 58 mph. This means that risk of death increases approximately linearly with speed for speeds between 32 mph and 50 mph, with an average increase of 2.8 percentage points (95% CI: 2.2 – 3.4) for each 1 mph increase in impact speed for speeds within this range.

Since SBC has a higher percentage, on average, of light trucks, SUVs, and min-vans, research included this added factor and indicates that risks are higher for pedestrians struck by light trucks than for pedestrians struck by cars. The average adjusted, standardized risk of severe injury for a pedestrian struck at any given speed by a light truck was approximately equal to the average risk if struck by a car travelling 6.3 mph faster (95% CI: 2.1 – 10.6 mph). The average risk of death for a pedestrian struck at

any given speed by a light truck was approximately equal to the average risk if struck by a car travelling 4.1 mph faster (95% CI: 1.4 – 9.5 mph).

At lower speeds (below 15 mph), risk is low and increases relatively slowly with small speed increases; most pedestrians struck (about 91%) do not sustain severe injuries, and few (about 2% to 5%) die. As speeds increase above 15mph, small changes in speed yield relatively large increases in risk. At an impact speed of 25 mph, it is estimated that 30% of pedestrians sustain severe injury, and about 12% die. Nearly half of all pedestrians (47%) struck at 30 mph sustain severe injury, and one in five (20%) die. *At 40 mph, 79% of struck pedestrians sustain severe injury and 45% die. Risks for a pedestrian struck at any given speed by a light truck are higher than if struck at the same speed by a car.*

Research indicates that SBC has been very lucky so far on Memorial Drive with the 40mph speed limit. The jury provides background of the potential risk exposure and potential for great mishap to pedestrians from vehicles travelling at speeds higher than 15mph in areas designed to allow pedestrians and vehicles to be in regular proximity to one another.  Further analysis might include a study of how many cars pass through Memorial Drive and how many pedestrians are present at the same time, both during an event and throughout an average week.

## FINDINGS

**F1.**    The speed limit of 40 mph is higher than the typical residential limit of 25 mph, presenting higher risk of vehicular pedestrian injury.

**F2.**    The speed limit on Memorial Drive does not reflect the use of existing speed risk data or any risk analysis.

**F3.**    Perception by some residents is that local government is either unaware of the risks to pedestrians on Memorial Drive or is unconcerned.

**F4.**    There is a lack of vehicle calming methods to assist pedestrian safety.

## RECOMMENDATIONS

**R1.**    F1, F2, F3, F4, Lower the speed limit on the segment of Memorial Drive adjacent to the park to a speed based on a combination of studies and surveys, not just the speed summary.

**R2.**    F3, F4, Put in a crosswalk from the playground area to the ballpark entrance.

**R3.**    F3, F4, Place calming techniques such as adding plate strips, Bott dots, speed bumps and/or advisory signs, paint the speed limit on the asphalt, yellow flashing lights during events.

**R4.**    F3, F4, Attempts should be made to make the motorist aware of non-apparent conditions while driving on Memorial Drive given the presence of events and pedestrians

**R5.**    F1, F2, F3, F4, Local government should not wait until a major traffic injury or fatality occurs on the Memorial Drive segment adjacent to Veterans Park before addressing the speed issue. Local government should acknowledge and further evaluate safety and the speed to prevent and not wait to react to accidents. Local government should decide if conditions warrant another E&TS be done before 2017.

**R6.**    F1, F2 Conduct further analysis: Determine the number of pedestrians during a typical event and on a regular day.  Count the traffic during a typical event and on a regular day. Research the risk of injury based on the number of pedestrians in proximity to the number of cars. Determine if any benefits exist in a speed limit of 40mph.

Responses Required:

- The San Benito County Board of Supervisors (90 days to respond)
- The City Council of Hollister (90 days to respond)

## REFERENCES

Pop Warner –
www.hollistervikings.com
www.popwarner.com

Babe Ruth –www.eteamz.com/
SanBenitoBabeRuth/index.cfm

Hollister Little League –www.eteamz.com/Hollister/
board/index.cfm

Hollister Heat –www.hollisterheat.com/
News%20&%20Events.htm

Hollister Tremors –www.hollistertremors.com/
index.html

Impact speed and a Pedestrian's risk of serious injury or death
www.aaafoundation.org/sites/default/files/2011PedestrianRiskVsSpeed.pdf

*Veterans Memorial Park*
801 Memorial Drive
Hollister, California
Phone: (831) 636-4170

The Veterans' Memorial Park Commission
 831-636-4170

**San Benito County Historical Park**
498 Fifth Street
Hollister, CA 95023
Phone: 1-831-635-0335
San Benito County Historical Society
www.sbchistoricalsociety.org

CA Department of Transportation Manual for Setting Speed Limits, 2013 http://
www.dot.ca.gov/hq/traffops/engineering/mutcd/pdf/california-manual-for-setting-
speed-limits.pdf



SPEED Limit
SiqN



## The San Benito County Special Education Local Plan Area
## Individualized Education Program (IEP)

### SUMMARY

The Individualized Education Program (IEP) provides evaluation and an individualized training plan for students with disabilities.  Students can be referred by School personnel or at the request of the parent.  The School District has budgeted $11,700,000 to spend this year on special education programs out of a total district budget of $55,000,000.  The San Benito County Grand Jury performed a complete review of the current program including; all manuals and forms, creation of custom reports for analysis and interviews with School District personnel.

### BACKGROUND

Each student with a disability has rights under the law to a Free and Appropriate Education (FAPE) in the Least Restrictive Environment (LRE).   Federal and State Laws provide every student who is suspected of having a disability an evaluation to determine if the student has a disability that requires special education and/or related services.  If the student is found eligible, an IEP is prepared for that student.  The IEP guides the delivery of services, such as speech and language therapy, physical therapy, mental health treatment, specialized learning environments, adapted physical education, behavior treatment plans and other services.

SELPA stands for Special Education Local Plan Area.  Governance of special education programs is administered through the San Benito County Special Education Local Plan Area local plan and the local governing council.  It always remains that the Hollister School District, and its elected Board of Trustees, have final authority over the expenditure of District funds, and the quality of educational programs provided to District students.  The governing council of the San Benito SELPA is comprised of representatives, typically district superintendents from school districts in the county and from the County Office of Education.

In 1977, Assembly Bill 1250 required school districts and county offices of education to form regions of sufficient size and scope to provide a continuum of programs and services for individuals with exceptional needs from birth through 22 years of age.  Each SELPA has to have a Responsible Local Agency (RLA) to serve as the Administrative Unit (AU).  The San Benito County Office of Education is the legal entity that receives funds and ensures that every eligible child receives appropriate services.  Special funding from the State, called regionalized Service Funds, augmented by funds for program Specialists, federal funds and local funds provide for the fiscal operation of the AU.

SELPAs are responsible to the State Superintendent of Public Instruction for the development of a Local Plan for special education.  This Local Plan must contain, among other things, assurances that the SELPA is in compliance with Federal and State Laws, a description of services provided by each district and county office, and demonstrated access to appropriate services under a student's IEP.  The legal

requirements for the Local Plan can be found in Education Code—Part 30, Chapter 3 Section 56200.

## History of San Benito County SELPA

From 1977 to 1992, the districts and county office of education in San Benito County were part of a tri-county SELPA that included Santa Cruz County and Pajaro Unified School District.  Until 1991, the San Benito County Office of Education was the Local Education Agency provider of all severely disabled, infant, and preschool programs for the districts in the county.  It also provided the special day classes, resource specialist programs, and speech and language programs for San Juan School District, North County Joint Union School District, and the seven rural school districts.  San Benito High School District and Hollister School District operated their own non-severe special day classes, resource specialist programs, and their speech and language programs.  Santa Cruz County Office of Education provided the itinerant low incidence services and program specialist services.  Students who were deaf, blind, or emotionally disturbed were generally sent out of county to other SELPAs because there were not sufficient numbers of eligible students in San Benito County to operate programs for them.

In 1991, Hollister School District opted to provide its own programs for its severely disabled students, as well as the infant and preschool programs, since the majority of these children lived within the boundaries of the district.  With such a reduction in the number of students left to be provided services and the consequent reduction in fiscal support, San Benito County Office of Education was not able to continue to provide any special education programs.  This necessitated the return of the operation of programs to the other districts.  San Benito High School District thus began the operation of its own severely handicapped programs.  Aromas-San Juan Unified School District and North County Joint Union School Districts began to operate their own special day classes, resource specialist programs, and speech and language programs, but did not have sufficient numbers of students to operate their own severely handicapped programs.  Both Hollister School District and San Benito High School District agreed to accept the severely handicapped students from these districts on a cost recovery basis.  Since the rural school districts were not viable to operate any programs independently, Hollister School District agreed, as part of the separation, to operate the programs for rural schools.  Santa Cruz County Office of Education continued to provide the itinerant low incidence services as well as program specialist services.  Students who were deaf, blind, or emotionally disturbed continued to be sent out of the county.

When Pajaro Unified School district decided to separate from the tri-county SELPA because it was large enough to operate programs on its own,  San Benito County was faced with the decision of whether to operate its own SELPA or collaborate with another larger county.  Even though the county was very small and resources limited, the district superintendents/boards in the county elected to operate their own SELPA.  This was done during the time that the county office of education no long operated programs. So the commitment of resources was large.  The districts entered into the formation of a new SELPA with the understanding that they would need to collaborate and commit to working together to meet the various challenges that operating their own SELPA would

present.  They elected San Benito County Office of Education as the Administrative Unit.  Thus, the San Benito County SELPA was formed in 1992.

Some of the districts had to operate regional programs as, at that time, the county office of education was not operating any special education programs and consequently was not able to be a regional provider.

The following is a summary of the agreements made in 1992 that are renewed every three years:

1. San Benito High School District agreed to operate the low incidence programs for the region, as well as special education day class services for all Severely Disabled high school students.  All services were to be provided on a cost recovery basis.
2. Hollister School District agreed to operate the Early Start Program (infant and pre-school) and the Medical Therapy Unit, as well as special education day class services for all severely disabled elementary and middle school students.  In addition, the district agreed to provide special education day class services, on a case-by-case basis, for those rural school district students who were learning disabled.  All services were to be provided on a cost recovery basis.

President Bush signed the reauthorized Individuals with Disabilities Education Act (IDEA) into law on December 3, 2004.  The provisions of the act became effective on July 1, 2005.  The U.S. Department of Education Office of Special Education and Rehabilitative Services published final regulations August 14, 2006 that cover a number of high interest topics.  This document addresses significant changes from preexisting regulations to the final regulatory requirements regarding IEPs.

The following is a summary of the changes and agreements made in 2010.  In June 2010, the Hollister School District Board of Trustees voted to transfer the operation of the Early Start Program to San Benito County Office of Education.  At the same time, San Benito High School District Board of Trustees voted to transfer the operation of the low incidence programs to San Benito County Office of Education.  San Benito County Office of Education agreed to operate the programs and the SELPA Governing Council voted to approve the transfers.  The change of service provider took effect in the 2011-2012 school year.  Hollister School District agreed to continue to operate the Medical Therapy Unit, as well as special education day class services for all severely disabled elementary and middle school students.  In addition, the district agreed to continue to provide special education day class services, on a case-by-case basis, for those rural school district students who were learning disabled.  San Benito High School District agreed to continue to operate the special education day class services for all severely disabled high school students.  All services continued to be provided on a cost recovery basis.

**Documents Reviewed**

Listed below are the documents and files provided by the School Department in response to the Grand Jury's requests.  They vary from instruction manuals to custom produced excel files and form the base of information used to evaluate the Individual Education Program.

1. School Department Organization charts.
2. Lists of the number of students in the education system for three years.
3. Lists of the number of students in the Individualized Education Program for three years.
4. Compliance Monitoring Reports.
5. Copies of all manuals used in the IEP program.
6. Copies of all forms used in the IEP program.
7. The San Benito County SELPA IEP Manual with codes and descriptors.
8. Developing IEP guidelines.
9. Notice of procedural Safeguards.
10. San Benito County SELPA data generated to show gender, race, ethnicity, and critical dates of service to the student for all IEPs for 2012,2013,2014,2015.
11. Copies of all complaints.
12. Copies of all lawsuits.

**Methodology**

The Grand Jury performed a comprehensive review of the Individualized Education Program.  Initial requests to the schools were for manuals and general information to gain an understanding of how the program is run and administered. Organizational charts for the Hollister School District and for the San Benito County Office of Education were both provided to the Grand Jury.

The Grand Jury was provided with additional input on the IEP creation, use, and follow up required under the program. Specialized reports were created and provided electronically for analysis by the Grand Jury for the Hollister School District.

## DISCUSSION

Either the parent or School personnel may initiate an Individualized Education Program referral.  While there are many forms used in the administration of the program Form 1 attached as Exhibit 3 contains critical dates of interest. Staff advised the grand jury that "Once a referral is made for a student to determine if the student is eligible for special education and/or related services, the school district has 15 days to meet with the parent/guardian of the student who is referred to develop an assessment plan. No assessment can proceed until the parent's procedural safeguards are explained and the parent provides written authorization for the assessment to proceed. From the date the parent/guardian gives consent, the school district has 60 days to complete the evaluation and to hold an IEP Team meeting to explain the assessment results and to determine if the student is or is not eligible for special education and/or related services".

There are 1278 students receiving IEPs.  Not all of these students are County residents since through agreements the County provides these services on a cost basis to smaller Districts unable to provide their own services.

The Grand Jury reviewed all the documents and files listed in the Documents Reviewed section.  In addition, four files were created from information provided by the California Department of Education and posted on Dataquest.  The Files were:

- Special Education Enrollment by Ethnicity and Disability
- Enrollment by Age and Major Ethnic Group
- Special Education Enrollment by Age and Disability
- Special Education Enrollment by Age and Grade

Finally, the Grand Jury reviewed the 18 complaints and cases filed against the Schools relating to the IEP since 2012.  One case was a mileage reimbursement.  Four complaints are pending and ongoing.  In three of the complaints the School District was found to be in compliance.  Seven of the complaints were closed or resolved with no award.  Only three of the complaints ended in an award of resources.  In the case of an IEP award a monetary settlement is specified.  This money must be used to provide services to the students relating to the students disability.

## FINDINGS

**F1.**  The Grand Jury found the School Districts are in compliance with the Individualized Education Plan's laws, guidelines and requirements.

**F2**.   In its review of records the Grand Jury found no case of bias as a result of ethnicity, race or type of disability.

**F3.**  The IEP and associated rules have the effect of distributing over 20% of the Education department budget to 10% of the students in the district with no attempt to evaluate the effectiveness of the increased services.

## RECOMMENDATIONS

**R1.**  While all the information regarding compliance was available it required several requests from different sources to obtain it.  Regardless of the record keeping requirements under the various provisions the Districts should have detailed master file electronic records on each IEP student identifying critical dates and the plan requirements.

**R2.**  The Grand Jury found no evidence of any kind to suggest that anyone had been the subject of discrimination.  This determination would be more transparent and easier to make had the Districts kept the electronic records suggested in Recommendation 1.

**R3.**  It was not clear from documentation provided how many students were from outside the districts and were receiving services on a pay as you go basis. *It is also not clear how the children receiving these services progressed as a group or by disability.  In other words does this program provide the benefits promised? Government seems consumed by process not results.  The Districts should make an attempt to track the success and failure of the various recommendations*.

## REQUEST  FOR  RESPONSES

Pursuant to Penal Code section 933.05, the grand jury requests responses as follows ;

From the following:
- Board of Directors, Hollister School District (90 days)
- Board of Education, San Benito County Office of Education (90 days.

## GOPHERS AT SCHOOL IN HOLLISTER SCHOOL DISTRICT





# GOPHERS AT SCHOOL IN HOLLISTER SCHOOL DISTRICT

## SUMMARY

The purpose of this investigation is to evaluate the inherent problem of injury to schoolchildren due to damages in Hollister School District (HSD) recreational fields made by California Pocket Gophers. The study determined the prevalence of field gophers and evaluated plans to address the extent of occurrence. Evidence of gophers was ubiquitous. While field damage control and abatement plans are in place, more aggressive control is needed.

## BACKGROUND

An investigation was initiated as a response to citizen complaint made to the San Benito County Grand Jury (SBCGJ). An elementary school child's twisted ankle incurred by tripping over a gopher mound in a recreational area of a Hollister school during school hours prompted parent concern. All schools in the Hollister School District (HSD) have recreational fields for child play during recesses and lunch. These fields may also be used for physical education classes (PE).  HSD uses a private company under contract for gopher management.  HSD has a current contract with Gavilan Pest Control whom advertises their company is expert in performing small animal control by habitat modification; eliminating gopher nest and food sources to "ensure the problem pest doesn't return."

## METHODOLOGY

Jurors began with determining the gopher presence in HSD fields and the impact gopher presence was having on San Benito County school children. Then followed a review of system management through evaluation of local related documents, method of gopher control used by HSD, and studied industry standard methods of gopher abatement.

Jurors conducted on-site visits. Initially performed, were site visits to a 25% sample of HSD recreational school fields. Evidence of gophers, often in large numbers, was found.  Jurors followed up with site visits to all eight schools fields.  In all eight, jurors concluded the school fields contained damage made by gophers, and given the prevalence, determined a need for increased abatement efforts.

To understand background about HSD planning and the existing management of gophers, the following documents were reviewed;
1. Hollister School District Maintenance/Work Order Request for Gopher Abatement.
2. Correspondence to School Sites Regarding Planned Turf Maintenance and Public Concern regarding injury to student at Marguerite Maze Middle School.
3. Pest Control Receipts for monthly gopher abatement.
4. The 2013-14 State of California Facility Inspection Tool School Facility Condition Evaluation.
5. The 2014-15 State of California Facility Inspection Tool School Facility Condition Evaluation.

6. The 2015-16 State of California Facility Inspection Tool School Facility Condition Evaluation.
7. The Hollister School District & City of Hollister Field agreement - Rancho San Justo.
8. The Hollister School District & City of Hollister Field agreement - Marguerite Maze/Gabilan Hills.
9. The Hollister School District & City of Hollister Field agreement – Calaveras.
10. The Hollister School District & City of Hollister Field agreement – Cerra Vista.
11. The 2014 Hollister School District Facility Master Plan.

Jurors also evaluated local gopher management by conducting current research data of gopher behavior and abatement. These data highlighted limited options for gopher control.

## DISCUSSION

Hollister School District (HSD) has a student population of about 5,500 students. There are five elementary schools with students in grades K - 5, one school that is K – 8, two middle schools that are 6 – 8, a Dual Language Academy (grades K – 6) and an Accelerated Achievement Academy (grades 4 - 8). All eight schools have recreational fields for children in which to play during recess and hold PE classes. Areas for safe recreational play are an indisputable need for San Benito County children in general, but particularly in school fields.  The school district's Mission Statement includes the district goal "All schools will provide safe and positive environments." Child injury due to the presence of unsafe gopher field damage in mounds and holes is occurring. The four most recently reported cases involved twisted ankles. Jurors determined through additional information that similar accidents occur frequently but are unreported to the school or school nurse and therefore official records do not reflect the true amount of gopher related injuries. Gopher presence in HSD fields is not only common, but also ubiquitous. This small animal creates inherent possibility of injury to playing children by creating fan-shaped mounds of dirt. Field damage caused by gophers includes destruction of surface areas where running and games take place. The mounds are often large enough even to cause damage to some field equipment passing over them. Pocket Gophers are the most common species of gopher in California grasslands. Gophers are small, burrowing animals about five to twelve inches long with an average weight of 8 ounces. This small animal is powerfully built with relatively long front feet and long sharp claws. Gophers have brownish soft fur, large check pouches and flattened heads with small ears and eyes. Their hairy tails are about four inches long, and are used to navigate through tunnels when moving backwards.

Mounds of soil on fields are a result of gopher burrowing activity. Burrows are typically 4 to 18 inches below the ground surface and are either plugged or open within the mounded soil surface. Gopher burrows consist of a main burrow and its additional lateral burrows. Deeper burrow branches, which can reach down to 5 or 6 feet, are used for nesting and caching food. A single burrow system may contain up to 200 yards of tunnels.

The pocket gopher burrowing activity brings sizeable amounts of soil to the surface and the number of soil mounds on the surface of field areas can reach 300 per animal in a year.  This means that if not controlled, a single gopher can make 1 to 3 dirt mounds per day and up to about 70 mounds per month.  This enormous amount of dirt moving can mean that as much as 2.25 tons of earth is moved per gopher each year, or 46.75 tons per acre for a population of 50 pocket gophers.

Pocket gophers are herbivores and feed on grasses, shrubs, and trees in three ways: (1) they feed on roots that they encounter when digging; (2) they may go to the surface, venturing only a body length or so from their tunnel opening to feed on above ground vegetation and seeds; and (3) they pull vegetation into their tunnel from below.

Federal or state law does not protect pocket gophers.  There are several methods to control gophers:

Traps.  The long-standing "tried and true" gopher trap is still effective. However, sets of two traps in a burrow runway need to be placed facing in opposite directions. It also may be necessary to change the location of the traps in the burrow more than once to catch the occupant. Gophers are very wary and will quickly block off sections of the burrow if they suspect danger. The trap method, though effective, is labor intensive. The San Benito High School has dedicated grounds men on site. A daily responsibility for the crew is to look for gopher holes. When they find one, they place traps inside the holes. Gopher abatement is a daily responsibility for the grounds crew at the high school. Traps may be effective, but are much safer to use with High School Students than Elementary or Middle School Students. However, recognizing that gopher management is a daily responsibility is notable.

Gas. Gas bombs can provide effective gopher control and immediate results using various types of pressurized gas, which the animal breathes inducing unconsciousness and a painless death. Bombs can tend to be expensive and can be dangerous to the handler whom ignites the fuse.  Gas bombs are not a preferable or effective method when used alone at schools or while children are present.

Spray. Chemical repellent spray is primarily used to keep gophers off of lawns. Several years ago HSD employed contract to spray phosphine (Fumi Toxin) to saturate the field grounds. The EPA recently banned the use of phosphine.  Spraying is not optimal for school field control due to the fundamental issue that chemical residue may be harmful to children.

Cement. Cement may be poured into a gopher hole to "close it up".  This is ineffective since the gopher will likely dig another hole. Machines can pump a sand/plaster mix into the holes closing the hole and leaving a hard area/mound.
Not only does this method fail to eliminate the gophers as the animal simply digs new holes in a nearby location, it fails to address the very problem that the mounds on the field are what are causing the child injury. Leaving a hard plaster mound defeats the purpose.

Mesh.  Laying wire mesh in fields is an effective, non-chemical method of gopher control.  The wires stop the gophers from working up through a field where they cannot surface.  No burrows and tunnels means mounds are eliminated.  The mesh is laid under the grass and about a foot below the dirt surface.  Digging up the school fields and laying mesh is costly and disruptive to existing schools.  It may be best to lay mesh in newly developed fields planned where children will play.

Bait.  Gopher tunnels typically go down about one to two feet after a sharp decline from the entrance. Placing deadly bait in the tunnel is useful for control. Several brands of bait are available which is usually a poison wrapped in a grain mixture. The compound and placement of bait in the burrow system is important, and done correctly can is successful gopher control.

HSD with oversight by the district's Facilities and Maintenance Department uses bait as its single method of gopher control.  Gavilan Pest Control (GPC), a private company, works under contract with the HSD for gopher control in lieu of dedicated grounds men. The company works on the fields on weekends. GPC employees walk sites and look for fresh mounds and holes. To poison gophers, bait must be placed in the gopher tunnel systems by hand or by machine for the gophers to consume. Typically, to place the bait, GPC staff will poke down about 1 foot from a recent dirt mound to find a tunnel, open a small hole, place the bait, and cover the hole without collapsing the tunnel. GPC utilizes bait with the anticoagulant rodenticide Diphacinone. The method makes it possible for more than one gopher to be eradicated with the same bait.  Once the resident gopher ingests the toxicant and dies, a neighboring gopher taking over the tunnel system may ingest the still-toxic bait. After ingesting the bait, gophers do not come to back the surface of the ground, instead going to their nest after eating the bait. Underground baiting for pocket gophers using this control method presents little hazard to non-target wildlife, either through direct consumption of bait or by other animals eating a poisoned gopher.

A child would have access to the placed bait if they were to dig up the dirt and reach into the gopher hole. Poison bait spilled on the ground surface can also be hazardous. GPC performs abatement with bait on weekends when there are fewer children present. Weekend athletics means many may be on a school recreational field when GPC would try to place bait. HSD also communicates with Gavilan Pest Control in regard to areas that are seeing more activity than others and request that they focus more treatment in those areas when needed.  If a mound is in a high traffic area during the week, a request is filed to fix a gopher hole and a local HSD employee is dispatched to fill the hole. This may take one or several days and is meant to be a temporary solution.

The HSD weekend arrangement with GPC means that many of the general public and children do not observe how the treatment process is applied and is also unlikely to dig up the bait. GPC as professionals have low risk of dropped bait on the surface of the ground. HSD also has a plan for getting a mound flattened during the school week in a high traffic area that poses an increased risk of injury. However, the prevalence of

gophers existing year round in the school fields indicates HSD arrangements made with GPC and local grounds men isn't working effectively.  A longer-term solution and a more effective short-term solution may both be needed.

It does appear that eradication of the gophers is subject to available funds.  On page 93 of the Hollister School District/Facilities Master Plan under the Heading **Site Work** is a line item called *Improve quality play/athletic fields*.  Six of the eight schools have a line item of $200,000 and the other two schools have a line item of $300,000 for a total of $1,800,000.

This Grand Jury realizes that the District has scarce resources and may not currently have access to any of the funds mentioned in the Master Plan. Jurors were pleased with the recognition in the Master Plan to upgrade all the fields in the district.  An increase in the funds available for gopher abatement may be of some help until funds are available to upgrade the fields with gopher proof mesh or some equivalent option can be deployed.

## FINDINGS

**F1.** Mounds and holes made by typical gopher activity presents a hazard of injury to HSD children playing and taking PE classes on school recreational fields.

**F2.** HSD has an ongoing problem controlling the prevalence of the number of pocket gophers living in recreational fields and/or the number of holes made by gophers in those fields daily.

**F3.** Weekends are not enough to address gopher prevalence.  It is too little time spent and some of that time may be compromised by weekend athletics.

**F4.** The number of injuries to children from gopher damage is underreported to the schools.

**F5.** Follow up regarding the effectiveness or ineffectiveness of current measures in place for gopher abatement/control is not being tracked.

**F6.** Long term plans to abate gophers from school fields and prevent persistent mounds in newer fields is needed.

## RECOMMENDATIONS

**R1.** F1, F2, F3, Address the numerous gopher mounds in HSD fields on a daily prevention basis as well as a weekly basis.

**R2.** F1, F2, F3, Reduce/eliminate the hazardous mounds and holes made by the gophers.

**R3.** F4, F5 Educate HSD children and staff to recognize the gopher mounds, report the mound, and report all tripping and falling over the mounds or into the holes to a designated staff member.

**R4.** F5, HSD facilities management should place its own tracking system on a sample of mounds and holes on a regular basis to track how quickly and effectively GPC and the bait works to resolve the gopher issue.

**R5.** F6, HSD should determine and report the cost of placing wire mesh on all existing recreational fields.  Compare this cost to the contract of contracting GPC over a 10-year period.

**R6.** F6, Follow the Master Plan layout of funds for the school site improvements.

**R7.** F6, All new school fields built should include wire mesh in the cost of construction.

## RESPONSE  REQUIRED

The California Penal Code subsection (933) requires that a response to the findings and recommendations made in this final report be delivered to the Presiding Judge of the San Benito County Superior Court.

- Board of Directors, Hollister School District  (response required within 90 days)

## REFERENCES

Hollister School District, 2690 Cienega Rd, Hollister, CA 95023 http://www.hesd.org/overview/about_h_s_d

California Coastal Prairies, http://www.sonoma.edu/cei/prairie/prairie_desc/animals.shtml

Mammals of California's Central Coast Region http://kennethadair.org/mammals.htm



Gopher Hole and Mound - Tripping Hazard

*Pocket Gopher (Thomomys bottae)*



## "THE JEWEL ON THE HILL"
## HAZEL HAWKINS MEMORIAL HOSPITAL EMERGENCY DEPARTMENT REPORT
## 2015-2016 San Benito County Grand Jury



## SUMMARY

Many citizen complaints led the San Benito County Grand Jury (SBCGJ) to evaluate a number of issues about the quality of healthcare services provided by the Hazel Hawkins Memorial Hospital (HHH) Emergency Department (ED). The complaints were specific in respect to poor healthcare performance by the ED staff and poor department management by the ED management company. The SBCGJ found that the original complaints have already led to many improvements in the overall operations of the ED and continue to do so going forward.

In 2012, the hospital was listed in the poorest healthcare survey group rating in the United States from Leapfrog, a widely used national hospital rating service. The Joint Commission for Accreditation of Healthcare Operations (JCAHO) also gave the hospital poor ratings in 2012. The Grand Jury wanted to know the reasons behind these poor ratings.

If a person, picked up by law enforcement, is suspected of mental illness, he/she is admitted to the Hazel Hawkins Emergency Department for evaluation. These people are referred to as 5150 mental health patients, as defined in Section 5150 of the California Welfare and Institutions Code (WIC). In order to determine the overall impact these patients are having on the Hazel Hawkins ED, issues regarding their handling were investigated.

## GLOSSARY

- California Welfare and Institutions Code (WIC)
- Center for Medicare and Medicaid Services (CMS)
- Emergency Department (ED)
- Hazel Hawkins Memorial Hospital (HHH)
- Joint Commission for Accreditation of Healthcare Operations (JCAHO)
- Lanterman-Petris-Short Act (LPS)
- San Benito County (SBC)
- San Benito County Behavioral Health (BH)
- San Benito County Grand Jury (SBCGJ)
- Valley Emergency Physicians (VEP)

## BACKGROUND

Hazel Hawkins Memorial Hospital (HHH) is a 62-bed, acute-care facility, located at 911 Sunset Drive, in Hollister, Ca. The hospital offers a wide range of inpatient, outpatient, and diagnostic services to its patients. The HHH medical staff consists of over 100 physicians, representing over 30 different specialties.

The hospital is named after a 10 year old girl from Hollister, who died from appendicitis, in part due to lack of an adequate healthcare facility in town. Her grandfather vowed that this kind of tragedy would not happen to other San Benito County (SBC) residents. In November of 1907, Mr. T. S. Hawkins fulfilled his commitment to the people of SBC by constructing Hazel Hawkins Memorial Hospital. The hospital was originally located on the corner of Monterey Street and Hawkins Street. At that time, it served as the county's principal hospital. In 1957, SBC voters approved the formation of a "hospital district" to manage its healthcare services. The San Benito Healthcare District is a nine-facility healthcare entity that includes HHH, ED, William and Inez Mabie Skilled Nursing Facility, Mabie Northside Skilled Nursing Facility, San Benito Home Healthcare Agency, Hazel Hawkins Community Health Clinic in Hollister, Hazel Hawkins Community Health Clinic at San Juan Bautista, Hazel Hawkins Solutions Program for Seniors, and Hazel

Hawkins Rehabilitation Services. The District also has four other off-site health clinics in Hollister. Two volunteer organizations, the Hazel Hawkins Memorial Foundation and the Hazel Hawkins Auxiliary, provide much needed financial resources to the hospital through grants, endowments, donations, proceeds from a gift shop, and a thrift store.  In 1962, the current HHH district hospital, on Sunset Drive, was completed and the first patients were admitted. Due to Measure L funding in 2002 from the SBC taxpayers, construction was started June of 2008, on a new 14,500 sq. ft. state-of-the-art ED for the hospital. It was completed in 2010. This new ED facility is more than double the size of the old one, with intra-department new CT scanner and spacious patient rooms.

## PURPOSE

The purpose of this ED investigation by the SBCGJ was:
- To determine if the many citizen complaints about the poor healthcare service provided by the ED had merit.
- To determine if lack of adequate staffing and poor management performance by the contracted ED management services company had merit.
- To determine the reasons the hospital was rated, in 2012, in the lowest quality hospital grouping in the nation and to determine if this rating has since improved.
- To determine the impact of the 5150 patients on ED operations.

## METHODOLOGY

The members of the SBCGJ were given a comprehensive tour of the ED facilities and conducted interviews of various HHH staff and officials. The Grand Jury reviewed various written materials, which included ED policies and procedures, contracts, hospital rating information, rating results, patient survey results, quality improvement data, and operational performance data.

## DISCUSSION

### Facility

The ED provides both physician and nursing support. The staff at the Hazel Hawkins's ED work two twelve-hour shifts on a twenty-four hour, seven-day a week basis. The ED, on the average, treats over 1600 patients per month.

The ED facility has a total of eighteen rooms, which include three state-of-the-art trauma bays and fifteen private treatment rooms. One room is a behavioral health evaluation room and one is a negative-pressure treatment room for housing patients with contagious diseases. Between 11:00 am and 11:00 pm, the Rapid Patient Management program designates a smaller waiting room for non-gurney-bound patients and four of

the private treatment rooms for gurney-bound patients. The purpose of the Rapid Patient Management program is to provide quicker services for patients who don't have life threatening illnesses or injuries.

## Technology

The ED has a technologically-advanced, 128-slice, CT scanner for diagnosing strokes and other serious problems as well as new "In-Touch TeleStroke" telemedicine equipment provided by Good Samaritan Hospital of San Jose, Ca. This telemedicine equipment implements a new interactive stroke program that offers hospital staff around-the-clock access to board certified neurologists via telemedicine with the Los Angeles Sage Neurology Stroke Center.

Upon arrival at HHH, a potential stroke patient is quickly assessed by the ED staff using the National Institute of Health Stroke Scale Certification system and given a CT scan. If the scan indicates a patient is experiencing a less severe stroke, the new, interactive stroke program is utilized and he/she can be treated at HHH. If the program indicates a serious stroke requiring advanced treatment, the patient is transferred to Good Samaritan Hospital or their "sister" facility, San Jose Regional Medical Center, both located in San Jose, Ca. The ED has the latest style helicopter pad to facilitate rapid patient transfer to a higher level hospital.

## Quality Surveys

Many hospitals subscribe to various rating surveys. This investigation focused on two of the surveys subscribed to by HHH, namely Leapfrog, a public survey service, and the JCAHO, a survey sanctioned by Medicare and Medicaid Services (CMS).
The purpose of these surveys is to evaluate the ability of the hospital to provide the latest CMS-approved healthcare. The surveys are conducted semi-annually, using phone interviews, written questionnaires, or onsite survey personnel visits to the hospital. The surveys cover many issues, ranging from facility conditions and amenities to quality and quantity of patient care. By the time the survey information is compiled into a final report, the information is two years old. At this point, the report could inaccurately and unfairly represent the hospital's current status.

The hospital takes the survey results very seriously; it uses them to improve policies and procedures, design and implement new training protocols, evaluate staffing needs, and upgrade facility equipment.

The rating results do not compare equally across the board. HHH is considered small in relation to some of the larger hospitals in the U.S. This can be very misleading. Smaller hospital's ratings are negatively impacted due to a limited number of services offered. Smaller hospitals are also at a disadvantage because of lower numbers of surgical cases and specific disease diagnoses, and smaller budgets.

Although surveys are voluntary, hospitals are rated even if they decline to participate. Not participating will garnish a poor rating. In the 2012 Leapfrog survey of the HHH, in which HHH declined to participate, the rating score dropped from a "C" to an "F." During the same time period as the Leapfrog survey, the JCAHO conducted its unannounced survey. This survey is given once every third year, in contrast to the Leapfrog survey, which is given semi-annually. The JCAHO survey identified several deficiencies in its final report, as well. The number and types of deficiencies reported were similar to other rated hospitals throughout the nation.

The consequences of bad survey ratings can affect the hospital in many ways. Healthcare insurance companies and government agencies to manage benefit claims paid to HHH use the survey results. A consequence of bad ratings is reduced claims payments paid by the insurance companies and government agencies. This would invariably impact the hospital budget negatively. Another consequence is that the insurance premiums paid by the hospital would increase.  Also, bottom-scoring hospitals generally suffer an unfavorable reputation that can be hard to overcome and this may lead consumers to seek alternative healthcare options.

**ED Operations**

Since 2012, the ED operations have improved substantially, contributing to improved hospital ratings. A contracted national ED management service, managed the ED operations, in 2012.  During the last few years of ED management, increasing patient and staff complaints, staff shortages, and dissatisfaction with performance finally led the HHH Board of Directors to recommend a change in the ED management company. A new contract was signed in early 2015.

Many changes were made. They hired a new Board Certified Emergency Care Medical Director. They hired new certified emergency care staff. They wrote new ED policies and procedures reflecting the latest in national emergency care standards. Finally, they improved employee morale, through counseling and performance reviews. HHH tracks the overall performance of the ED using a monthly census of operation details. This enables the medical staff and nursing staff to discuss whether desired targets are being met and which areas are in need of improvement.

The ED is driven by patient satisfaction. The ED staff tries to call all patients within three days of their ED experience to inquire if post discharge instructions are being followed. Data supplied by the hospital shows patient satisfaction has increased from the thirty percent approval range into the high seventy percent range. A new procedure has been implemented in order to handle patient complaints and to conclude any issues with a satisfactory resolution within thirty days. All complaints are now tracked electronically. More than one experienced local medical professional has referred to the HHH ED as "*The Jewel on the Hill*" that the people in SBC don't realize they have.

**Mental Health Patient Issues**

During the course of its investigation, the SBCGJ became aware of 5150 mental health patient handling issues that are becoming a serious problem for the ED. The ED mainly provides medical attention to patients with emergency physical issues. However, according to the law, a public hospital   like HHH, that operates an emergency department, cannot refuse to treat a patient who is seeking emergency healthcare. Patients with mental health issues must be seen.

Section 5150, which is a part of the California Welfare and Institutions Code (WIC) and the Lanterman–Petris–Short Act (LPS), authorizes a qualified peace officer or mental health clinician to confine a person who is suspected of having a mental health disorder and to assign that person a 5150, involuntary, seventy-two hour, patient-hold status. Authorized officials in SBC include only Hollister police officers, County Sheriff's deputies, and San Benito County Behavior Health (BH) clinicians.

The 5150 mental health patients arrive at the ED either by themselves or escorted by their families. Authorized officials also sometimes bring in patients from the streets or en route to or from the jail system. Upon arrival, the patients are given an emergency admission (not psychiatric) and a required, comprehensive physical exam and possible lab tests are conducted. The patients are then placed in a specially designed lockdown room and observed the duration of the confinement, around-the-clock, by a security officer, who is posted outside the patient's door. The costs of the emergency room stay, physical exam and lab tests are charged to the patient if possible; but if not possible these costs and all related security guard costs are assumed by the ED.

In SBC, only Behavioral Health (BH) claims the authority to release a 5150 patient hold status. The ED Medical Director cannot assign or release a 5150 hold. However, in adjacent Monterey and Santa Clara counties and in several other counties as well, the ED Medical Director has the authority to assign and release 5150 holds.

The 5150 patient is confined in the ED until detoxed if needed, given a medical clearance by the ED, and then assessed and released by BH. If a patient is deemed to require any mental health evaluation and treatment or voluntary or involuntary admission to a psychiatric facility he/she remains, sometimes confined, in the ED until an open bed in an appropriate psychiatric facility is found. The process may take days of involuntary ED confinement, incurring a cost of $2200+ per day. In this case, the BH clinician will issue repeated 5150 72-hour holds (a practice called "stacking") until an open psychiatric facility is located to do a mental health evaluation of the patient. This stacking practice may be illegal by LPS standards in SBC. If a bed is found, the ED must provide patient transportation to the psychiatric facility – often incurring unshared costs with BH.

The 5150 patients receive no psychiatric treatment for their mental illness while being held in the ED.  The SBC BH clinician provides an assessment only in terms of whether or not a patient meets the criteria for a 72 hour 5150 psychiatric hold, but cannot provide any evaluations for recommendations for treatment of, or diagnose, a mental illness.  Frequently those BH assessments are slow to occur and delays of many hours are common.  SBC BH has made available their psychiatrists on a limited basis (Monday through Friday business hours) for phone consultation only, and not on a routine basis. Routine treatment of psychiatric illness does not occur for patients on a 72 hour 5150 hold. There have been cases where a psychiatric patient is only released or transferred for evaluation for the next step (a 5151 72 hour hold at a qualified treatment facility) after many days of being confined in the ED without specialized treatment of his/her mental illness. The ED has difficulty billing the processes that cover the handling costs for 5150 patients confined in the ED. Most of these patients have no healthcare insurance coverage. The number of 5150 patients brought into the ED is increasing placing additional burden upon the facility.  The SBCGJ has found no clear, concise policy between the HHH ED and SBC BH that covers all of the handling issues of 5150 patients in this county.

## FINDINGS

**F1.**  The SBCGJ was impressed with the ED operations and facilities at HHH. More than one experienced, local, medical professional has referred to HHH ED as "*the jewel on the hill*" that the people in SBC do not realize they have.

**F2.**  The ED management company after many years of service was finally replaced after alleged reported poor performance and staffing issues. Current HHH research data shows that conditions are improving and patient satisfaction scores have improved since the new management company took over.

**F3.**  The SBCGJ found there have been many state-of-the-art improvements and more effective policies and procedures put in place that are greatly improving operations and patient healthcare at the ED.

**F4.**  Hospital ratings are much more complex than citizens realize. Public perception of a poor rating is detrimental to the overall reputation and economic well-being of the institution.

**F5.**  The 5150 patient situations are not being addressed in a timely manner between the ED and BH, causing the ED an extra burden and increased expenses. The ED

57

Medical Director does not have the authority to assign and release 5150 holds. This lack of authority adds to unnecessarily longer hold times and higher expenses for 5150 patients at the ED.

**F6.**  There is no clear, agreed upon protocol between HHH ED and SBC BH regarding the treatment, handling, and associated costs of 5150 patients confined in the ED.

## RECOMMENDATIONS

**R1. (F1)** The HHH should encourage SBC residents to be aware of the positive, medical professional recognition Hazel Hawkins Hospital receives.

**R2: (F2)** Maintain an open dialogue with the new management company to ensure that the ED continues its excellent performance.

**R3. (F3)** Keep the community informed to improve public perception of HHH and the ED.

**R4. (F4)** Disseminate the hospital's rating results and corrective actions to the general public through local media sources, public relations presentations to various local community organizations, and public periodicals published by HHH.

**R5. (F5)** The ED Medical Director or ED Physician on duty should also have the authority to assign and release 5150 holds. By sharing this authority with BH, a higher operational efficiency and potentially large healthcare cost savings could be realized by the ED.

**R6. (F6)** HHH ED and SBC BH need a comprehensive written agreement addressing the responsibilities of each organization as to the confinement, treatment, handling, and associated costs of 5150 patients brought into the ED.

## REQUEST FOR RESPONSES

Pursuant to Penal Code section 933.05, the grand jury requests responses as follows:

From the following governing bodies:

- Hazel Hawkins Memorial Hospital Board of Directors (response required within 90 days)

- Board of Supervisors, County of San Benito (response required within 90 days)

## REFERENCES

- California Welfare and Institutions Code (WIC) http://www.leginfo.ca.gov/cgi-bin/displaycode?section=wic&group=05001-06000&file=5150-5155
- American Hospital Association http://www.aha.org/research/rc/stat-studies/fast-facts.shtml
- News and Views  http://news.health.com/2012/12/02/25-worst-hospitals-in-the-u-s-is-yours-on-the-list/.  The report was issued by Leapfrog, a coalition of public and private purchasers of health insurance benefits. The group recently updated its June list of poor-performing hospitals, giving "D" and "F" grades to those that represent "the most hazardous environments for patients in need of care." December 2, 2012 | By Amy O'Connor.
- http://www.wtvy.com/home/headlines/One-of-the-Worst-Hospitals-in-the-US-Could-be-Closer-Than-You-Think-182094061.html
-  http://hospitals.healthgrove.com/d/d/California  Hazel Hawkins Memorial Hospital Hollister, California. #158 ranked in California.
- The Joint Commission on the Accreditation of Healthcare Organizations: https://www.jointcommission.org/
- CMS: The Center for Medicare and Medicaid Services: https://www.medicare.gov/hospitalcompare/
- The Hospital Safety Score provided by The Leapfrog Group, an independent U.S. organization:  https://www.hospitalsafetyscore.org
- Consumer Reports http://www.consumerreports.org/health/doctors-hospitals/hospital-ratings/ratings/search-results.htm?state=CA
- Hazel Hawkins Hospital Emergency Services http://hazelhawkins.com/services/emergency-services/



# A CALIFORNIA PAYMENT METHOD FOR PROCUREMENT

## "CAL-Card" in Hollister Government

## SUMMARY

The State of California's CAL-Card program provides tax-funded local agencies and governments with a procurement method. Cal-Card is a payment method in the form of a Visa card issued by the U.S. Bank Corporation (USCB) to local government employees and elected officials. In San Benito County (SBC), the City of Hollister (COH) government uses the CAL-Card program.

Misconception exists that Hollister is running up unsupported debt relying upon credit cards to procure goods and services. The San Benito County Grand Jury (SBCGJ) found this to be unsubstantiated conjecture. The program is determined to be efficient, straightforward to manage, increases vendor reach, and the State of California's contract bank pays back 1% of the funds used for purchases to the COH, generating additional revenue for its constituents.  The program is well run by the COH.

At the time of this report, San Benito County (SBC) government has not taken advantage of this additional revenue stream offered by the State of CA.  An evaluation by the jury of the program's benefits indicates it outweighs both perceived risk of theft or theft within a well-run program. Along with promulgation of the CAL-Card program, recommendation is that SBC adopt this program for procurement of goods and services.

## BACKGROUND

What is CAL-Card?
The local CAL-Card program was approved and adopted by Hollister City Council in October 1998. The program in place is intended to supplant most purchase orders, travel expense claim reimbursements, and office "petty cash."

How does CAL-Card work?
The California (CA) Department of General Services, Procurement Division (DGS PD) is in a Participating Addendum (Cooperative Agreement) with U.S. Bank National Association for purchase card services, which support the State of California Purchase Card (CAL-Card) Program. The State of California negotiates 5-year contracts to enable local governments to use this streamlined procurement method. CA is currently under contract with U.S. Bank Corporation (USCB).

The CAL-Card agreement invites local government agencies to participate. Individuals in various government agency procurement departments become authorized; those individuals are issued a purchasing CAL-Card bearing a VISA logo. USBC payment

cards are issued to individual employees, not to a group or to a specific department. The individual using the card is allowed to make only department authorized purchases and pay for work related travel and per-diem within the operational scope and departmental budget.  They must maintain established departmental limits, and maintain all budgets approved by COH elected officials' and adopted for that fiscal year. After a purchase is made, USBC pays the vendor, and then the COH pays USBC in a consolidated expense outlay.  Vendors prefer this procurement method because USBC pays the vendor within 2-3 days; faster than typically checks drafted and issued by local government made to a range of vendors, individually. In SBC, the COH is the sole tax-funded agency utilizing the CAL- Card program.

## DISCUSSION

There is erroneous belief among SBC citizens about the issued procurement cards. The conjecture is that the CAL-Card program maintains "debt" above allocated funds. Concerns about abuse of the card, whereby departments overspend, and buy unneeded or unauthorized items is pervasive.  As any mechanism concerning government spending using taxpayer money, this is understandable. However, controls are in place to avoid abuse. This procurement method is inherently efficient, supplanting purchase orders, travel expense claim reimbursements, and the need to track office "petty cash".

In September 2015 the SBC Freelance Newspaper reported that during FY 2014-15, "The City (of Hollister) spent $795k on credit cards".  What was not clear in the article is that this was a drawdown of the City's general fund of over $18 million dollars that year, allocated to city departments for routine operation. Certainly an almost $800,000 of true "credit card *debt"* might shock a taxpayer, but this is not how the CAL-Card program functions. In fact, no debt is accumulated at all; USBC is paid at the end of every month in full.  The Grand Jury came to understand that the article was misleading and decided to follow the process to determine if taxpayers should have other concerns.

As of April 5, 2016, 110 Visa cards are issued and active within Hollister City government out of 142 employees and City Council Members. Each purchase is treated like a Visa card transaction and is accepted wherever a card with a Visa designation is honored. Purchases by the COH therefore are not limited to just vendors who accept purchase orders. The State of California established rules that limit cards' authorization for official business and the cards are subject to spending limits. Though USBC allows a limit of $100,000 per card and $20,000 per month, Hollister employees' limits are reduced further by the City of Hollister. Spending limits imposed on an employee may vary by Hollister department policy.  For example, department rules may stipulate a limit for a single transaction to purchasing goods and services up to $2,500 per transaction. The maximum purchase amount allowed per thirty-day period is $20,000 per card and the maximum is $25,000 per vendor per fiscal year.

CAL-Card users are protected from fraud, waiver liability, and purchases can be disputed up to 60 days from the invoice date. USBC is in process of increasing security measures by migrating the CAL-Card Program to chip-enabled cards in 2015 and 2016.

There is also a financial incentive for local governments to adopt the program through 1% "cash back" and this should not be overlooked. The jury investigation determined that the 1 percent reimbursement program by U.S. Bank yielded $25,206.83 for the City of Hollister from March 3, 2011 to February 29, 2016. Reimbursement checks are issued to the City of Hollister quarterly, augmenting the City budget.

## METHODOLOGY

The Grand Jury evaluated the efficiency and efficacy of the CAL-Card in Hollister, CA. The SBCGJ evaluated, researched, and verified how the CAL-Card program worked locally, and looked for problems. The jury tested the Hollister's, Cal-Card system in place in 2015-16.

Purchase approval procedures were analyzed as well as sources of funds to purchase goods and services through CAL-Card.  This was within the speculation that citizen conception of the CAL-Card program generates local government "debt" and entails systematic abuse of "credit" by government employees.

The current process in place by the City of Hollister is:
-   An employee is issued a Visa card by the Department Head.
-   The employee is authorized to use the Visa card under directed stipulations by the Department Head, City of Hollister, and the State of California.
-   The employee makes a purchase using the card.
-   The employee receives a monthly Visa statement summary.
-   The employee reviews the statement, signs and submits the bill to his Department Approving Official (DAO) with all receipts and supporting documentation the Department Head or DAO requires. The DAO can be a Department Director, Manager, or Line Supervisor.
-   After reviewing bill detail and matching the charges against the receipts, The DAO signs off on the Visa bill and forwards it to the City Finance Department (CFD).
-   The CFD/City Auditor evaluates, reviews, signs off and then forwards the statement for check preparation using funds drawn against the department's budget.
-   Two employees in the City Finance Department sign a check and payment is made to USCB Visa.

To conduct a statistically significant evaluation, with no more than 5% error, a random sample of 30% (33 card users) was drawn from the total 110 active accounts. No identifying factors were used to determine which accounts would be audited or to whom the accounts belonged.  Each active account was assigned a number between 1 and 110. The numbers were placed in a container and pulled out randomly by jurors. Two jurors publicly matched the numbers picked to the corresponding account so that any claim of potential bias could be eliminated. The Grand Jury subsequently requested and received reports for the previous 24 Months for those personnel and evaluated from card issue, to Visa purchase, and then submission of Visa bill to the City for payment along supporting documentation and signatures pursuant by the City of Hollister policies

and procedures. Interviews were conducted to determine how the Cal-Card program works locally to validate the adopted relevant City of Hollister policies and procedures.

The jury found no incidences of fraudulent purchases, misuse, mismanagement of spending or spending limits.  A *comprehensive* detailed set of documentation was missing in a few instances.

Perceptions of an official's conduct matters in government and in politics. If constituents *believe* misuse of Visa cards can and is being committed, this possibly lessens use of the card – which then forgoes the 1% cash back. There is very limited chance of individual card abuse or fraud with 5 different people reviewing statements and payment in a monthly cycle. The positive economic impact of using the card is stressed and SBC residents might look further than newspaper headlines or insist local a journalist is tasked to fully evaluate questionable government misconduct before reporting. Misconception should not be the limiting factor that results in forgoing revenue returns from 1% of purchases, or cost savings by eliminating the small purchase order process. Unfortunate misguided perception of the card may have slowed SBC leadership from adopting the card and slowing the inherent revenue stream addition to the county general fund.

## FINDINGS

**F1.**  Some invoices were missing the complete documentation stated in section V111 of the City CAL-Card Procedures issued by the City of Hollister Finance Division.

**F2.** The CAL-Card is an excellent, efficient, and profitable method of procurement for goods and services.  The COH government is commended on the long-standing use of the State's CAL-Card program.

## RECOMMENDATIONS

**R1.** F1**,** Ensure that *complete* documentation is provided on all invoices; which includes the business purpose for the expenditure, amount of expenditure, and the name of the business where the expense was incurred.

**R2.**  F1, Documentation requirements should be consistent throughout all departments and cardholders, and departmental policies and procedures should be followed as written.

**R3.**  F2, The continued use of the CAL-Card Program is recommended.  The program provides for conducting City of Hollister official business efficiently and expeditiously.

**R4.**  F2, SBC is encouraged to implement this method of procurement to streamline operations and augment revenue to the county's General Fund.

## REQUEST  FOR  RESPONSES

Pursuant to Penal Code section 933.05, the grand jury requests response:
From the following governing bodies,

Hollister City Council (90 days to respond)
San Benito County Board of Supervisors (90 days to respond)

## RESOURCES

CAL-Card Program Website
Participating Addendum 7-14-99-22
CAL-Card quarterly rebate reports, 2015
State of California Purchase Card "CAL-Card" Policies and Procedures
- ▪ CAL-card Local Agency Subscription Agreement - *updated 10/2015*
- ▪ CAL-card Implementation Process Overview
- ▪ CAL-Card State Contract Administrator
- ▪ www.sanbenitocountytoday.com

City of Hollister, Organization Chart
City of Hollister, Finance Division, City Credit Card (CAL-Card) Policies and Procedures
City of Hollister FY 2014-15 adopted budget

CMAP; Minutes taken during the 24 May 2016 SBC BOS meeting.

**San Benito County Jail**
**San Benito County Grand Jury**
**2015-2016**

## SUMMARY

The annual evaluation of the San Benito County Jail detention facility was conducted during 2016.  Members of the San Benito Grand Jury (SBCGJ) requested a tour of the facility and interviewed staff and inmates. The jury found overall the jail staff managed jail operations under their purview, given their resources, excellently.  The San Benito County Board of Supervisors (BOS) should recognize however, that jail leadership's continued requests for staff remains a jury concern and a safety issue. The jail needs either less demand or a larger staff to conduct routine operations with lesser risk; maintaining order and safety management of the inmates. Preventive and repair maintenance continues to fall behind without a full time maintenance position. Corrections Officers (CO) are overworked and so short staffed that any additional consideration leading to a reduced roster, for example, due to health reasons, leave the jail less safe. Inmate complaints predominantly clustered around food quality and portion size, the jury researched this aspect further and provided topical discussion.

## BACKGROUND

### Jail Personnel

The Jail Commander has a staff of 24 sworn correctional officers and one non-sworn office person. There is a person assigned to update the budget and acts as a liaison to the Jail Commander. The jail is staffed 24 hours per day with correctional officers working twelve-hour shifts. There is a control position, which rotates personnel every four hours. Two correctional officers are assigned to transport inmates to and from court Monday through Friday. There are two additional deputy positions and $100,000 per year for construction provided as extra funding with CA Assembly Bill 109. There are two unfilled positions.

### Inmates

There are six housing units (called Pods, A through F). Two pods (A and D) are set-aside for maximum-security prisoners, including gang-affiliated inmates. Two pods (B and C) are for minimum and medium security inmates. Female inmates are housed in separate pods, E and F, with F used for maximum-security inmates. Once booked and admitted to the jail, inmates are given two sheets and one blanket; (2 blankets during winter season). Inmates are given a shirt and pants, the color determining minimum, medium or maximum security risk (orange, blue, or black and white stripes, respectively). Inmates also have an identifying wristband. They are provided a towel, a pair of shower shoes, socks, underwear and a mattress. For safety reasons, inmates

are not given a pillow. Inmates receive at least one hour of common recreation every other day, and a shower every 48 hours. Visiting hours are limited to two, one-half hour visits per week with a maximum of two adult visitors. Inmates have the use of an in house phone contracted by the jail with Global Tel Link, and are advised that all phone calls are recorded.

## Support Services
All prisoners are allowed to participate in a variety of educational classes and programs. In addition to formal programs, there are television sets, board games, and an exercise area. The inmates have access to a small library. Library books are provided through donations.

## Jail Facilities
The jail facility includes an intake unit, front office, several holding cells, safety and sobering cells, housing pods, a command center, an educational/library room, kitchen, laundry, medical area, visiting area and exercise yard. All areas of the jail appear clean, organized and well maintained. There are monitoring cameras throughout the jail with the exception of the individual cells.

With the construction of the new courthouse facility in Hollister, additional holding cells have been added there for inmates waiting to appear in court. Those facilities were not inspected by this Grand Jury.

There is a jail addition planned with an estimated operational date sometime in 2017. There will be an additional 72 beds when the new addition to the jail is built.

## Maintenance Services
There is not an on-site maintenance person. Repair maintenance is provided by the San Benito County Public Works Department following a work order input document submitted by the Jail. Preventive maintenance is lacking. The GJ saw areas both indoors and outdoors needing and repair and repairs being made at the time of the visit. Inmates could perform some of the work, but a maintenance person would still be needed to supervise the tasks. Emergency plumbing is contracted to outside plumbers.

## Staff Interviews
The expected "result of being short on personnel is that it can lead to safety issues for staff and inmates".

There were no known filed employee grievances. It was stated that if there are complaints, they are usually handled before escalating to the formal grievance process.

Staff enthusiasm is demonstrated with requests for continuing and updated staff training. There was a desire to have training in medical care, defensive tactics, Critical Incident Training, and cell extraction techniques. There currently is no policy or training on a safety chair used for violent inmates. This has led to staff injuries in the past. There was also a mention to have the current policy manual revised because of the emphasis

on patrol functions, leaving the corrections functions outdated. It was also suggested to have some policies that reflect the current day social issues, specifically surrounding the media and law enforcement. With the implementation of AB 109, there are more sophisticated and violent inmates being housed at the county levels. This would also warrant additional safety training.

**Medical Service**

The medical service is provided by contract with California Forensic Medical Group, an outside company with expertise in correctional medical care. A Registered Nurse (RN) is on duty in the nurse's office from 7AM to 3PM daily, along with a part-time nursing assistant, Certified Nursing Assistant (CNA) 22 hours per week. A correctional officer accompanies the inmate to and from the infirmary. Required inmate medications are administered in the pods three times daily, twice by the RN accompanied by a correctional officer and once by the correctional officers after hours. If it is determined further follow up is needed, the inmate will be referred to his or her primary care physician at the inmate's expense or to the local hospital. Pursuing medical care after hours is at the discretion of the supervising correctional officer. A suicidal inmate is housed in what is called a "Safety Cell" and Behavioral Health is called immediately. A suicidal inmate is checked every fifteen (15) minutes for twenty-four (24) hours by a staff Corrections Officer (CO).  An inmate in the Safety Cell is re-evaluated by San Benito County Behavioral Health (BH) only during business hours. The jail staff is trying to manage under this response policy by SBC Behavioral Health. In 2016, Behavioral Health implemented a twenty-four (24) call out window. During that twenty-four (24) hour time window a correctional deputy needs to monitor an inmate every fifteen (15) minutes until BH gets to the jail for assessment. This takes a deputy out of the main jail area and shortens the staffing levels until BH responds to assess the inmate. This could cause a safety issue for both the correctional staff and inmates because of a lower ratio of staff to inmates while waiting for Behavioral Health and until the deputy is relieved of the 15 minute checks.

**Inmate Interviews**

Inmates thought they were treated fairly. There was no concern about inconsistent treatment by the correctional officers. In the grand jury research, inmates interviewed felt their grievances were heard and handled promptly. Inmates felt they were housed safely and separated accordingly. There was a desire to have the correctional officers come through the general population Pod more often. An example was given that the younger inmates can get beaten up and as such the other inmates mostly police the pod. Inmates felt they had access to medical care when they needed it, and feminine products were being provided when asked. Inmates would like to see the deteriorating showers be cleaned a little better. The inmates that have special privileges, such as laundry, kitchen duty, washing cars, cleaning the booking areas, would like to have access to more sanitary supplies. This was emphasized when having to clean the safety cells. There was a desire to have more educational classes and programs, as well as a larger variety of accessible and regular religious services. The main complaints by the inmates were about the food. Inmates interviewed, and some whom complained in writing, called the "food horrible and the portions were small and lack of protein besides

peanut butter, beans, and bologna, with little to no change in variety." Inmates say they spend a lot of money on commissary cart items because the food served was "foul tasting and gross."

**Food Service**

The jail contracts with Aramark Corporation Food Service to prepare and deliver three pre-packaged meals a day to the facility: two cold meals and one hot meal. The contracting service indicates that they employ dieticians, and that arrangements are made for inmates with special dietary needs, such as pregnant females, diabetics, and those with religious requests. The meals are cooked and chilled at the Alameda County Jail in Santa Rita. Meals are transported to San Benito every other day. The jail receives deliveries of individual servings that are prepared to be placed in their walk-in refrigerators and freezers for warming up at meal time.

At SBC jail, the hot meals are heated by jail inmates, called trustees, and transported on a warming tray to each pod. The contractor provides food supervision on site 5 out of the 7 days a week. The method of delivery depends on the pod in which the inmate is housed, and whether the inmate is either in protective custody, administrative segregation, or general population. The jail strives to maintain a three-day supply of emergency meals.

Depending upon their status, inmates may purchase additional snack food or other items from a travelling commissary cart once a week. Commissary is a privilege. Those inmates who have $2.00 or less in their account, may order a welfare pack that includes paper, envelopes, toothpaste, pencil, eraser, razor and three packets of shampoo. An inmate may lose commissary privileges due to a disciplinary action; however, he/she may be eligible for a disciplinary pack, which is similar to a welfare pack.  Additionally, relatives of inmates can order and pay for commissary items to be given to inmates.


**DISCUSSION**

**Areas of concern:**
*"Corrections officers are constantly under some kind of stress or threat…they say in prison, nothing happens until everything happens."*

- Staffing: The County Jail is undermanned. For example, two correctional officers are required to transport inmates to and from court Monday through Friday. However, due to limited staff on Mondays and Fridays, only one correctional officer is available for this task. Additional personnel are required to be brought in on overtime to cover these staff shortages. There is more shortage during the daytime shifts due primarily to court transportation. It was also noted that no additional staffing is provided during the Hollister Independence motorcycle rally weekend. During this time there can be an influx of people being booked into the jail for various crimes. It was clear to the jury by observation and a brief tour that the jail is undermanned. Rearranging manpower to maintain adequate security is

part of a dangerous routine and a daily struggle.  Rotating CO's is coordinated to cover unmanned areas during medicine dispensary, 15-minute safety cell checks, court trips, and CO scheduled time off.  The bus to and from court is undermanned even though it may carry gang members from rival gangs at the same time to meet court date requirements.

- Repairs. Short-staffed CO's have to direct attention now to routine repairs to "put out fires". The jury noted several areas both indoors and outdoors that needed relatively minor repairs, which if not completed timely, would result in safety breaches. Larger equipment preventative maintenance has fallen behind; which typically results in costlier future repairs. Without dedicated maintenance staff on site as in the past, the wait time to get the repairs done may be extensive. During the jury inspection a doorknob needed repair – an immediate concern in a correctional facility. Inmates could perform some of the work, but would still need to be supervised, and would still require taking a CO off the floor along with the added responsibility of tools to secure. Emergency plumbing is however still contracted to outside plumbers.

- The fact that both above issues were found in past grand jury investigations points to BOS complacency.  Since the SBCGJ is the mandated investigator for the State of California regarding the San Benito County Jail, lack of action and external oversight recommended to county government by juries in the past to address these repetitive issues is unacceptable.

- WIC 5150 Psych Holds:  The latest policy directed by BH to the jail in January 2016 aggravates jail understaffing.  BH unilaterally directed that they would not evaluate jail 5150 holds between 5pm and 8am the next day.  This means that a CO is needed every 15 minutes to check and document an inmate in the safety cell. At the absolute, if an inmate is placed on 5150 hold at 5:15pm on a Friday evening of a long weekend, BH will not respond at the earliest until the following Tuesday morning after 8:15 am.  This scenario means that SBC BOS finds it acceptable: that the jail operate in such a manner that over a holiday weekend, given mandated 15 minute checks on one inmate, in an already undermanned environment; *an inmate needing mental health care is left for 89 hours before he is even looked at by a mental health professional*. This county government implicit policy is unacceptable by investigative, medical, and ethical standards.

- Food:  Inmates complained unequivocally that the food provided by the contractor was unpalatable; portions were small, lacked protein and had an unhealthy limited change in variety. Inmates explained they spend considerable money on the commissary cart, but feel it's necessary.  They worry about the financial impact this has on their families who place the money into their accounts to buy food.  Interestingly, the same contractor who runs the meal food service also runs the commissary cart.  The jury was told, "the commissary has tastier food and soups, even though it's primarily junk food".  The jury was

73

concerned that the commissary food may be priced higher than standard market price but found this to be untrue.  The prices were investigated and found commensurate with grocery store prices.

**Jail Food Service Quality**
The food service contractor at the time of investigation with San Benito County to serve all meals at the county jail is found in colleges, hospitals, sports venues, schools, special events, as well as jails and prisons.

*"I complained. They said, 'This is [a jail] not a five-star restaurant.' "*

The jury arranged for a food tasting during their annual inspection.  The food was agreed among the jury to be "considered just tolerable," and it was concluded there is cause to believe that inmate complaints should be considered further. The jury-sampled food was provided during an *announced* visit. Walking through the facility the jury witnessed many food trays left untouched by inmates along with the recognizably significant commentary about the poor quality of food from SBC inmates.

The jury inquired why food service is privatized instead of operating the large on-site commercial kitchen that exists at the jail, and meals not prepared by prisoners under the supervision of prison employees to create jobs for SBC. The answer to the jury was the "contract was in place to reduce waste."  General cost saving measures may have become more widespread and used to reduce institutional type food cost to address higher populations in jails beginning in 2005.

Contractors hired to serve meals at a static price can mean finding a way to better manage and reduce food costs in jails. The current contractor provides food to inmates at about a dollar a meal. Those captive behind bars generate revenue to contractors from local government's General Fund spending.  It is therefore necessary for local governments to carefully evaluate the contracting provisions and quality of service. The Free Press documents ethical standards with respect to meals to the incarcerated on a national level and were easily found during jury research.

SBC inmates believed it necessary to buy from the commissary providing the contractor both the set revenue from the food service contract and additional variable revenue from commissary purchases.

One can argue that the commissary can be used as an inmate privilege, as in the SBC Jail, to enhance security by allowing inmates a 'treat' as long as order is maintained in the jail.  On the other hand, if food is an incentive for peace, the jury wondered what that implies when the food is generally not tolerable.  The jury wondered whether the SBC Board of Supervisors has considered this during contracting processes.

The jury would have liked to provide the BOS with further research.  However, the SBC grand jury 2015-16 had direct limitations, by design of the SBC BOS adopted ordinance's which thwarted fully investigating the quality of the food served to inmates

using a longer term random sample, funds in committee to inspect the food preparation facility, regularly and realistically meeting in committee to conduct in depth analysis of the food with a dietitian and nutritionist, or determining if the food served to the SBC inmates even meets OSHA and FDA regulations - in temperature monitoring in cooking; the serving of raw or undercooked meat; validity of records related to dishwater temperature and cleaning solution quality; the serving of food that had been dropped on the floor; or the possibility of changing the dates on stored leftover food.

Since the grand jury is limited by the BOS, and there is no other state or county agency that specifically evaluates food served in the SBC Jail, and it's a premise that an orderly jail may depend upon what and how food is served, then it is imperative the SBC BOS step up, take notice, and hear the inmates – or support future juries in doing so.



**FINDINGS**

**F1.**  The jail requires a full-time, dedicated maintenance person for both preventative maintenance and routine repairs.

**F2.**  The county jail staff excellently runs the jail without critical resources. Though admirable, this cannot nor should not last indefinitely. SBCGJ recognizes the county jail for what it is: a vital community agency, which renders superb service to the public 24 hours a day/7 days a week. The jail staff is commended.

**F3.**  Incidents of correctional officers injured due to lack of training/use of the safety chair used for violent inmates.

**F4.**  Though urgently needed, there is no acceptable and workable protocol for WIC 5150 Psychiatric holds.

**F5.**  Additional staffing needed. Required duties performed per shift indicate the ratio of staff to inmates is at unsafe levels during known influx times.

**F6.**  Inmate complaints about the quality and portions of food provided at the jail seem warranted.


## RECOMMENDATIONS

**R1.**  F1, Employ a full-time, dedicated maintenance person for both preventative maintenance and routine repairs. The employee has his main office at jail and work on other outside Public Works jobs, if needed; not the other way around as is now.  Note: If governing bodies plan to address this recommendation with a statement that simply refers to "lack of funds", SBCGJ also recommends this be accompanied by a cost/risk/ benefit analysis using hours CO spend on repairs versus other duties; associated risk with CO's taken off the floor to do maintenance and the safety risk of skipping repairs; cost of major repairs due to lack of preventative maintenance; and a list of critical equipment's most recent preventive maintenance and calibrations.

**R2.** F2, F5, Provide the jail with needed resources and staff. The BOS should not become complacent and assert because the jail staff runs the jail well doesn't mean they don't need the additional assets that they continue to request. They make it work because it is a matter of life or death.  Not providing the jail with assets penalizes staff for a job well done and keeps the jail running at high stress levels. **Staffing is needed** specifically during daytime court transports and in the evening for the additional duties specific during the night hours (i.e. when no nurse, medical, or behavior health personnel is on site). Additional staffing should also be regularly provided for planned events when it is known there is a large influx of people into the community, such as the bike rally weekend. Required duties performed per shift clearly indicate the ratio of staff to inmates is at unsafe levels during influx times.

**R3**. F3, Provide the jail staff with needed training. Provide training in extraction and restraint for hostile inmates, specifically in regard to utilizing the safety restraint chair.

Having no policy or training on a safety chair used for violent inmates has already led to staff injury. Use of the Restraint Chair is necessary and therefore appropriate training is required.

**R4.**  F4, Collaboration is vital to determine a workable system for WIC 5150 inmate evaluation and treatment. An agreement needs to be reached between the County Jail and Behavioral Health that is acceptable to both parties in regard to call out procedures; to evaluate suicidal inmates in a more timely manner so that correctional staff is not used for prolonged monitoring of a suicidal inmate or inmates needing other special psychiatric care.

**R5.**  F6, It is time for SBC governing agencies to analyze carefully the potential high costs of the poor quality of food given to people in lock-up. The pervasiveness of food quality complaints by inmates in the SBC Jail is a call for stepped up external oversight. Not simply relying on reports generated by the contractor, the BOS should conduct an in depth management analysis of taxpayers' money spent for inmates in a service contract.  This evaluation should review OSHA guidelines for quality assurance; proper food handling; food safety; and that FDA guidelines for nutrition are being provided to inmates. *The BOS is strongly encouraged to opt for inspection from an outside nonprofit organization, such as the American Correctional Association.*


## REQUEST  FOR  RESPONSES

Pursuant to Penal Code section 933.05, the grand jury requests responses as follows;

From the following office and governing bodies:

- San Benito County Board of Supervisors (response required within 90 days)

- San Benito County Sheriff, Darren Thompson (response required within 60 days)


## REFERENCES

http://www.freep.com/story/news/local/michigan/2014/10/23/former-aramark-prison-workers-allege-unsafe-kitchen-practices/17753335/

http://www.complaintsboard.com/aramark-b108804

http://www.aramark.com

https://www.google.com/search?client=safari&rls=en&q=www.clarktraining.org/gen_info/accr editation3.as&ie=UTF-8&oe=UTF-8

http://www.truthdig.com/report/page2/food_behind_bars_isnt_fit_for_your_dog_20131222

http://www.calsheriffs.org/Documents/do_the_crime,_do_the_time.pdf
http://www.cosb.us/county-departments/sheriff/about-the-department/
units-and-divisions/county-jail/commissary/#.V2YVYIfmJPM

http://nbc24.com/news/local/prison-overcrowding-may-pose-safety-risks

Title 15 of the California Code of Regulations

Operating regulations, Physical plant regulations, CA Title 24

California Penal and Welfare and Institutions Codes

Board of Corrections (BOC) instructions and manual

**American Jail Association** 1135 Professional Court
Hagerstown, MD 21740-5853
Phone: 301–790–3930 | Fax: 301–790–2941
*www.aja.org*

## San Benito County Juvenile Hall Inspection
## San Benito County Grand Jury 2015-16

## SUMMARY

The San Benito County Juvenile Hall is responsible for providing a safe, secure, and healthy environment for children while they are temporarily detained at the facility. It also assists the community in the rehabilitation of Juvenile Hall wards of the state (or dependents) through counseling and appropriate programs.

## BACKGROUND

The Juvenile Hall is a division of the San Benito County Probation Department.  It is not treated as, nor connected with the San Benito County Jail or any other penal institution. Rather, Juvenile Hall is a temporary detention and treatment facility that holds minors under the age of 18 whom are waiting for a court hearing or for release to a parent, guardian, or another responsible adult.  According to its policy and procedure manual, the Juvenile Hall's Mission is to provide a total system of care that provides a safe, protective environment, and promotes individual responsibility and accountability on the part of minors while encouraging professional excellence of the staff. Its goal is to provide minors with an environment that promotes acceptable community values and behavior.

Members of the Grand Jury took a pre-scheduled tour of the Juvenile Hall facility. During the course of the tour members met with Juvenile Hall staff. Jurors discussed the day-to-day operations of the facility and overall improvements since the 2014-2015 Grand Jury Report.

## DISCUSSION

Located at 708 Flynn Road, approximately two miles north of Hollister and adjacent to the San Benito County Jail, Juvenile Hall is near the intersection of State Route 25 and Flynn Road.  It shares a common driveway with the San Benito County Jail.  The previous Grand Jury Report indicated an issue with the lack of signage identifying the location/direction to the facility and clarity between the Juvenile Hall and the San Benito County Jail.  This issue has been remedied and signage identifying the individual entities is posted at northbound San Felipe just prior to Flynn Road.  Additional signage is posted on Flynn Road prior to the entrance of the Juvenile Hall.

### Juvenile Hall Personnel
The Juvenile Hall Superintendent is responsible for the management of day to day operations as well as daily supervision of Juvenile Hall personnel. Currently, there is one full time Juvenile Hall Superintendent, 11 full-time Juvenile Institution Officers (JIOs), 1 full time Administrative Assistant and an on-going open recruitment for part time help. Officers are working 12 hour shifts. There is no overlap of shifts or personnel. Staffing operates on a one JIO per ten detainees and normal staffing during any given shift is two JIOs and one

79

Supervisor. The JIOs receive their training during an academy and then have in house updates when required. The supervisors have all recently completed supervisor training. All staff have recently been trained on a new piece of equipment called "The Wrap" which will safely restrain dangerous juveniles without causing additional harm or restrict breathing.

**Juvenile Hall Residents**
Juvenile Hall provides housing for individuals from 13 to 19 years of age. If a youth is sentenced to serve time when he or she is under the age of 18, the detainee can be housed there even if he or she reaches age 18 or 19. This is decided on a case by case basis. Building capacity is 28, but the size of the classroom will not allow more than 20 juveniles to be housed per state law. At the time of our visit, there were 6 residents: 1 female and 5 males. Most residents are there for assaults, robbery, probation violations, and awaiting court. Juveniles are given sets of clothing. Previously, their clothing was orange in color. In the past year, the clothing has been changed to polo shirts, khaki pants, more athletic type footwear, and athletic shorts. This provides a more home like environment and fosters a positive self-image. They change clothes and shower daily. Bedding is changed twice a week.

**Juvenile Hall Facility**
Juvenile Hall consists of an intake area, day or multi-purpose room, classroom, sleeping cells, showers, an operations room, administrative offices, laundry room, storage, courtroom and a secure outside recreational area. The overall appearance is neat, clean, updated, spacious, and youth friendly. There was a metal detector in the lobby of the visiting area and a newer washer and dryer in the laundry room. The outside grass recreational area is currently unused. There have previously been numerous jury recommendations to repair the dangerous holes for safety reasons. This year a plan has finally been created and approved to concrete over the grass area. The current option is to resurface the current concrete basketball court area at the same time, as the new concrete area so there is no seam between the two areas. The new concrete area will have an additional, spongier surface placed on top of the concrete. This will be ideal for tennis and volleyball. There have been some delays in completing this because it is not clear who is currently in charge of the approval process at the county level. Expected as a result of this report this issue will be resolved, and responsibility for the project is assumed and confirmed. There is a need to have the shower in the intake area changed. It is currently a shower over a bathtub with a showerhead jutting out of the wall. The plan is to potentially make it a shower only, with a more recessed showerhead. The door would also be changed to allow more privacy for the juvenile. Currently, there is a cutout window that provides a full body view of the person showering. The desire is to change the door to a ¾ length door covering the body but leaving an area to view the head and feet for safety reasons.

There has been an implementation of a supervisor's office to allow employee counseling, report writing, and other administrative functions. A new risk scale has been implemented during the intake process. It is much more objective and has no demographic information on it allowing a broader overview of the juvenile.

**Food Services**

Juvenile Hall has an attractive, clean, multi-use common room where meals are served. The facility contracts with the same food service as the Jail to prepare and deliver three meals a day to the facility. Juveniles are also given healthy snacks throughout the day at the discretion of the staff. Complaints about the food are commensurate with the complaints from the Jail inmates.

**Medical Services**

Juvenile Hall contracts with a medical provider, California Forensic Medical Group. There is a Registered Nurse on duty from 8:00 AM to noon, Monday through Friday. A physician is available by phone in emergencies to provide advice as needed. San Benito County Behavioral Health provides mental Health services. Some juveniles may be wards of the court, and wards of the court often take longer to get care due to lack of a needed parent or guardian. Dental care is not provided unless the family has dental insurance or is willing to pay for it however; a contract for potential dental care for housed residents is currently being researched.

**Educational Services and Activities**

Juvenile Hall provides educational instruction and support through the San Benito County Office of Education. One teacher, an aide and one JIO for security purposes staff the classroom. The classroom is well lit and well equipped. Students are placed on individual learning plans, each working at his/her own pace. An effort is made to keep them current with their studies at their previous schools. They receive 280 minutes of daily instruction, Monday through Friday with an allocated 15-minute break during the course of instruction. The juveniles also work on life skills programs after school hours.

The YMCA offers sports programs 3 days a week for 2 hours. They currently offer soccer, tennis, and basketball. There has been a large garden area prepped for planting. The plan is to use the food for snacks and to possibly sell the overage at the local farmer's market. There is a recent contract with Sacred Rock to facilitate an overnight rock-climbing trip to Yosemite in the future. This trip would be for juveniles that have already been sentenced and have good behavior. They would be accompanied and supervised by the JIOs. A grant has been received from the San Benito Arts Council to start a dance, poetry, and mural painting program.

**Maintenance Services**

Juvenile Hall is responsible for performing its own maintenance and repair on its building, grounds, building systems, and equipment. It does not have a maintenance worker on staff to perform regularly scheduled maintenance tasks or perform general maintenance and preventative or repair work. San Benito County Public Works personnel perform major maintenance projects while staff members perform minor repairs when warranted.

**FINDINGS**

**F1**. There is no clear understanding on what the status is on the project to fix the basketball court and cement over the dangerous, hole filled grass area.

**F2**.  The shower in the intake area needs to be remodeled for safety reasons.

**F3**.  There has been recent training for the staff, but continuous and additional training would be beneficial.

**F4**.  There is no regular facility maintenance employee.

**F5.** The Mission Statement is outdated


**RECOMMENDATIONS**

**R1**. (F1) Get an update from Capital Projects on what is needed to complete the resurfacing and repairs.


**R2.** (F2) Remodel the shower in the intake area in a timely manner.


**R3.** (F3) Provide additional training for the staff, both in the corrections area and in the juvenile counseling area.


**R4.** (F4) Provide additional funding for a full time maintenance employee.


**R5**.  (F5) Update and shorten the mission statement


**REQUEST FOR RESPONSE:**

*PURSUANT TO PENAL CODE SECTION 933.05, THE GRAND JURY REQUESTS RESPONSES AS FOLLOWS:*

*FROM THE FOLLOWING GOVERNING BODIES:*

- Chief Probation Officer, San Benito County (response within 60 days)
- San Benito County Board of Supervisors (response in 90 days)

# Psychiatric Hold and Treatment
# Public Mental Healthcare Management
# San Benito County

## SUMMARY

"5150" is the language used in the State of California referring to the temporary, involuntary detention of an individual who may be mentally ill or gravely unstable. San Benito County has a complex problem with sound administration and management of mental health care for people placed on a "5150" holds. The county is duty bound under *California Law; Division 5 of the California Welfare and Institutions Code (CA W&I or WIC)* for assessment, in conjunction with working definitions in the *Diagnostic and Statistical Manual of Mental Disorders (DSM-5)*.

Several San Benito County (SBC) agencies share the operational and fiscal responsibility and constraints for individuals placed under temporary involuntary hold. With many organizations involved, the process has become a "hot potato" with finger pointing. Interpretations of various regulations, "best practices" and California and Federal law result in confusion and hardship executing logistics, assessment, disposition, and transit of persons requiring mental health care in our county.

Resolution in SBC will take a full collaboration of many.  This includes San Benito County Board of Supervisors, members of the Hollister City Council, Board of Directors of San Benito Health Care District (Hazel Hawkins Hospital), County and City Law Enforcement, SBC Probation Department, the SBC Jail, the SBC Juvenile Hall, and the SBC Behavioral Health Department.

This Civil Grand Jury Evaluation summarizes some recognizable difficulty agencies experience working under Federal, State and County governments' restraints, mandates, and intent. Solving this problem is resoundingly important because residents and employees of San Benito County are negatively affected by a broken system impacting our access to healthcare, our safety, and our financial resources.

- **San Benito County is struggling to work within California and Federal government laws; the reality is it is**
    - **Hard for patients,**
    - **Hard for the City of Hollister,**
    - **Hard for our Hospital, Hazel Hawkins,**
    - **Hard for our Law Enforcement,**
    - **Hard for our County Behavioral Health,**
    - **Makes needed transport difficult,**
    - **Makes SBC dependent on unreliable help from other counties.**

It's argued, 'it's not just SBC.'  Mental health care and logistics needs national attention. This is true.  However, on a local level more can and should be done; and the best of local collaborative effort is necessary because there can be a life-changing impact of receiving the right mental health care; and it is the law.

*CA WIC 5655.  "All departments of state government and **all local public agencies** shall **cooperate with county officials to assist them in mental health planning.** The State Department of Health Care Services shall, upon request and with available staff, provide consultation services to the local mental health directors, local governing bodies, and local mental health advisory boards."*

Following extensive research, among recommendations made by the SBC Grand Jury is to initiate work to establish clear multi-agency protocols and Memorandum of Understandings (MOUs), and that the MOUs remain in duration until superseded by subsequently negotiated agreements.

In the case that national attention will not likely provide SBC forthcoming relief; the Grand Jury asserts that county population increase is an impetus to go beyond MOUs, and strongly recommends SBC effect plans for a psychiatric crisis center and inpatient psychiatric beds. With a broken system and not enough resources - for a population reaching 57,000 in San Benito County - the words of this psychiatric expert in treatment advocacy are daunting:

*"What you see is predictable. If there are only a few beds, facilities have to triage, and take only the most severe cases," he said. "People aren't very good at predicting when someone is imminently dangerous, and so they are let out and what happens is people continue to deteriorate. Those folks then find themselves in a much less therapeutic facility — they're in jail."*

Or they hurt someone.

The current total of voluntary and involuntary, inpatient and/or outpatient psychiatric beds in SBC with a near population of 57,000 is **zero**.  This is objectionable.

And dangerous.

## BACKGROUND

The "5150 72-hour hold" is to *hold and transport* a person involuntarily so he/she may receive possibly needed medical and mental health care.  An involuntary psychiatric hold may be continued legally under CA law to up to 30 days with the correct resources and administration.  Right now SBC has authority to administer only the initial 5150 72-hour hold.

How are SBC 5150s handled?
An outline of the current basic process in SBC

California Law reads: "*WIC 5150.  (a) When a person, as a result of a mental health disorder, is a danger to others, or to himself or herself, or gravely disabled, a peace officer, professional person in charge of a facility designated by the county for evaluation and treatment, member of the attending staff, as defined by regulation, of a facility designated by the county for evaluation and treatment, designated members of a mobile crisis team, or professional person designated by the county may, upon probable cause, take, or cause to be taken, the person into custody for a period of up to 72 hours for assessment, evaluation, and crisis intervention, or placement for evaluation and treatment in a facility designated by the county for evaluation and treatment and approved by the State Department of Health Care Services.*"

When an individual is suspected of the need to be transported and held involuntarily for mental health reasons under WIC 5150, Law Enforcement (LE) is typically the first line of authority and initiates the hold. To legally place an individual on a 5150 detention, LE must only identify *probable cause*, the lowest level of evidence or proof. Imminent danger is not necessary. LE substantiates probable cause with "specific and articulable facts"; the law requires basing the hold upon observable and reportable behaviors by the authority detaining the individual.

Once an LE officer in SBC invokes a 5150 hold, LE transports the person to Hazel Hawkins Hospital (HHH) Emergency Department (ED) for *emergency* admission (not psychiatric) and assessment. The ED notifies the SBC Behavioral Health Department (BH) and then ED staff initiates and completes the "medical clearance" required by law when a county engages an ED in a WIC involuntary hold process.

Medical clearance determines underlying conditions that may contribute or explain the appearance of mental illness. If an individual is diabetic, has a high blood alcohol reading, or needs to detox, these conditions are addressed *before* BH review even though co-diagnoses are common.  After completing medical clearance and regardless of elapsed time, BH initiates a mental health assessment.

A BH clinician meets with the individual to decide whether to hold the patient for further observation, try to have the person transferred for admission to an inpatient facility, or to release the individual with or without inpatient or outpatient treatment arranged.  The person's release may follow after, say, an alcohol detox, and taken off the 5150 hold, followed perhaps by a plan to meet with BH about substance abuse.

If SBC BH deems an individual will benefit from being held *involuntarily* to wait for an inpatient bed, an attempt is made to locate and assign an appropriate bed as soon as possible - with this wait time still under the legal timeframe constraint of the 5150 72 hours.  Successfully researching and locating a viable option for help in another county for an SBC resident following clearance and assessment can easily exceed the 72 hours.

Transportation logistics begins after locating a bed. Patients' travel may be long distances to reach the bed, and needed transportation is not readily available for them in SBC.  Not obtained transport means the bed is *forfeited*.

Even if the person remains a danger to himself or others, the patient may be released directly from the ED.  LE and the Jail are under strict WIC 5150.1 law not to place an individual in the Jail due to lack of an acute care bed.  Therefore, unless the person has a pending arrest, they are free to go.

## DISCUSSION

The following questions presented to the SBC Grand Jury are answered by this Discussion and the subsequent Analysis - along with an overview of guiding legislation.
- Why is HHH the place to bring 5150 holds?
- Does HHH have adequate resources to address mental health care?
- Why is HHH involved at all?
- When do the 72 hours of the 5150 period start?
- What if more time is needed than 72 hours while a person is in the ED waiting for mental health assessment?
- Are a person's civil rights affected?
- Are those requiring public mental health care in SBC obtaining what they need?
- Can an ED representative decide to take off a 5150 hold?
- What is the BOS role in overseeing mental health in SBC?
- If patients are released when there is no bed for them, is LE picking up the same people over again?
- Who oversees the whole process?
- Is SBC in compliance with the law?
- Who is responsible for what?
- What should SBC do?

The minimum describes SBC's mental health care program and its current processes, and even that is struggling. From the initial steps to the final disposition, resources are strained In SBC; the BOS directs that the intake for professional *mental health psychiatric assessment* for an individual on a 5150 hold is conducted in the HHH ED. Other CA Counties may use an intake location such as a *County Crisis Clinic* where LE can bring people within 5150 hold guidelines.  Clinics such as these conduct *both*

medical and psychiatric evaluations.  Without something like a Crisis Clinic, our sole Emergency Department is the holding place to assess those who may need an evaluation for further mental health care.  The stop and hold at our community hospital ED are default for a person in a 5150 status to get "clearance" to proceed to get psychiatric help in SBC.

In addition to *County Crisis Clinics,* some counties also have one or more stand-alone clinics called a *Psychiatric Healthcare Facility (PHF – "puff").* These facilities can assign some individuals to a bed to complete the *evaluation.* A PHF can receive patients following an ED medical clearance, or it may conduct medical clearance - one that is allowed by law to be less rigorous than the ED. Using extrapolated data concerning beds per capita from other CA counties, the Grand Jury research estimates that SBC needs a 10+ bed PHF.

What about inpatient beds?  SBC does not have any.  Expert guidelines approximate the need to be one bed for every 2,000 per capita. This view means SBC should have access to 26 beds, some in locked units.  However, competition to obtain state funding for beds is sizeable – which in turn has communities reach for support from special districts like HHH.  Setting aside the seemingly impossible expert guidelines, another comparison using further data indicates that the *least* number of beds in any other CA county is 14.9 beds per population of 100,000.  Therefore, the minimum number of inpatient beds available in SBC should be *at least seven (7).*

Without inpatient or outpatient beds in SBC and a continuous population increase due to housing development our mental health care process is aggravated.  Federal and state government policies push SBC to have a *"community-based"* mental health care approach, but the county has not supplemented infrastructure for either type of bed or facility.

Mid 20th Century CA legislation began pushing psychiatric healthcare local and community-based. Historically the federal government managed mental health care but decentralized, assisting financially state run inpatient mental health facilities. Starting in the 1960's another general shift was initiated to decentralize mental health care for financial reasons further; the positive impact of advances in psychiatric medications, and in some degree due to a general distrust of hierarchical medical institutions (*One Flew Over The Cuckoo's Nest*). Our local government officials in SBC became responsible for our "community-based approach to mental health care" in the 1960's.

**Federal Law:**
**1963 - Community Mental Health Centers Act:**  With the purpose to facilitate transitioning patients from inpatient psychiatric hospitals out into communities. In 1963, deinstitutionalization began, and scores of state hospitals closed across the United States. This act moved patients from inpatient psychiatric hospitals out into communities. The number of inpatient psychiatric beds declined precipitously, from a high of more than 550,000 in 1950 to 30,000 by the 1990s.

**California Law:**

**1967 - California Lanterman-Petris-Short (LPS) Act (*established WIC*)** LPS is the basis for which we refer to the law known as the California Welfare & Institution Code, or WI&C, or WIC.  California's LPS Act intended to end what was considered the inappropriate, indefinite, involuntary commitment of mentally disordered persons in CA. The spirit of this legislation was to end state psychiatric hospitals and move patients to community-based facilities, *encouraging full use of community resources and agencies so that people with mental disorders could receive prompt evaluation and treatment closer to home.* Without centralization, mental health professionals scattered across all CA counties. Moreover, since inpatient bed reimbursement rates did not cover some cost of care, there was added avoidance in establishing needed inpatient psychiatric beds in local community hospitals as the LPS Act and WIC law intended. SBC has this problem. **Our county mental health professionals cannot admit an individual to the local hospital for the purpose of evaluating their mental health.**

LPS established the law to be a simple 2-step process for communities:
1. WIC 5150 – hold to transport and assess.
2. WIC 5151 – admit to evaluate and treat

WIC 5151 was intended as the follow-up to the 5150 hold. WIC designates that a 5150 **involuntary *transport and hold*** for *assessment* may not be longer than 72 hours, and a subsequent 5151 **involuntary hold *for evaluation and treatment*** of an individual *admitted to a licensed facility* may not be longer than 72 hours. In a licensed facility the 5150 and 5151 holds may overlap or be consecutive providing 144 hours to decide what to do with someone who may need serious help. The difference between the two is key to understanding SBC's limitations with just access to the 72 hours under WIC 5150. This fundamental concept creates underlying conflict among SBC agencies.

Since SBC does have a place to admit a psychiatric patient for an evaluation the time/ delays in the minutes spent here towards *assessment* are on trial, scrutinized and blame assigned. If the time exceeds 72 hours, are patient's rights violated? Ethical issues surrounding a civil commitment are one of the most controversial practices in modern psychiatry. Involuntary holds and hospitalization present unique challenges for psychiatry (e.g., not guilty by reason of insanity).  A spurious or arbitrary psychiatric assessment made to squeeze into SBC's 72 hours can affect the legitimacy and appropriateness of mental health treatment for SBC residents.

The US Constitution, Fourteenth Amendment states that a State may not deprive any person of liberty without due process of law, and the CA LPS Act does provide a safeguard for individuals' rights through judicial review and a method to remove an involuntary hold using the California court system. But SBC local government is not doing its job if BH needs more time to care for an individual in a psychiatric crisis effectively but the state, county, nor the community hospital is not providing any facility for BH to do so.

Other WIC provisions allow for subsequent 14 and 30-day involuntary holds.  WIC Section 5250 allows for a qualified officer or clinician to involuntarily confine an individual deemed to have certain mental disorders for up to 14 days. This hold placed by qualified staff on a person they determine to have a mental disorder which poses a danger to him or herself, or others or to be gravely disabled (unable to care for oneself) and also requires more than a 72-hour hold for treatment. The law allows (WIC 5270) for a patient held an additional 30 days, initiated following a 14-day 5250 hold. Neither provision can be provided locally to San Benito County residents or their families if needed even if a psychiatric evaluation deeming this appropriate.

Of the 58 counties in CA:
- 26 counties (44%) have no designated involuntary inpatient psychiatric beds. SBC is in this category.

- 47 counties (81%) have no beds for children or adolescents. SBC is in this category.

- 56 counties have no Geri-psych beds; meaning a patient who also suffers from dementia, 97% of counties have no bed for that person. SBC is also in this category.

It seems government pushes mental health dollars toward prescription drugs and outpatient treatment. This point of research is offered to highlight causes - not to excuse the BOS to sidestep enormous effort to get needed beds for SBC.  Data collected from the Kaiser Family Foundation shows the nationwide shift from inpatient treatments in mental health spending in 1986 and 2005.  *Figure A.* highlights funds reduced for inpatient facilities



**Figure A**
**Distribution of Mental Health $ Spent**
**by Type of Service, 1986 and 2005**

n   Behavioral health outpatients increased more.
n   Fewer inpatient beds.

In addition to the ubiquitous reduction of inpatient psychiatric beds, salient federal and state legislation can restrict local governments and special districts' abilities' to obtain resources and set policies to establish an optimal community mental health program for their residents.  Law, funding, best and typical practices can conflict - resulting in the mental health care logistics quagmire that SBC is in now and which needs tackling by our local government.

To highlight various governing rules and regulations affecting SBC:

**California State Law**
California Lanterman-Petris-Short (LPS) Act
California Welfare and Institution Code (WIC)

**Local Government**
Under CA WIC guidelines.
Can be subject to CA funding for mental health treatment facilities.
Can be subject to licensing issues in special district healthcare.
Subject to funding.

**Local Hospital**
Under Federal Law regarding Emergency Department (EMTLA).
Under CA WIC guidelines.
Subject to its Board of Directors.
Subject to medical best practices under JCAHO.
Subject to CA State licensing restrictions for psychiatric care.
Subject to its district funding.

**Local Behavioral Health Department**
Funded by the State of CA
Uses CA WIC Law
Situated in SBC, subject to some county BOS directives.
Dependent on the local ED at HHH
Uses IMQ Health Care Standards baseline for care
Restrictions in employee union contract

**Local Law Enforcement**
BOS, City of Hollister, Best LE practices based on Federal and CA State law.
San Benito County Sheriff's Department Policies and Procedures 2015-16
Hollister Police Department Policies and Procedures 2015-16
Lexipol, LLC

**Local (County) Jail**
Subject to CA law under Title 15, BOS, BH, ED, LE, best DOJ and DOC jail practices.

**Local Patient Transportation**
Subject to BOS, HHH ED, SBC BH, and city, county, state, and federal funding.

## ANALYSIS

The 2015-16 Civil Grand Jury discerns the public mental health care topic of managing 5150s in SBC will only succeed with collaborated effort from county agencies and oversight by our BOS. The Grand Jury also acknowledges that each has significant, conflicting concerns. Below summarizes some of the concerns. From their independent perspective, resistance is understandable, and each addressed. Local agencies are frustrated and want to know: Why is there trouble and who is responsible? The Grand Jury submits the problem as decidedly overdue for attention and action by the BOS and those communally involved. Residents want to know our public leaders are doing their best to cooperate and their best to secure local and outside resources for the sake of our community.

### Board of Supervisors (BOS)
*The State of CA **mandates** that the Board's task be to ensure that **SBC has a viable mental health program**. Are they in compliance?*

State Law (*CA WIC paragraph (1) of subdivision (a) of Section 5150),* mandates the BOS certify there is a *designated county health professional.*  This professional may typically report to the most senior county appointed official, the County Administrative Officer (CAO). The Board is also mandated to *select and designate the treatment facility* to receive 5150 holds.

During data collection, it was implicit that designation of the county health care professional was last made in a directive (circa, 1993) issued by a previous CAO under a prior BOS. Neither this paperwork nor any related updated paperwork could be produced to satisfy this CA WIC regulation during the investigation.

No department including SBC Behavioral Health Department has paperwork that indicates or *assigns HHH to be the designated facility* to receive WIC 5150 holds. Not a county-run hospital, HHH through its Board of Directors should have clear procedures negotiated with SBC about the breakdown of responsibilities for WIC 5150 management. This formality may have existed at some time – but nothing could be found by any department to provide to the Grand Jury, concluding one was not on file. Paperwork lapse may not be in particular violation of WIC but does denote that detailed collaborative oversight and evaluation of SB County 5150 policies is a deficient priority of the BOS.

For purposes to proceed with the investigation and report, the "designated professional" by SB County per WIC is supposed: The Director, Behavioral Health Department, San Benito County.

BH is funded solely by the State of CA.  Services are provided only on an outpatient basis: meaning, no beds, voluntary or involuntary. BH describes their caseload as challenging. Since the only local hospital (HHH), is not under BOS direction, our county

government cannot dictate HHH keep an on-staff psychiatrist or be equipped to offer assistance to BH proceed with any 5150 related assessments, evaluations, or treatment.

Patient care and mental health treatment mandated to the county by CA WIC law may to *some degree* are left unsatisfied because of state and local funding for facilities bound SBC's abilities to comply. However, amid the growth of SBC, this can no longer be sufficient local government pretext. SBC demands require either, a county or private hospital with an inpatient psychiatric ward; or a separate state, local, or privately funded facility with inpatient beds; and/or a Crisis Center; and/or a PHF with beds for those that need some closer monitoring and shelter.

*CA WIC 5250 (b). The facility providing intensive [psychiatric] treatment is **designated by the county** and **agrees to admit the person**. No facility shall be designated to provide intensive treatment unless it complies with the certification [licensing] review hearing required by this article.*

This means that the BOS is stuck.  Without an appropriate facility, the Board cannot designate or direct that a patient needing an evaluation or intensive inpatient care "go" anywhere. So even if the BOS wanted to designate HHH, it is restricted because HHH does not fall under their purview, nor can the facility admit or evaluate the patients without licensing for psychiatric mental health care under WIC 5768 guidelines.

Placing or releasing a WIC 5150 hold may be authorized to *emergency room physicians*, members of the *attending staff* of an **evaluation** facility designated by the county, and other professional persons designated by a county. SBC limits 5150 "hold and release" authority to local Law Enforcement and Behavioral Health staff.  Changing this policy could give some relief to a patient backlog, but is as likely to create additional or dissimilar types of problems.  It is not a complete solution to the issue.

*WIC 5651. … [the] annual county mental health services performance contract shall include the following:(a)(2) That the county shall provide services to persons receiving involuntary treatment as required by Part 1 (commencing with Section 5000) and Part 1.5 (commencing with Section 5585).*

WIC says that the state directs the county to have a workable plan for patients receiving involuntary treatment. Our county does not provide involuntary **treatment**; but because it does not, the BOS's job does not just stop there. Lack of support from the state does not mean that the BOS is not held responsible for the CA mandate. Our current oversight is not effective nor is the plan optimal. SBC is out of compliance. The law also says:

*WIC 5652.5. (b) Nothing in this section shall prevent a county from restructuring its systems of care in the manner it believes will provide the best overall care.*

Restructuring our county mental health program is a solution for the county. Those with psychiatric needs:

*WIC 5600.2.(3) …Shall be viewed as total persons and members of families and communities. Mental health services should assist clients in returning to the most constructive and satisfying lifestyles of their own definition and choice. (4) Should receive treatment and rehabilitation in the most appropriate and least restrictive environment, preferably in their own communities.*

Our community hospital is not maintaining psychiatric beds. To provide beds and treatment SBC could build a Psychiatric Health Facility (PHF). A PHF allows a less restrictive medical clearance and both the needed mental health assessment and evaluation. PHFs are typically in addition to inpatient beds but in SBC it could augment our BH clinic.  A PHF has beds to **evaluate** and **treat** those who may have otherwise been an outpatient. To establish a PHF, SBC needs to obtain state funding that exists for this purpose. A primary funding criterion is a population. At the time of this report, data suggests this means adding an initial 10 to 12-bed facility in SBC.

Funding is typically allocated for a PHF when at least 16 beds are needed. Though the state may attempt to sidestep SBC as under this threshold, the BOS should not dismiss this recommendation.  Counties have successfully obtained state funding for a PHF under these circumstances. Their contact information is:

El Dorado County 935-B Spring Street (530) 621-6212 **10 Bed Psychiatric Services** Placerville, CA 95667 (530) 622-2385.

Sacramento County Crestwood Psychiatric 4741 Engle Road (916) 483-8424 **12 Bed Health Facility** Carmichael, CA 95608 (916) 483-3071.

Experts estimate the need for a **_minimum_** of one public psychiatric bed for every **2000** people for hospitalization for individuals with psychiatric disorders  - yet SBC has **zero** Psychiatric Treatment beds in a General Acute Care Hospital setting, Acute Psychiatric Hospital setting, or even a Psychiatric Health Facility (PHFs).  County leadership should determine a way to begin robustly requesting that the state of CA provide SBC with funding to address our shortfall. Moreover, due to the delays inherent in the construction of the county homeless facility that local government locates an area ready to allow the building of a psychiatric treatment facility as soon as funding is secured.

*The San Benito Health Care District (SBHCD) &*
*Hazel Hawkins Hospital (HHH)*

*The SBHCD Mission Statement:*
**_"The District serves as a responsive, comprehensive health care resource for its patients, physicians, and the healthcare consumers of the community."_**

*Is the District meeting its mission in mental health care?*

SBHCD is a public agency called a special district working under an elected Board of Directors who serves our county. Though a community hospital, HHH is not a "county run" hospital. The hospital generates revenue and receives funds by the patient ability to pay either through private insurance or Medicare/Medical. The District does not obtain funding from the state or county general fund, nor is it under the directives of the SBC BOS.  HHH and its Board are however subject to policy and regulation from both federal and state law.

No law states that HHH must maintain a psychiatrist on staff or build inpatient or outpatient beds to augment its community healthcare system, or even to provide any mental health treatment. Where HHH comes into SBC's mental health system is the medical clearance aspect of the WIC 5150 process.

The HHH ED has to adhere to Federal guidelines under *The Emergency Medical Treatment and Active Labor Act (EMTALA).* This Act mandates the strict rule that hospitals with emergency departments ensure one's access to emergency services, regardless of ability to pay. This law makes the HHH ED a default location to bring SBC 5150s since these individuals will need medical clearance before they can receive an assessment and there are no other community EDs or psychiatric facilities to conduct these clearances.

*Section 1867 of the Social Security Act* also imposes specific obligations on HHH as a Medicare-participating hospital that offers emergency services.  HHH is required to provide a medical screening examination (MSE) when *any request is made* for examination or treatment for an emergency medical condition regardless of an individual's ability to pay. If a patient has an emergency medical condition, the ED must provide stabilizing treatments. If the hospital ED is *unable* to stabilize a patient within its capability, an *appropriate transfer* must be implemented - including mental health care.

The 2010 adoption of the *Patient Protection and Affordable Care Act* and the 2-1/2 million more insured Californians under this Act added upward pressure to the numbers seeking mental health care that begins with a trip to an ED.  However, of those that Law Enforcement (LE) and family members bring to the ED for psychiatric evaluation, 70% do not need to stay for evaluation once medically cleared, and 70% of the remaining 5150 patients do not meet inpatient treatment admission criteria.

This HHH ED volume feels rising pressure as the funnel to sort out who needs mental health care evaluation and treatment or who can be released.  HHH ED is also the place to wait while sorting out where, when, and how a patient will transfer for services. HHH is not the ideal setting for part of SBC's mental health care, though tasked with this vital role as part of our community's mental health safety net. The ED strains without HHH licensed for psychiatric care or having inpatient or outpatient bed.  HHH ED has concerns as the holding place for an increasing number of people needing mental health evaluations or psychiatric treatment. To summarize data collected about the concerns; in the ED:

- *Long delays are common. Those needing to be seen for mental health care sometimes have to wait a long time; very long if needing hospitalization for treatment. When waiting, many 5150s are written, called 'stacking.'*

- *Patient's information should more clearly state that they could receive a judicial hearing if held against their will longer than the initial 72 hours.*

- *The ED does not understand why 5150 patients do not receive specialized psychiatric treatment for mental illness while held for long periods in the ED.  Nor do they know why BH clinicians provide an assessment only regarding whether or not a patient meets the criteria for a 5150 psychiatric hold, but does not give any recommendations for treatment of the mental illness.*

- *The ED is frustrated that SBC Mental Health psychiatrists have limited availability; Monday through Friday business hours and for phone consultation only, which is not certain either.*

- *ED staff has concerns that there have been cases where a psychiatric patient is released or transferred after many days of being confined in the ED with no actual treatment of his/her mental illness.*

HHH ED's unease about those not receiving mental health care *treatment* in the ED is an example of how the SBC mental health system lacks collaboration.  SBC Grand Jury's review of WIC law determined that 5150s not be supposed to be receiving any *treatment or evaluation* from a BH clinician in the ED, only an assessment – notwithstanding one to be made as quickly as possible following medical clearance. If the BH clinician believes the person on a 5150 should be held over involuntarily and admitted for psychiatric evaluation and treatment (as with a WIC 5151), according to CA law the clinician's job stops there  – *due to our lacking resources*. Clinicians are not to make any recommendations for treatment until after a full mental health evaluation, and the evaluation occurs when admitting the patient to a licensed facility. The ED or BH instead attempts to find a bed outside the county for the person to receive an evaluation. However, ultimately the individual's release may be warranted.

The timeframe during which a person is held involuntarily for further evaluation is where the BOS, BH, and HHH need to collaborate the most.  HHH ED may be managing several 5150 individuals for numerous days. A safe and guarded room is typically required and security provided at HHH expense.  5150 holds create financial, security, and logistics problems for HHH ED when patients remain in the ED with no appropriate room or bed for hours or days.

HHH and the ED are stuck.  With the Emergency Medical Treatment and Active Labor Act (EMTALA), HHH *must* treat a prospective mental health patient that comes through the door with a full medical clearance before the patient can be assessed and possibly transferred for evaluation. These individuals can accumulate while waiting.

95

What if HHH had beds set up to move a 5150 patient out of emergency resources, to complete medical clearance and implement an overlapping WIC 5151 72-hour hold? Can HHH find the resources to assist our community to admit an individual for evaluation to determine the need for further voluntary or involuntary treatment? Perhaps HHH even provide resources for a WIC 5250 14-day involuntary inpatient treatment?  What if HHH as a whole could do more for SBC mental health patient care besides medical clearance?  Can HHH consider a new approach?

What if SBC also had a Psychiatric Health Facility (PHF)? A stand-alone PHF with beds is not required to follow the strict rules with which hospital EDs must adhere. A prospective patient in a PHF could be medically cleared, assessed (5150), and admitted (5151) if a reasonably competent individual could manage the patient's conditions until a BH psychiatrist completes the evaluation. Treatment could even commence before the 5150 or 5151 72-hour holds expire. The PHF could also provide voluntary outpatient for patients who also have no place to stay and provide care and a bed. If the PHF needs to transfer a patient, treatment could already be underway.

The ED also indicates concern about patients' rights infringement from prolonged involuntary holds. HHH's concerns about patient's rights violated using **consecutive** 5150 holds have merit.  Once the initial 5150 72-hours are up, there is no **legal** basis to hold the patient involuntarily.  Given the county's limitations to provide mental health care, the next step in WIC might be arrangements with an attorney to file with the court so the judge may rule to let him/her be held longer or let go if held against their will.

*WIC 5254.1. …. "at the time the [involuntary] hold is initiated, the person delivering the notice [for ex. LE] shall, at the time of delivery, inform the person certified of his or her legal right to a judicial review by habeas corpus, and shall explain that term to the person certified, and inform the person of his or her right to counsel, including court-appointed counsel under WIC Section 5276."*

To avoid the possibility of judicial review, HHH and the Grand Jury understand BH to bend WIC law regarding the "start time" of a 5150 hold.  BH argues the law as "ambiguous" and as such may claim to start the hold later, say at the time the person arrives into the ED for medical clearance, or perhaps after completing the medical clearance.  However, our Grand Jury investigation determined that under WIC 5254.1, the law clearly identifies the 5150 start time to be when the hold is *first initiated*, which may be, for example, at the person's home before transport. A WIC 5150 72-hour hold is meant to include the inclusive time of "placement on hold, transport, and assessment."

During our investigation, HHH ED staff began handing out pamphlets, written by and adopted from Santa Cruz County to patients on 5150 holds to assist with what they felt missing in patient advocacy.  Currently, patients' rights about the option for judicial certification review after 72-hours are either repeated or explained in further detail by ED staff:

*WIC 5256.5.  If at the conclusion of the certification review hearing… there **is not** probable cause …then the person certified may no longer be involuntarily detained.*

*WIC 5256.6.  If at the conclusion of the certification review hearing ….there **is** probable cause …then the person may be detained for involuntary care, protection, and treatment related to the mental disorder or impairment by chronic alcoholism pursuant to Sections 5250 and 5270.15.*

A judicial review in SBC would essentially replace the process of BH deciding to release an involuntary hold or retain the individual over from a WIC 5150 hold to a 5151 72-hour hold, i.e. to finding the person a bed and be admitted involuntarily to a facility, for further evaluation. Instead of a psychiatrist, the judge would decide probable cause to move forward to complete the assessment and/or evaluation and determine further treatment.

HHH ED and the Grand Jury have apprehension about SBC BH and the pressure to bend and violate CA law by writing consecutive 5150 involuntary holds. Emergency staff was:

- *….explained to by SBC BH that they can write repetitive 5150's in out county and that the process of "stacking" 5150 holds is not illegal.*

The ED contends:

- *That they will not be participating in the course of stacking 5150's any longer due to the understanding that it is a liability to violate individual rights. They assert that they have established a process where the person will be released.*

The BOS should note:

*WIC 5651. The…annual county mental health services performance contract shall include the following: (5) **The county shall comply with all provisions and requirements in law pertaining to patient rights**.*

HHH ED expresses:

- *The understanding that there is a limit to available inpatient beds outside the county.   Nevertheless, psychiatric individuals that are "languishing in HHH ED" deserve timely treatment.*

The grand jury confirmed that:

- *Holding multiple psychiatric patients in ED beds interferes with other ED patients receiving emergency treatment*

Also, the Grand jury concurs with sentiments the BOS should:

- *Find a solution to get patients in need of psychiatric treatment to an appropriate facility and out of the ED.*

SBC needs solutions. Suggesting patients petition the Superior Court Judge to speed things up may seem reasonable out of understandable frustration, but is not the viable long-term solution the ED needs to alleviate extended stays of individuals under involuntary hold. There are essential steps for county government to employ to renovate the process with enhanced oversight and resourcefulness.

*Law Enforcement (LE)*
*Follows the guidance and directives of:*
BOS and the City of Hollister,
Best Practices based on Federal and CA State law, through Lexipol, LLC,
San Benito County Sheriff's Department Policies and Procedures 2015-16,
Hollister Police Department (HPD) Policies and Procedures, 2015-16,
CA WIC under 5100 -

Relevant statutes and protocol LE uses to place a person on a 5150 hold include:

*WIC 5153.  Whenever possible, officers charged with the apprehension of persons pursuant to this article shall dress in plain clothes and travel in unmarked vehicles.*

*WIC 5150.1 shall not be instructed by mental health personnel to take the person to, or keep the person at, a jail solely because of the unavailability of an acute bed.*

A WIC 5150 detention by LE is not a criminal arrest but instead part of California's procedures of *civil* commitment. The individual placed under 5150 hold is not being charged with a criminal offense while in civil commitment.  SBC and HPD Law Enforcement both have local authority to force an individual to go to a designated facility for assessment when the individual is acting in a way that is either dangerous to oneself or others and or appears to be unable to care for oneself for food, clothing, and shelter ("gravely disabled").

The HPD and SBC Sheriff's Department (both are LE) train to handle mental health call-outs using best practices information and recommended protocols from the web-based company, *Lexipol, LLC.*   "LEXIPOL**"** provides local LE with policies to implement and a management system for the protocols that has been reviewed by professionals and attorneys in their field. LE uses a set of proper daily "scenario-based" training so that these agencies have the ability to work within the framework of current and updated legislative policy, including WIC. The information system is systematically updated when CA state-specific and federal regulations change.

LE's responsibility when placing a person under civil commitment is to write up the following form, explain to the individual what is happening, and transport the 5150 to the designated facility by local government:

*5150 (g)(1) informs "each person, at the time he or she is first taken into custody under 5150 section, shall be provided, by the person who takes him or her into custody, the following information orally in a language or modality accessible to the person. If the person cannot understand an oral advisement, the information shall be provided in writing. The information shall be in substantially the following form:*
My name is _____

I am a _____
                            (peace officer/mental health_____ professional)
     with _____ .
                  (name of agency)

You are not under criminal arrest, but I am taking you for an examination by mental health professionals at _____ .
     _____
                  (name of facility)

You will be told your rights by the mental health staff.

(2) If taken into custody at his or her own residence, the person shall also be provided the following information:

You may bring a few personal items with you, which I will have to approve. Please inform me if you need assistance turning off any appliance or water. You may make a phone call and leave a note to tell your friends or family where you have been taken.

*In 5150 (i). Each person admitted to a facility designated by the county for evaluation and treatment shall be **given the following information by admission staff of the facility**. The information shall be given orally and in writing and in a language or modality accessible to the person. The written information shall be available to the person in English and in the language that is the person's primary means of communication. Accommodations for other disabilities that may affect communication shall also be provided. The information shall be in substantially the following form:*

  My name is _____.
  My     position here is_____.
  You are being placed into this psychiatric facility because it is our professional opinion that, as a result of a mental health disorder,
  you are likely to (check applicable):
  ( ) Harm yourself.
  ( ) Harm someone else.
  ( ) Be unable to take care of your own food,
  clothing, and housing
needs.
  We believe this is true because
  _____

99

(list of the facts upon which the allegation of dangerous or gravely disabled due to mental health disorder is based, including pertinent facts arising from the admission interview).

*WIC 5150.1 directs LE that they may not be restricted from bringing a patient in for mental health evaluation under a 5150 hold, nor may the peace officer be told to remove a 5150 patient from a healthcare facility.*

*Under 5150.2,* **LE should not be detained** *any longer than to admit the person on hold.*

Once at the ED **then the security** of the **individual transfers to HHH**.

Law Enforcement is stuck.  First, though following LEXIPOL, LE cannot bring a 5150 to a designated evaluation facility – because SBC does not have one. HHH, the default because it has an ED, is not a facility where a person placed under an LE civil commitment CAN receive an evaluation.

Second.  Since HHH is not equipped to receive civil commitment persons, then the security of the staff is compromised.  HHH cannot by law even ask LE to stay to guard a potentially dangerous individual, but the appropriate safety of a locked and guarded room for detention that a licensed facility would have is absent.

Third.  LE is wedged into what is called a "revolving door" of our mentally ill. While LE has the burden of the hold and transport, they encounter many individuals repeatedly. LE sees the same patients in need of outpatient or inpatient beds often because people did not find a static place for help; because as a BH outpatient was challenged to have the necessary support systems; or unsuccessful help in with addiction results in a return to the ED to sober/detox again. LE may even encounter probable cause that is determined later as homelessness seeking a warm bed for a few days or those even wanting a change of pace from the jail.

The Grand Jury determined that *LE is not technically follow*ing WIC law.  Persons they place on 5150 holds are not transported to a location and *admitted to a facility designated by the county for evaluation* as WIC 5150.2 instructs.  The type of facility CA law intends to receive 5150 holds from LE in SBC is yet to be established or constructed putting LE out of compliance.  HHH is compromised both as the LE default location for 5150 drop-offs and that it has not sought to be licensed to receive 5150 holds from our community though it is our only community hospital.

*The City of Hollister Government (COH) and the Hollister Police Department (HPD)*

The City of Hollister is stuck.  City government is not given the state authority to establish its policy regarding mental health processes.  Hollister residents, its Mayor and City Council, and HPD are at the discretion of the BOS's policies regarding how and where WIC 5150 patients are transported, held, and assessed.  Therefore, Hollister's ability to oversee and manage mentally ill is as good as what the BOS provides. As a result, HPD is out of WIC law compliance, and LE and the COH also bear the burden of the "Revolving Door" – having no beds for its residents in need of mental health care, voluntary or involuntary.  The COH should play an active role in collaboration and in establishing plans for future facilities.

*The SBC County Jail*

The SBC Jail is subject to the law, mandates, policies, and procedures of:
CA Title 15, BOS, BH, HHH ED, LE, and best DOJ and DOC jail practices

*Title 15. The State of California, CA Code of Regulations, Title 15. Crime Prevention and Corrections* is the primary law guiding CA jail operations and management. However, *in practice,* since the SBC BOS *funds* the Jail operations, the Board by design, creates or condones much of the Jail's local policy. For this Grand Jury investigation, for example, the BOS directly influences the type, quality, and amount of onsite inmate medical care and the total Jail staff and training.

The LE, ED, and BH Departments are key relationships to the Jail.  Policies and procedures between these agencies and the Jail require supportive oversight from a BOS that recognizes these dependencies.

The Jail is stuck. What can the Jail do when its best practice policies conflict with other key departments' policies and procedures and Correction Officers (CO) are tasked to handle a person deemed requiring assessment or suspected of needing a mental health evaluation or mental health treatment?

The Jail may find they have or receive an inmate from LE who would qualify as requiring a mental health assessment, but that person has also committed a crime or is a suspect in a crime. The Jail's current general operating procedure is for a BH representative to travel to the Jail and assess the individual, who is kept in a separate area (safety room) under 15-minute observation intervals by a CO.

The Jail received a letter from BH during this evaluation, dated 1/7/2016, directing, effective immediately, a policy that Jail custody staff cease calling county mental health clinicians between the hours of 5 pm to 8 am. BH cited *IMQ Health Care Accreditation Standards for Adult Detention Facilities* as the basis to authorize changing its policy - but later confirmed that policy change was also a result of staffing shortages and union demands.

The Jail takes direction from Title 15, Article 9, Mental Health Services section 3360. This section reads:

**3360.** *(a) The Department [county jail]* **will provide a broad range of mental health services** *to inmates and parolees by assessing the needs of its population and developing specialized programs of mental health care… necessary and appropriate mental health services will be provided to* **inmates and parolees***, and* **adequate staff and facilities** *will be maintained for the delivery of such services.*

Title 15 regulation mandates the Jail must *either* provide mental health services on site *or* refer the person to an appropriate facility for evaluation and to receive treatment. The Jail does not have on-site mental health providers. Inmates do not have ready access to an adequate facility to accommodate psychiatric evaluation and treatment as Title 15 mandates.

The Jail does have on-site medical care. The staff consists of a Registered Nurse and a nurse's aid to provide basic medical care daily 9 am to 5 pm. The county contracts this care, as well as 24-hour access to a physician by phone with the private healthcare company, *California Forensic Medical Group (CFMG), in Monterey, CA.* When a patient needs medical care, the Jail uses this contract service to call the MD in Monterey who advises the CO what to do based on a list of symptoms that the CO provides over the phone. If an inmate needs to see an MD, then arrangements are made. The CFMG contract does not include mental health care *though the company offers this aspec*t. CFMG is IMQ accredited – the standards from which BH cites its policy change - and offers a sizable range of healthcare services, including mental health care - specifically for both adult and juvenile correctional facilities.

Interestingly, at the time of this investigation, SBC 2016 Jail Policies and Procedures read:

*"609: MENTALLY DISORDERED INMATES:  The San Benito County Jail has an admission policy with Natividad Hospital in Salinas. Natividad Hospital* **shall provide** *acute psychiatric inpatient services for inmates of San Benito County twenty-four (24) hours a day, seven (7) days per week.*

*A Correctional Deputy (CO) will initially evaluate San Benito County inmates. If the inmate appears to be psychiatrically disabled, the Correctional Deputy will notify the Jail nurse immediately. If the Jail nurse is unavailable, correctional staff will notify the on-call San Benito County Mental Health Crisis Worker.* **The crisis worker will respond to the Jail immediately***. The crisis worker will determine whether the inmate should be transported to Hazel Hawkins Hospital for medical clearance prior to* **transfer** *to Natividad Hospital. The Hazel Hawkins physician will discuss possible admission with the Natividad Mental Health Charge Nurse. The inmate will arrive with the appropriate paperwork, including the original 5150 form."*

**The Jail has a well-written policy in place.  Unfortunately, it is unworkable as it relies on the cooperation of other agencies such as BH that has no directive to comply with the Jail, or responsibility to compel such as Natividad in Monterey County. The BOS should recognize this as a problem in its oversight.**

The Jail is stuck again.  The difficulty for the Jail is rooted in the same problem as other SBC agencies; what to do with a person needing a mental health assessment, evaluation, and treatment?  After the determination that a psychiatric hold is necessary by either LE bringing in a person to the Jail needing assessment or a CO recognizing the need for psychiatric care, the person is placed in the safety cell under 15-minute observation intervals while BH responds.  Though the Jail's policy is for BH to "respond immediately", BH policy can mean a wait in the safety cell for an inmate assessment on a long weekend from as long as 5:30 pm on a Friday night to Tuesday morning at 8 am. This total of *86 ½ hours – is far from an immediate response*.  Understanding that the "WIC 72 hour involuntary" hold does not apply to a person held on an alleged crime still, leaves two other issues to address.

1. Is it humane to keep an individual in a safety cell for that long that needs a mental health assessment?
2. The 15-minute checks take manpower leaving the Jail shorthanded to operate the rest of the Jail, a safety concern. The Jail's general policy while waiting for mental health to respond is in Section 608 and reads:

*"608: MENTAL HEALTH*
*A mental health assessment [by the Jail security staff] to determine the mental health status of an inmate shall be conducted during the intake medical screening. If the need for mental health care is suspected, refer the inmate to the [Jail] medical staff. If the inmate states he/she is suicidal or attempted suicide, call Mental Health immediately. The inmate shall be placed in the safety cell. A safety cell log shall be started. **Mental Health shall provide** a face-to-face evaluation of the inmate, in regards to his/her suicidal intentions. They will advise, **at that time,** what level of watch shall be placed on the inmate, if any.  Mental health **services will be provided** on a regularly scheduled day, each week, for approximately four (4) hours."*

This Jail policy indicates the need to wait for BH help in determining **if** they need to do the 15-minute checks. It also indicates, "mental health is on the way" after the call placed. The mental health assessment is critical to the inmate and to getting jail operations back in order when there is a mentally ill or suicidal person confined.

The Jail sets its policy.  BH sets its policy.  The county contracts other medical care for the Jail but not psychiatric care. The BOS should be aware of how each these policies impact total operations and resources and how medical contracting choices lessen access to mental health care in SBC.

*SBC Behavioral Health Department (BH)*
**Complications for SBC BH are at *every step* of the current process.**

Behavioral Health is really stuck. While BH acknowledges the frustrations and issues of the other agencies, this department just does not have what SBC needs in supporting infrastructure to resolve the issues alone successfully. *BH just cannot function efficiently in the 5150 process.*

*BH and Bed Shortages.*
BH lacks staff and has no direct access to beds. Hospitals like HHH that choose not to establish and license for psychiatric capacity results in emergency department overcrowding and hospitals without psychiatric staff - among other factors mentioned occurring in SBC.

SBC BH cannot step in until after medical clearance to begin a mental health assessment for a 5150 hold.  If more than 72 hours is needed, at this time, another 5150 is written attempting to keep the individual longer, involuntarily.

Wait times for a patient to obtain a bed outside SBC may last longer than 72 hours - maybe even a week or more.  If locating a bed is not possible and the person has no criminal charge, the patient may simply be released.

*BH has a heavy reliance of on the HHH Emergency Department*
There is a discussion of the proposed CA AB 1300, authored by Assemblyman Ridley-Thomas (D-Los Angeles) that may see enactment in FY 2016-17.  If approved, this bill would remove regulations from WIC that require hospitals to have 5150 patients evaluated only by trained psychiatric professionals or their designees. Passing AB 1300 legislation to change WIC would take control from some designated mental health authorities and purposely give more power to an ED staff.  It is unclear if the AB 1300 approval will impact HHH ED physicians since it is not an ED located a healthcare facility providing evaluation and treatment for psychiatric care.

The strong opposition argues that this would weaken our mental health safety net. SBC BH does not want to happen here what already happens in other California hospitals where ED staff discharges patients in psychiatric crisis before full stabilization and before developing an appropriate assessment. The revised legislation is feared to make it too easy for hospitals to release patients who are in real crisis, continuing a cycle of emergency department and jail stays.  Patients without appropriate treatment end up in jail or back in the ED to start the 5150 process over again, the Revolving Door concept.

*BH and stacking 5150s*
BH is supposed to complete the mental health assessment before the 72-hour 5150 hold is up. BH writes consecutive 5150s to provide more time. This practice has been argued as "illegal" and interferes with patients' rights.

BH claims they are within their right to extend a stay under WIC 5150. BH explains the

LPS Act gives them no guidance on *lifting a hold* and thus provides an unclear definition of a start time; that the law regarding the time a 5150 hold begins is ambiguous.  BH indicates that they can under some circumstances determine the 5150 start time when they initiate the mental health assessment or use other factors such as starting the hold when the person arrives at the ED, say when BH places the 5150 hold instead of LE.

During this investigation, the Grand Jury found the law to be well defined.   Based on WIC 5254.1 the start time of a hold is identified to be when **first initiated** by an authority; this may be (LE) informing the person he/she **is required** to come with them. The hold time is considered initiated even if the person goes along with no resistance to the ED for medical clearance but has a 5150 in place.  The HHH ED cannot put an individual on a 5150 hold – so in SBC, LE has to be called.

The Grand Jury recommends that BH cease writing consecutive 5150s – and instead admit the person under a WIC 5151 72-hour hold to a local facility – **just as soon as the BOS gets a place to do so in SBC**.  Resolving the time issue of a 5150 hold will not solve the county's larger mental health care systemic problems.

What is BH supposed to do if more time is needed for assessment? Co-occurring (dual-diagnosis) untreated medical conditions can make a quick mental health diagnosis impossible. Substance use disorders can mimic symptoms of psychosis or lead to dangerous withdrawal issues.  Mental health evaluations need to be done after a medical clearance and a complete or attempt at detox. What if this simply takes longer than 72 hours?  Where should the person go?  Also, the lack of an SBC homeless shelter can raise further complications.

BH receives criticism that "no psychiatric evaluation or treatment" is provided to the person waiting in HHH ED for a bed even when the first the 72 hours elapsed and the person is in the ED on a stacked 5150

This is true.  Moreover, due to WIC law, BH should not provide any. The Grand Jury recognizes that given the limited existing SBC facilities, BH can **only** work within the WIC 5150 – *72-hour "transport and hold to assess"* timeframe.   BH cannot move to enter the WIC 5151 phase – the *72 hours for "admit and evaluate"* - aspect **since there is no place to *admit* the patient in SBC.**

Lack of insurance coverage for medications or treatment or beds can also result in mental health patients waiting longer than the initial 72 hours for the BH clinicians to figure out a plan. If a bed is determined to be the best option and one is found but transferring/transporting the patient is not readily possible or is unfunded, then this means longer than 72 hours is also likely needed.

Ultimately, the Grand Jury found that the time between initial custodial hold and admission to an inpatient unit often exceeds 72 hours in SBC, and not infrequently goes beyond a week.  HHH ED reports patients being held waiting in the **ED for as long as 14 days**.  This is unacceptable.

*BH Staffing*

BH has staffing issues and working hours that impact and aggravate SBC's 5150 72-hour hold problems.  *The CA State Department of Health Care Services* has put forth this statement regarding weekends and holidays that:

*"Saturdays, Sundays, and holidays may be excluded from the 72-hour period if the State Department of Social Services certifies for each facility that evaluation and treatment services cannot reasonably be made available on those days. The certification by the department is subject to* **renewal every two years***. The department shall adopt regulations defining criteria for determining whether a facility can reasonably be expected to make evaluation and treatment services available on Saturdays, Sundays, and holidays."*

Under these guidelines, SBC BH *may* not have to include weekends and holidays as part of any of the time in a 72-hour hold. Having this proion adversely impacting patient's rights is addressed in the information provided to the person during intake when placed on a 5150. WIC specifies that the BH and ED staff should inform the patient:

"If you have questions about your legal rights, you may contact the County Patients' Rights
Advocate at _____
                         (phone number for the county
_____.
  Patients' Rights Advocacy office)
  Your 72-hour period began _____.
                         (date/time)

(2) **If the notice is given in a county where weekends and holidays are excluded from the 72-hour period, the patient shall be informed of this fact.**
(j) For each patient admitted for evaluation and treatment, the facility shall keep with the patient's medical record a record of the advisement given….which shall include all of the following:
   (1) The name of the person performing the advisement.
   (2) The date of the advisement.
   (3) Whether the advisement was completed.
   (4) The language or modality used to communicate the advisement.
   (5) If the advisement was not completed, a statement of good cause.
address concerns of some SEIU members, BH directed change to its relationship with the SBC Jail in its *County Jail's Safety Cell Mental Health Assessment Protocol* in January 2016.  A Quality Improvement (QI) report issued by BH indicated that the union felt that there was an "unnecessary utilization of the after-hours crisis on-call staff."  BH policy changed, as a result, removing the availability of after-hours mental health workers. It was agreed that County Mental Health Clinicians were to begin facilitating the *basic requirement* to provide "a mental health opinion for placement and retention be secured within *24 hours* of placement "(Title 15). **The new BH policy was to**

106

**increase a 2-hour response time to a 24-hour response time.**  BH policy directs the Jail not to call before 8 am the following morning to inform them of any safety cell placements that occurred during the previous 5pm-8am timeframe.  Then if notification to BH is made at 8 am the BH 24 hour response time begins.  This could potentially mean that an inmate placed in the Jail safety cell at 6 pm on a Tuesday may not be seen by BH until 8 am Thursday morning and still fall within Title 15 requirements. Also, this means that CO staff at the Jail must conduct required 15-minute checks on the inmate for 38 hours – radically reducing the active time on the floor as a CO part of an understaffed Jail.

The Grand Jury finds it **reasonable** on the one hand that BH SEIU clinicians not be *rushed* to dispose 5150 patients from the HHH ED given common factors in dual-diagnoses and lack of beds in SBC – Though on the other hand, **unreasonable** to argue that BH delays to the jail are unavoidable due to uncomfortable working hours.

It is objectionable the BH staff is simply not sooner on sight to begin their job of forming a potential diagnosis of a mental disorder based on the readily observable factors. The Grand Jury finds the BH delay its staff has to get to the jail unreasonable and negatively impacts Jail resources and adversely impacts the acceptability of an overall SBC mental health care program.  It is not a stretch to suggest from the scope of this investigation, to purport that some 5150s released from the ED may turn up at the Jail needing BH to finish completing a previously missed assessment.

*BH and SBC needs a Psychiatric Health Facility (PHF)*
The same societal forces and resource constraints discussed in this report for SBC have led to the development of alternatives in other counties; general hospital inpatient psychiatric units; skilled nursing facilities providing mental health services; nonmedical facilities under the licensing category of residential care facility; Crisis Centers; and Psychiatric Health Facilities (PHF).

BH hopes the State Department of Health Care Services to approve SBC for a state-funded separate facility. A California PHF licensed for patient psychiatric treatment will provide short-term acute treatment in a nonhospital setting. A PHF is a more flexible service with different staffing requirements than hospitals. The enabling legislation explains the per diem cost amounts to approximately 60% of the cost of similar services provided in a hospital like HHH. Since 1985, there has been a rise in private and public PHFs operating in California. The number of applicants wishing to open both public and private PHFs has increased at a higher rate due to the Affordable Care Act and mandated insurance coverage. Data on existing PHFs indicate the characteristics of many of the patients in PHFs and general hospitals are similar in treatment requirements, just less costly.

*Transportation*
When BH or HHH ED find a patient bed, transportation logistics is attempted for the individual needing one voluntarily or held involuntarily. Is the 72-hour clock for a 5150

involuntary hold still running when a bed is found but transportation is the only consideration left?  Yes, it is.

From SBC, patients may have to travel short or long distances to get to a bed located for them.  Either distance, active transportation is not available for psychiatric care. If transportation is not available to get the individual to an inpatient bed, the individual needing inpatient psychiatric evaluation and treatment *forfeits* the bed. Unless the person also faces criminal charges, a patient on involuntary hold may simply released from the ED due to lack of transportation.

Transportation logistics are stuck.  Who is responsible for arranging and paying for this type of transport? **By CA law, the county's inpatient Mental Health Unit is responsible for the movement of the patient.  However, SBC does not have an inpatient Mental Health Unit.**

Neither BH nor HHH wishes to absorb the sole responsibility of fully funding or partially supporting transport of mental health patient transfers to another facility or a bed located for patient evaluation and treatment.  This investigation determined that the position in SBC healthcare oversight is keeping an ambulance on contractual call to transport mental health care patients is cost prohibitive.

Should BH use some of its already strapped budget to move a patient that needs help when it is not their mandated responsibility?  Should HHH transfer patients from the ED since they are their patients but by design cannot provide the needed care to the patient?  Should these transfers be considered the same as other medical transfers or different because of the mental healthcare aspect?

The Grand Jury recommends that the BOS provide this transportation by providing general fund money to either BH or HHH to manage for the specific purpose of transporting our county residents to get mental health care evaluation and treatment **as long as our local government and community hospital cannot or will not provide that type of care in SBC**.

SBC has established a transit system for others in need like the elderly and disabled. The Council of Government (COG) oversees the San Benito County Local Transportation Authority (LTA). This agency provides transport for county citizens through both routinely scheduled routes for pick-up and return, as well as a Dial-a-Ride program.  Dial-a-Ride transportation may be utilized by county residents to go to and return from local medical appointments and for distant area medical appointments as far north as Palo Alto, CA.  There is currently no LTA transport coordinated for patients needing mental health care evaluation or transport of WIC 5150 patients.

The Grand Jury also recommends that the BOS, in conjunction with the Council Of Government, should evaluate the use of LTA to assist the BOS in its problematic management of SBC mental health care oversight.

## FINDINGS

**F1**.  The San Benito County Board of Supervisors is out of compliance with California State Law; specifically the CA Welfare and Institution Code.

**F2**.  No written directive is in place from the County Administration Officer for designation of the county health care professional as required by California State Law (*CA WIC paragraph (1) of subdivision (a) of Section 5150),* and which also mandates the BOS certify whom the CAO *designates as the county health professional*.

**F3**. A written policy is needed from the BOS to specifically designate the *treatment facility* to receive WIC 5150 holds in SBC.

**F4**. San Benito County needs a clearly defined ***program*** to care for persons that need to be held involuntarily for mental care assessment (5150), through to evaluation and treatment (5151, 5250, and so on.)

**F5**.  Agencies and departments such as the ED, BH, SB County Jail, LE; all that come into contact with individuals who may need mental health assessment or treatment do not have updated, and *consistently relevant* to one another's, policies and procedures on file.

**F6**.  Conflicting policies and procedures exist *with particular reference to 5150 holds* among agencies, districts, and SBC departments.

**F7**.  General communication between departments, agencies and districts are lacking.

**F8**.  Negotiated Memorandums of Understanding (MOUs) do not exist for providing mental health care in SBC and between agencies under different boards, county, or state authority.

**F9**.  The time between initial custodial hold and admission as an inpatient for a person in an involuntary hold under WIC often exceeds 72 hours in SBC, and not infrequently goes beyond a week. Reports indicate that patients are being held waiting in the HHH ED for as long as 14 days for further mental health evaluation and treatment.

**F10**.  The SBC Behavioral Health Department is writing consecutive WIC 5150s.

**F11**.  Patients on a temporary involuntary hold in SBC hold may not know their legal rights under the CA WIC laws of civil commitment.

**F12**.  There is a possible violation of Patient's Rights when under a temporary involuntary hold in SBC being violated, under the CA WIC laws of civil commitment.

**F13**. The HHH ED staff is using a pamphlet derived from Santa Cruz County to distribute to patients on WIC 5150 holds about their civil rights.

**F14**. The HHH ED staff may be releasing WIC 5150 hold patients that exceed 72 hours due to concerns about violations of patient's rights.

**F15**. BH does not have official authorization or paperwork from any authority to support the claim that they may stack 5150s.

**F 16.** There is a lack of adequate county psychiatric health facilities, crisis centers, and/or inpatient psychiatric *beds* based upon the previous, current, and the rapidly growing SBC population.

**F 17**. Mental health patients may have to wait a long time to be medically cleared.

**F 18**. Mental health patients who come in, or are brought in, consecutively to the HHH ED may 'backup' in the ED while waiting for medical clearance and assessment.

**F 19**. Healthcare and security manpower requirements at HHH increase when monitoring and holding an individual on a WIC 5150 involuntary hold, and increase at a more rapid rate when exceeding the allowed 72 hours.

**F 20**. A backlog of individuals on a WIC 5150 involuntary hold results in mental health patients in the ED with no place to wait creates general HHH ED crowding, financial, and security risks.

**F 21.** The ED can be holding multiple psychiatric patients in ED beds, creating a longer wait time for medical treatment for other types of ED patients.

**F 22.** HHH or the HHH Emergency Department or does not have a psychiatrist on staff.

**F 23.** The San Benito Health Care District, Board of Directors, is not involved enough in the oversight and disposition of HHH ED individuals in a WIC 5150 temporary involuntary hold and persons needing mental health care assessment, evaluation, and treatment or transfer.

**F 24**. The Mayor of Hollister and City Council of Hollister are not systematically involved in the impact Hollister residents experience froma limited mental health program and dysfunction of the communications and protocols among the agencies.

**F 25**. Jail psychiatric support is lacking.

**F 26**. Correctly updated written SBC Jail policies and procedures in Section 609 are not possible in the current climate of a broken mental health care program in SBC.

**F 27**.  BH providing one-way directives to the Jail or other agencies such as LE or HHH ED that significantly impact the other's resources is not appropriate nor in the best interest of the SBC mental health care system.

**F 28**.  The current BH policy incurring significant limits to the Jail staff in making calls to clinicians AND the expanded timeframe the Jail staff endures while waiting for clinicians to arrive at the Jail for assessment has had a substantially negative impact on the Jail.

**F 29**.  Our local government is not considering the strain placed on County Jail Correctional Officers at the SBC Jail due to BH policies, and HHH limitations or as part of a comprehensive SBC mental health care program.

**F 30**.  Inmates are waiting in a safety cell for a mental health assessment for too long.

**F 31**.  Requiring Jail Corrections Officers to conduct 15-minute checks to the Jail's Safety Cell on an extended basis while waiting for mental health clinicians to perform a mental health assessment is unacceptable.

**F 32**.  Transportation logistics are inadequate. Obtaining and funding the appropriate type of transportation for mental health patients to other facilities with an available bed is problematic.

**F 34.** Inmates are not provided with an adequate facility per Title 15 to accommodate psychiatric evaluation and treatment.

**F 33**.  There is no established, dedicated, and collaborative committee to confer and effect solutions under BOS oversight to remedy current mental health care problems and to explore the future mental healthcare needs of the county.

**F35.**  SBC Law Enforcement and HPD LE are out of compliance with WIC 5150 by not transporting persons placed under involuntary hold to a facility where the person may receive a mental health *evaluation*.

**F36.**  SBC government does not have an area set aside to construct the augmented infrastructure needed for a psychiatric treatment facility.

**F37**. COG has not considered SBC LTA as an option for transportation in a comprehensive mental health care program nor a temporary solution in the shortfall of transportation logistics in SBC for mental health care patients.

## RECOMMENDATIONS

**R1**.  F1, F2, F3, F4.   The BOS should review Division 5 of the CA Welfare and Institutions Code (CA W&I).

**R2.**  F1, F2, F3, F10-12, F14, F23, F35. The BOS should make the appropriate designations for both the SBC Mental Health Director and the treatment facility to receive SBC 5150 holds made by LE.  Each designation should be official and produced by the BOS in writing. If the facility designated by the BOS is under San Benito Health Care District, Board of Directors (i.e. HHH) management, then both Boards should take note that HHH is not a licensed facility for evaluation or treatment of patients placed in a temporary involuntary hold for mental health reasons. The BOS should be aware that the result of designating HHH as the treatment facility may be to direct LE out of CA WIC compliance, and may result in patient's rights infringement by exceeding 72-hour limits while attempting to deliver patient care.

**R3**. F1, F4. The BOS should provide a detailed plan of action indicating steps and initiatives taken in the public interest that put SBC in compliance with Division 5 of the California Welfare and Institutions Code and augments mental health care in SBC. This plan of action should be made in response to this investigation and submitted to the public in time for a review for continuity by the SBC Civil Grand Jury 2016-17.

**R4.** F1, F4. The BOS should research and confer with BH to effectively get the attention of the State of CA to provide immediate resources to SBC for psychiatric mental health care assistance.

**R5**.  F5, F23, F24.   LE and HHH ED should begin regularly providing data available to the BOS to track the number of WIC 5150 cases brought to the ED, and the disposition of each one, including total length of stay.

**R6**.  F5, F23, F24.  HHH and BH ensure that LE receives information about all WIC 5150 individuals that released without further evaluation.

**R7**.  F4, F5, F6, F23, F24. As a result of collaboration, ALL agencies, and departments that come into contact with those whom may need mental health assessment or treatment should have relevant policies and procedures updated and relevant to one another's on file and shared with other agencies to minimize procedural conflict.

**R8**.  F4, F6, F7, F23. The LE, ED and BH Departments and the Jail are key relationships to one another.  Policies and procedures between these agencies should be made with particular attention and supported with a close oversight of the BOS that reflects these dependencies to ensure mental health care program efficiency and success.

**R9**.  F1, F4, F5, F6, F7, F23.  Collaborative effort should begin immediately from all parties for the health and welfare of SBC.

**R10.** F4, F7**,** F8, F23. SBC BOS establish clear Memorandums of Understanding (MOUs) written by and for the involved agencies, districts that have a separate board, and counties, (i.e. those not operating under the SBC BOS direct authority) to determine and establish agreement upon, and compliance with, local protocol. Also, that the BOS effect policy to maintain these MOUs until superseded by subsequently negotiated agreements.

**R11**. F1, F4, F10, F11, F12, F14, F23. "Stacking" 5150 holds is bad practice, and may be in violation of CA law. SBC should cease taking liberties with CA legislation concerning persons placed on 5150 holds. All methods available to agencies and departments should be implemented to attempt not to exceed the 72-hour maximum elapsed time from when the hold is initiated by LE, or otherwise, until the point of completed disposition of the patient.

**R12**. F1, F4, F10, F11, F12, F14.  F15.  BH should not look for, or be compelled to find, creative ways to circumvent the law to extend the 5150 72-hour hold due to SBC's lack of psychiatric treatment resources. BH should not "fudge the start time of the 5150 hold" nor argue that the start time or "hold lift time" is ambiguous. BH's good intention is clear, but working with the BOS to gain the facilities for an outstanding mental health program is optimal.  Anything else may be counterproductive to achieving a long-term viable and quality program in SBC.  If SBC BH does obtain *written official temporary authorization* to stack 5150s from the state, SBC should still employ a more strict 5150 72 hold time, and county agencies *work together* to increase our quality of mental health care under this time constraint. If BH obtains formal approval to stack 5150s given our dire lack of resources, BH's use of the temporary waiver should be done so understanding that it to be used in parallel to a dedicated lobby for establishment and implementation of permanent solutions for SBC.

**R13**.  F9, F10.  Recommended that SBC adopt a model such as Monterey County to consider weekends and holidays as part of the 72-hour period of a 5150 hold regardless of SEIU bargaining demands.

**R14**.  F1, F4, F10, F12, F23, F32.  *Both* the ED and BH should be responsible for researching and locate bed availability to transfer 5150 persons who cannot receive needed care in SBC. Both departments should be held equally accountable for delays or wait time in the 72 hours to research and find a bed. This policy should be written in a formalized protocol and enforced by the BOS in oversight of the county mental health care program.

**R15**. F1, F10, F11, F12, F14, F15, F23.  If individuals object to being *involuntarily* held during or beyond the 72 hours on a 5150 hold, then the use of the patient's legal rights to judicial review (filing a writ of habeas corpus) process should be brought (again) to the patient's attention by the ED staff.  In particular, when medical clearance has

processed but a BH assessment is not complete. That is, according to WIC the patient may be reminded that: "*If held longer than 72 hours, you have the right to a lawyer and a qualified interpreter and a hearing before a judge. If you are unable to pay for the lawyer, then one will be provided to you free of charge.*" Notification by the individual to the County Public Defenders office or any other attorney should not be interfered with or discouraged. *The individual may also be reminded that if demanding a writ of habeas corpus, the decision whether to file it lies solely with the SBC Public Defender.*

**R16**.  F1, F4, F11, F12, F13, F23.  The San Benito Health Care District in conjunction with BH and the BOS should develop its own, customized, patient's rights pamphlet to distribute to individuals on a WIC 5150 hold in the ED instead of using what was prepared specifically for Santa Cruz County.

**R17**.  F1, F14, F18, F23, F24.  The HHH ED should cease developing plans to release individuals in need of psychiatric care by "lifting the hold" on WIC 5150s.  Any authorization for the ED to use this type of protocol should be made as a result of the SBHCD Board of Directors and the SBC BOS joint approval following multi-departmental, agency, and district collaborations held with The Director, Behavioral Health. When any release is made, LE is to be notified immediately.

**R18**.  F1, F4, F9, F10, F11, F12, F13, F14, F15.  Request immediate assistance from the State of CA, Department of Health and Human Services, before SBC has legal issues regarding patients' civil rights for involuntary detainment beyond the 5150 72-hour holds; and *failing to admit a patient for evaluation and treatment* because SBC does not have a necessary psychiatric treatment facility.

**R19**.  F1, F4, F5, F6, F7, F8, F14, F23, F24. Recommend preparation of negotiated agreements among the agencies that share the responsibility of WIC Division 5 management and agreement should include confidentiality in *ARTICLE 7. Legal and Civil Rights of Persons Involuntarily Detained [WIC 5325 - 5337] especially Section 5328.*  This agreement should be established within the meaning of California Civil Code so that *one agency may not unilaterally change established procedures which affect any other agency* without a new negotiated agreement among the agencies.

**R20**.  F17, F19, F23. As the designated treatment facility HHH should provide resources to medically clear 5150 hold patients as soon as possible.

**R21**.  F16, F18, F23, F35.  HHH should consider setting up a licensed inpatient area and move 5150s to 5151s for an added 72 hours of evaluation for treatment – then, if necessary, transfer the patient.

**R22**.  F17, F18 F19 F20, F21, F22, F23, F35. HHH should consider becoming a licensed psychiatric facility with 7 to 10 beds to help alleviate problematic county mental health issues.

**R23**.  F1, F17, F18 F19 F20, F21, F22, F23. It is recommended to take pressure off of the ED and BH clinicians by SBC finding at least ten beds for psychiatric care. The SBC

BOS and SBHCD Board of Directors should understand that SBC needs to augment mental health care now. El Dorado County has a 10-bed PHF, and Sacramento has a 12-bed PHF; this is a basis to understand CA counties can get the state's support for county mental health care needs.

**R24**.  F1, F16, F17, F18, F19, F20, F21.  Recommended that BOS capture the attention of the state on the basis of the CA Law WIC 5770 which reads: "*Notwithstanding any other provision of law, the State Department of Health Care Services may directly, or by contract, with any public or private agency, provide any of the services under this division [WIC Division 5] when the state determines that the services are necessary to protect the public health, safety, or welfare.*"

**R25**.  F1, F17-24, F35.  SBC leadership and elected officials undergoing the impact of this lacking psychiatric mental health care system together implement an immediate and *temporary* solution. They should establish locations for a psychiatric crisis center for LE to bring 5150 holds needing *assessment* and a place to admit patients who require mental health *evaluation and treatment* as a result of the information provided in this report until effecting permanent solutions.

**R 26.**  F24 The COH should be involved in and conferred with to play a more active role in collaboration, financing, and in establishing plans for future facilities.

**R27**. F1-F8, F16, F25, F26, F27, F28, F29, F30, F31, F34. Recommended that the SBC Sheriff or his SBC Jail representative be present at collaborative meetings when determining SBC mental health care program specifics that include the Jail.  A further recommendation is that the Jail update policies and procedures section 609 correctly and reflective of a working mental health care system.

**R28**. F1-F8, F16, F25, F26, F27, F28, F29, F30, F31, F34.  BH should no longer provide one-way directives to the jail or other agencies as LE, HHH ED, that significantly impact the other's resources.  The January 2016 directive to the Jail should be rescinded and re-negotiated and re-established in a collaborative manner.  If this includes union bargaining members, the BOS and its council should be notified, consulted and involved.

**R29**.  F1, F25-F31, F34.  Recommended that related elected officials consider augmenting Jail psychiatric mental health care, either temporarily or permanently, by expanding the existing CFMG medical health care contract.  CFMG currently offers this service and SBC currently is in contract with CFMG for other medical care.
.
**R30**.  F1, F4, F5, F7, F14, F28, F29, F30, F34.  The recommendation is that every action is taken to eliminate significant delays at the Jail, including but not limited to, policies that exclude BH from being called into the Jail overnight, weekends or holidays until such time that SBC's mental health care program is viable.  Also, until such time when it is determined conclusively by further investigation that WIC 5150s released from the ED are no longer turning up at the jail needing BH to *complete a previously*

115

*truncated* assessment and/or from making arrangements for an appropriate psychiatric evaluation and treatment plan.

**R31**.  F1, F28, F29, F30, F31, F33, F34.  BOS consider looking elsewhere for the Jail's mental health (inpatient or outpatient) needs as it does with other medical needs and establish a contract with an outside private facility to refer patients that will agree to work during the night to meet the SBC goals to work to achieve sound mental health care for inmates.  If current BH union staff does not wish to assess inmates as needed, not simply adopting a procedure based on the minimums of related law, other resources should be used or shifted, and perhaps BH staff decreased.

**R32**.  F1, F4, F7, F8, F9, F10, F12, F18, F23, F24, F32.  Recommend that a milestone be that the 72-hour hold is no longer significantly extended after finding a bed and transportation is the only consideration left. BOS should allocate funds from the county's general fund and request, through the Council of Government, that City of Hollister funds also is allocated this year for either BH or SBHCD (HHH) to manage for transport. After locating a patient bed, transport of mental health patients should be readily accessible, efficient, safe and conducted as soon as possible for the patient. The amount of funds needed annually approximates $300,000. It is understood this expenditure can reduce as state-funded facilities (such as a PHF) are established in SBC and wherein SBC can conduct mental health *evaluations* locally.

**R33**.  F1, F8, F14, F16, F23, F32, F33. BOS establish directed protocol that ensures *no* mental health patient in SBC will forfeit an available bed in another county, to simply be released from the ED specifically due to *lack of transport.*

**R34**.  F1, F24, F33.  BOS and COG evaluate and consult with BH and the Local Transportation Authority (LTA) for possible transport of some types of patients to facilities for voluntary mental health care.

**R35**. F33, F34 Is it recommended that the BOS have research continued to help determine the concerns of the SBC Juvenile Hall (JH) and the SBC Probation Department policies and procedures in mental health care.  Both departments should be consulted and interviewed by independent, nonaligned researchers.  Both departments should also participate in future collaboration and planning. The mandates and policies for the mental health care for minors held in detention and parolees stayed outside the scope of this report only due to time constraints.  Members of the SBC Grand Jury 2015-16 working on this research have volunteered to assist with further impartial research and reporting on the needs and impact on these departments if requested. The SBC Grand Jury Foreperson has 2015-16 has contact information.

**R36.**  F36. Recommend that due to the inherent delays associated with the construction of a Homeless Facility that SBC local government together identify and the BOS approve an area and property ready to allow the building of a psychiatric treatment facility as soon as state assistance is secured.

**R37.** The Grand Jury recommends that the BOS, in conjunction with the Council Of Government, evaluate the use of LTA to assist SBC in transportation as part of a temporary or permanent solution to the inherent and problematic logistics of a Mental Healthcare Program in SBC.

**R38**. F5, F6, F7, F24, F27, F30, F32, F33.   For the good of our community, the SBC BOS establish a committee with members from HHH, BH, City Council, COG, County Jail, LE, Health and Human Services, SBC Probation Department, and **three** representative members *from or appointed by* the BOS.  The initial meetings should validate Grand Jury findings and compare existing research and documentation surrounding the various issues relevant to the departments, agencies and special districts about 5150, and general mental health care management in our county. The Grand Jury recommends these committee members (or representative) ratios to explore viable resolutions and report to the county:

City of Hollister Police Department (HPD)            1
San Benito County Sheriff's Department (SD)          1
Board of Directors, Hazel Hawkins Hospital (HHH)     2
San Benito County Board of Supervisors (BOS)         3
San Benito County Council of Governments (COG)       1
Hollister City Council                               1
SBC Department of Health and Human Services          1
San Benito County Probation Department               1
Behavioral Health Department                         2

A formally established Director should be hired as an unbiased county employee consultant to direct the meetings and mediate and negotiate solutions. The BOS should confer with and select an individual to have knowledge, impartial bias, authority, and ability to travel to Sacramento to meet with relevant state authorities to obtain support and meet with all SBC community agencies ensuring their needs met.  An ad hoc or permanent committee should be formed as soon as possible, and remain working with authority until formalized solutions for a viable public mental health care system are established from the beginning to end to correctly manage individuals in a temporary involuntary hold placed in SBC's responsibility.  No appointees should have cognitive bias from an existing government, agency, or district to avoid counterproductive or ineffective resolution.

**RESPONSES REQUIRED**

*Deliver responses to the findings and recommendations made in this final report to the Presiding Judge of the Superior Court within the following timeframes:*

**Board of Directors, Hazel Hawkins Hospital (HHH) (90 days)**

**San Benito County Board of Supervisors (BOS) (90 days)**

**San Benito County Council of Governments (COG) (90 days)**

**Mayor of Hollister and the City Council of Hollister (COH) (90 days)**

**City of Hollister, Chief of Police Department (60 days)**

**San Benito County, Sheriff (SD) (60 days)**

**SBC, Director of Health and Human Services (HHS) (60 days)**

**SBC, Director of Behavioral Health (60 days)**

**Executive Director, SBC Local Transit Authority (60 days)**

## REFERENCES

The California Welfare and Institution Code, Division 5

California Legislative Information; www.leginfo.legislature.ca.gov

The State of California, California Code of Regulations Title 15, Article 9

The State of California, California Code of Regulations Title 9, Section 6

http://www.lacourt.org/division/mentalhealth/MH0021.aspx

*California Penal Code* http://www.leginfo.ca.gov/.html/
pen_table_of_contents.html

*National reports on the state of mental health care in the United States and California*. www.cdcr.ca.gov

SBC Department of Public Health http://
hhsa.cosb.us
*COMMITMENT ISSUES FOR LAW ENFORCEMENT;* http://www.ncaclea.org/
Commitment%20with%20Forms.pdf

*Civil Commitment in the United States*; http://www.ncbi.nlm.nih.gov/pmc/articles/
PMC3392176/

*Behaviorism and Mental Health*; http://behaviorismandmentalhealth.com/
2014/03/20/involuntary-mental-health-commitments/

More Mentally Ill Persons Are in Jails and Prisons Than Hospitals: A Survey of the States. May 2010, Written by a task force of specialists in LE, MD, MPA.

http://www.treatmentadvocacycenter.org/storage/documents/final_jails_v_hospitals_study.pdf

Cost of not caring: Nowhere to go. THE FINANCIAL AND HUMAN TOLL FOR NEGLECTING THE MENTALLY ILL. *Liz Szabo, USA TODAY*

**AB 1300: Modernizing the Lanterman-Petris-Short Act**
*5150 Involuntary Civil Commitment for Psychiatric Treatment*

The **Lanterman–Petris–Short (LPS) Act** (Cal. Welf & Inst. Code, sec. 5000 et seq.)

One Flew Over the Cuckoos Nest, by Ken Kesey, 1962

California Assembly Bill 348 (AB 348)

*Workplace Violence in Healthcare* https://www.dir.ca.gov/
dosh/doshreg/Workplace-Violence-in-Healthcare/Comments/
psych_bed_data_2014.pdf

Lexipol, LLC
6B Liberty, Suite 200
Aliso Viejo, CA 92656

LPS 24-hour Facilities, by county in CA http://
www.dhcs.ca.gov/services/MH/Documents/LPS-24hr.pdf

## Officials and Management Distribution Reports Summary:

**County Park Pedestrian Safety**
Responses Due:
*The City Council of Hollister (90 days to respond)
*San Benito County Office Board of Supervisors (response required within 90 days)

## The San Benito County Special Education Local Plan Area Individualized Education Program (IEP)
Response Due:
*Board of Directors, Hollister School District (response required within 90 days)

**Gophers at School in Hollister School District**
Responses Due:
*Board of Directors, Hollister School District   (response required within 90 days)

**"The Jewel on the Hill" Hazel Hawkins Memorial Hospital Emergency Department**
Responses Due:
*Hazel Hawkins Memorial Hospital Board of Directors (response required within 90 days)
*Board of Supervisors, County of San Benito (response required within 90 days)

**A California Payment Method for Procurement "CAL-Card" in Hollister Government**
Responses Due:
*The City Council of Hollister (90 days to respond)

**San Benito County Jail**
Responses Due:
*San Benito County Office Board of Supervisors (response required within 90 days)
*San Benito County Sheriff's Office (response required within 60 days)

**San Benito County Juvenile Hall**
Responses Due:
*San Benito County Office Board of Supervisors (response required within 90 days)

**Psychiatric Hold and Treatment SBC issues in Public Healthcare**
Responses Due:
*Board of Directors, Hazel Hawkins Hospital (HHH) (90 days)
*San Benito County Board of Supervisors (BOS) (90 days)
*San Benito County Council of Governments (COG) (90 days)
*Mayor of Hollister and the City Council of Hollister (COH) (90 days)
*City of Hollister, Chief of Police Department (60 days)
*San Benito County, Sheriff (SD) (60 days)
*SBC, Director of Health and Human Services (HHS) (60 days)
*SBC, Director of Behavioral Health (60 days)
*Executive Director, SBC Local Transit Authority (60 days)

**Send Responses To:** Honorable Sanders, Presiding Judge San Benito County Superior Court 450 Fourth Street, Hollister, CA 95023

121